UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
                                 :

UNITED STATES OF AMERICA et al.,       :
                                 :

             Plaintiffs,         :

                                 :         22-cv-10313 (LJL)
        -v-                    :         22-cv-00751 (LJL)

                                 :

LABQ CLINICAL DIAGNOSTICS, LLC et al.,  :

                                 :       OPINION AND ORDER

            Defendants.      :

                                 :
---------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __3/24/2025__

LEWIS J. LIMAN, United States District Judge:

       The United States of America (the "Government") applied, pursuant to the Federal Debt

Collection Practices Act ("FDCPA"), for writs of garnishment and writs of attachment

(collectively, the "Writs") directed to LabQ Clinical Diagnostics, LLC ("LabQ"), Community

Mobile Testing, Inc. ("CMT"), Dart Medical Laboratory, Inc. ("Dart," and with LabQ and CMT,

the "LabQ Corporate Defendants"), and Moshe Landau (together with the LabQ Corporate

Defendants, the "Defendants"). Dkt. Nos. 31, 171. The Court granted and issued those Writs.

Dkt. Nos. 60–95, 176, 241–298. Defendants have now moved to quash the Writs. Dkt. No. 182.

       The Court conducted an evidentiary hearing pursuant to 28 U.S.C. § 3101(d) on

December 19, 2024. *See* Dkt. No. 313 ("Hearing Transcript"). Upon consideration of the briefs,

the evidence presented, and argument of counsel, the Court finds that the Government has

complied with the statutory requirements for issuance of the prejudgment remedy under the

FDCPA, 28 U.S.C. § 3001, *et seq*. The Government has established, and Defendants have not

undermined, the probable validity of the Government's claims under 31 U.S.C. § 3729(a)(1)(A)

and (B) of the False Claims Act ("FCA") and the right of the Government to recover what is

demanded in its application. The Government has established reasonable cause to believe that

Defendants, as debtors, prior to issuance of the Writs, had or were about to assign, dispose, conceal, or encumber property "with the effect of hindering, delaying, or defrauding the United States." 28 U.S.C. § 3101(b)(1)(B), (C). The Government has also established a compelling need and exigent circumstances supporting the requested prejudgment remedies to secure its claim of debt. Defendants' request to quash the Writs is accordingly denied.

At this prejudgment stage, because the Government's Writs are independently supported by its claims under 31 U.S.C. § 3729(a)(1)(A) and (B), the Court need not assess the probable validity of claims arising under 31 U.S.C. § 3729(a)(1)(G) or under the common law.

## BACKGROUND

### I.    Parties

LabQ is a New York limited liability company which owns and operates laboratories located in Budd Lake, New Jersey and in Brooklyn, New York. Intervenor Complaint, Dkt. No. 11 ("Compl.") ¶ 16. Among other activities, it performs COVID-19 testing. *Id.*

Dart is a diagnostic laboratory company located in New York. Compl. ¶ 17.

CMT is a New York company that operated over one hundred "LabQ Mobile Testing Sites" in New York City. Compl. ¶ 18.

Moshe Landau is a 30% member of LabQ and, because LabQ is the sole shareholder of Dart, Landau through LabQ is a 30% owner of Dart; he is also the majority owner of CMT. Dkt. No. 32, Declaration of Lu Tszyan-Dai ("Tszyan-Dai Decl.") ¶ 11; Dkt. No. 32-2, Deposition of Moshe Landau, First Excerpt ("Landau Dep. I") at 18:3–19:2. He is the Chief Executive Officer ("CEO") of each of the LabQ Corporate Defendants. Compl. ¶¶ 15–18.

### II.    HRSA's Uninsured Program

On March 11, 2020, the World Health Organization declared the COVID-19 outbreak a global pandemic. Dkt. No. 182 at 4. The United States experienced over 100 million cases of

COVID-19, with over 1.1 million deaths.  *Id*.  New York City alone faced over 3.25 million

cases of COVID-19, with over 45,000 deaths.  *Id*.  As late as January 1, 2022, New York State

recorded 114,082 new COVID-19 cases—its highest number of new cases in a single day.  *Id*.

In response to the public health emergency caused by the global COVID-19 pandemic,

Congress passed the Families First Coronavirus Response Act ("FFCRA") on March 18, 2020,

which appropriated $1 billion to the Public Health and Social Services Emergency Fund to

reimburse healthcare providers for COVID-19 testing claims of "uninsured individuals."  The

FFCRA defined uninsured individuals as:

> an individual who is not enrolled in—
>
> (1) a Federal health care program (as defined under section  1128B(f) of the Social
> Security Act (42 U.S.C. 1320a-7b(f)), including an individual who is eligible for medical
> assistance only because of subsection (a)(10)(A)(ii)(XXIII) of Section 1902 of the Social
> Security Act; or
>  (2) a group health plan or health insurance coverage offered by a health insurance issuer
> in the group or individual market (as such terms are defined in section 2791 of the Public
> Health Service Act (42 U.S.C. 300gg-91)), or a health plan offered under chapter 89 of
> title 5, United States Code.

Division A, Pub. L. No. 116-127, 134 Stat. 182 (2020); s*ee* Dkt. No. 40, Declaration of

Alexandra Huttinger ("Huttinger Decl.") ¶¶ 7–8.  Another provision of the FFCRA required

private insurers to cover testing for COVID-19 without cost-sharing or prior authorization

during the emergency period which began with the enactment of the FFCRA.  Sec. 6001

(Division F), Pub. L. No. 116-127, 134 Stat. 182 (2020).  On March 27, 2020, Congress passed

the Coronavirus Aid, Relief and Economic Security Act ("CARES Act"), which appropriated

$100 billion to the Public Health and Social Services Emergency Fund for healthcare providers

"for health care related expenses or lost revenues that are attributable to coronavirus."  Pub. L.

No. 116–136, 134 Stat. 281 (2020).  The Department of Health and Human Services ("HHS")

created the Provider Relief Fund ("PRF") using these funds.  Huttinger Decl. ¶ 9.  Additional amounts were appropriated through the Paycheck Protection Program and Health Care Enhancement Act ("PPPHCEA"), Pub. L. No. 116-139, 134 Stat. 620 (2020), and the American Rescue Plan Act of 2021 ("ARPA"), Pub. L. No. 117-2, 135 Stat. 40.  *Id.* ¶ 10.  The Secretary of HHS allocated a portion of funding from the CARES Act, PPPHCEA, and ARPA to support healthcare-related expenses attributable to COVID-19 testing for the uninsured. *See id.* ¶ 11.

HRSA, an agency within HHS, established and administered the program to reimburse providers who tested individuals without healthcare coverage, formally titled *The COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured Program*, often known as the "Uninsured Program" (hereafter, "the Uninsured Program" or "UIP").  Huttinger Decl. ¶¶ 2, 12.  HRSA contracted with UnitedHealth Group to help administer the Uninsured Program.  *Id.* ¶ 13.  Since 2022, HRSA's contract has been with OptumServe Technology Services, Inc. ("Optum"), a division of UnitedHealth.  *Id.*

### A.    UIP Regulations

The UIP began accepting claims on May 6, 2020.  Dkt. No. 182 at 10.

The submission of claims to the Uninsured Program involved several steps.  Huttinger Decl.  ¶ 14.  As an initial step, a healthcare provider wishing to participate in the Uninsured Program was required to enroll through an online portal known as the "UIP Portal."  *Id.*

After enrolling, a healthcare provider could administer tests covered by the Uninsured Program.  To be reimbursed for a test, the provider was required first to submit the patient's name and identifying information on a patient roster through the UIP Portal.  *Id.*  Each patient roster generally included a number of "rows," with each row representing a separate claim for an individual patient—if a provider submitted claims for the same patient on multiple occasions, the

4

same individual would be reflected in different "rows." *Id.* ¶ 30 n.5. For the patient roster to be accepted, the provider was also required to complete a Patient Roster Attestation (the "Attestation"). *Id.* The Attestation consisted of boxes that the providers had to check in order to upload the patient roster. *Id.* Among other terms, it required the provider to attest to the following:

> I have read and agree to the applicable HRSA COVID-19 Terms and Conditions [link to Terms and Conditions]. I attest that I am authorized to agree to these terms on behalf of the provider with the Tax Identification Number associated with this attestation.

> I attest that I have checked for health care coverage eligibility and confirmed that the patient is uninsured, and does not have employer-sponsored or individual coverage, Medicare or Medicaid and that no other payer will reimburse for COVID-19 testing or care for the patient.

> I agree that I will accept the defined program reimbursement, as determined and/or adjustment by Health Resources & Services Administration (HRSA), as payment in full and will not balance bill the patient. I further understand that reimbursement is subject to available funding for the program.

Dkt. No. 40-1 at ECF p. 2.

The applicable Terms and Conditions for Testing or Treatment Services were hyperlinked to the Attestation. *Id.* Until on or about May 31, 2021, the Terms and Conditions provided in relevant part that: "[the provider] . . . certifies that to the best of its knowledge, the patients identified on the claim form were FFCRA Uninsured Individuals at the time the services were provided." Huttinger Decl. ¶ 18.[1] "FFCRA Uninsured Individuals" were defined as individuals who, "as of the date of service for which Recipient seeks Payment, are not enrolled in [a] Federal health care program . . . .. . or [a] group health plan or health insurance coverage

---

[1] https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/terms-conditions-ffcra-relief-fund.pdf

offered by a health insurance issuer in the group or individual market," *id.*, mirroring the language of the FFCRA, Pub. L. No. 116-127, 134 Stat. 182 (2020) (supra).

On or about May 31, 2021, HRSA updated the language of its Terms and Conditions. *Id.* ¶ 19. The updated Terms and Conditions provided that: "The [provider] . . . certifies that to the best of its knowledge, the patients identified on the claim form were Uninsured Individuals at the time the services were provided." *Id.*[2] That sentence was identical to the prior version of the Terms, except for the removal of "FFCRA" as a modifier for "Uninsured Individuals." *Id.* "Uninsured Individuals" were then defined as "individuals who do not have *any* health care coverage at the time the services were provided." *Id.* (emphasis added).

Both versions of the Terms and Conditions included the following language:

> The Recipient acknowledges that each time the Recipient submits such claims for reimbursement, each claim must be in full compliance with these Terms and Conditions, and submission of those claims confirms the Recipient's ongoing compliance with these Terms and Conditions. The Recipient acknowledges that the Recipient's full compliance with all Terms and Conditions is material to the Secretary's decision to disburse funds to the Recipient. Non-compliance with any Term or Condition is grounds for the Secretary to recoup some or all of the payments made.

Huttinger Decl. ¶ 20[3]; *see also* Dkt. No. 184-9 at ECF pp. 2, 13, 24.

Both versions also provided that:

> [The provider] certifies that it will not use the [Uninsured Program payment] to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse. If the [provider] subsequently receives reimbursement for any items or services for which the [provider] requested Payment from the [Uninsured Program], the [provider] will return to HHS that

---

[2] https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/terms-conditions-uninsured-relief-fund.pdf
[3] Prior to May 31, 2021: https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/terms-conditions-ffcra-relief-fund.pdf. After May 31, 2021: https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/terms-conditions-uninsured-relief-fund.pdf.

portion of the Payment which duplicates payment or reimbursement from another
source.

Huttinger Decl. ¶ 18.[4]

After a provider attested to compliance with the above program requirements and
submitted its patient roster, but before the provider could submit a claim, Optum, the division of
UnitedHealth with which HRSA contracted to administer the Uninsured Program, performed
patient insurance eligibility checks on behalf of HRSA. Huttinger Decl. ¶¶ 13, 21. HRSA
established the processes that Optum followed when conducting patient insurance eligibility
checks. *Id*. Specifically, Optum was to use a "health insurance coverage validation process to
check for third-party health insurance coverage based on available internal and external data."
Dkt. No. 184-14, HHS Office of Inspector General ("OIG") Audit Report, A-02-21-01013 (July
2023) at 4 ("OIG Audit Report").

If Optum's eligibility check did *not* identify health insurance for an individual on a
patient roster, Optum would assign the patient a Temporary Patient ID (also referred to as a
"Temporary Member ID"). Huttinger Decl. ¶ 22. Conversely, if Optum found that a patient
included in a roster had insurance on the date of service, it would not issue a Temporary Patient
ID. *Id.* Optum was only able to check for insurance for patients whose Social Security Numbers
("SSNs") had been included in patient rosters submitted by providers. *Id.* ¶¶ 21, 33. If no SSN
was submitted, Optum, on behalf of HRSA, was unable to match new rows in Patient Rosters
with previously submitted rows or determine whether patients were insured. *Id*. ¶ 33; OIG Audit
Report at 4. As a result, Optum could deny reimbursement for a patient associated with a

---

[4] At some unspecified point in time, HRSA's FAQs noted that "[t]he program identifies
overpayments and has a process in place to collect the overpaid funds from future claims
payments related to the HRSA COVID-19 Uninsured Program. Alternatively, providers who
self-identify an overpayment can send a check to return the funds." *See* Dkt. No. 184,
Declaration of Laurie A. Allen ("Allen Decl."), Dkt. No. 184-11 at ECF p. 4.

specific SSN because the patient had insurance coverage, but if a provider later resubmitted a claim for a patient with the same name, same date of birth, and same date of service but did not include an SSN, Optum would assign a Temporary Patient ID.  Huttinger Decl. ¶ 33.  Providers could then seek reimbursement for the ineligible claim through Uninsured Program.  *Id.*  The Government does not allege that Defendants or other providers knew at the time of the UIP's operation that Optum was only able to check patient eligibility when SSNs were submitted.

Once a Temporary Patient ID was provided, the provider could then submit a claim for reimbursement to the Uninsured Program.  *Id.* ¶ 23.  Claims submissions to the Uninsured Program were made through the Medicare Electronic Data Interchange ("MEDI"), a system widely used by healthcare providers.  *Id.*  Claims for COVID-19 testing submitted to the MEDI that were not accompanied by a valid Temporary Patient ID were rejected.  *Id.*; OIG Audit Report at 5.

At HRSA's direction, Optum conducted post-payment retrospective eligibility checks of patients for whom providers submitted SSNs.  These retrospective checks were conducted thirty, sixty, and ninety days after a claim was paid to identify whether the patient had health insurance coverage on the date that the patient received the COVID-19 service.  If such a post-payment eligibility check indicated that the patient had health coverage on the relevant date of service,[5] HRSA's policy was to offset future claims submitted by the provider by the improperly or erroneously paid amount.  *Id.* ¶ 36.  Providers received notice of rejected claims from Optum, Huttinger Decl. ¶ 25; Dkt. No. 32-38, and had notice of the offset policy, Dkt. No. 184-11 at

---

[5] The Huttinger declaration does not specify whether Optum's retrospective check was for health insurance coverage generally, or coverage for COVID-19 tests within general health insurance coverage.

ECF p. 4.[6]  Providers could also submit "cancellation claims" to HRSA to cancel claims previously submitted to the Uninsured Program if, for instance, the provider later identified the individual as insured.  Huttinger Decl. ¶ 38.

   B.    **HRSA "Frequently Asked Questions" and Guidance**

   HRSA published "Frequently Asked Questions" ("FAQs") on the Uninsured Program website.  Mirroring the language of the attestations, the FAQs noted that providers must attest that "[t]hey have checked for health care coverage eligibility and confirmed that the patient is uninsured. They have verified that the patient does not have coverage such as individual, employer-sponsored, Medicare or Medicaid coverage, and no other payer will reimburse them for COVID-19 testing and/or care for that patient."  *See id.* ¶ 25 n.3 (quoting *FAQs* (published April 29, 2020, prior to the opening of the Uninsured Program portal)).

   Later FAQs had somewhat more expansive language.  They included the following guidance:

> **Who is considered to be an "uninsured individual" for purposes of providers requesting reimbursement for testing, treatment, or vaccine administration?**
> For claims for COVID-19 testing and Testing-Related Items and Services, a patient is considered uninsured if the patient does not have coverage through an individual, or employer-sponsored plan, a federal health care program, or the Federal Employees Health Benefits Program at the time the services were rendered.

Huttinger Decl. ¶ 25 n.3 (quoting *FAQs for COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment and Vaccine Administration FAQs* (published May 8, 2020)).  Shortly thereafter, HRSA published a slightly revised FAQ, which noted:

> **Who is considered to be an "uninsured individual" for purposes of providers requesting reimbursement for testing, treatment, or vaccine administration?**
> For claims for COVID-19 testing and testing-related items and services, treatment of positive cases of COVID-19, and vaccine administration claims, a patient is

---

[6] The Terms and Conditions note that "[n]on-compliance with any Term or Condition is grounds for the Secretary to recoup some or all of the payments made."

considered uninsured if the patient did not have *any* health care coverage at the time services were rendered.

Huttinger Decl. ¶ 25 (quoting *FAQs for COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment and Vaccine Administration FAQs* (published May 2020)) (emphasis added). An FAQ published one year after the program commenced stated:

> **What if a provider submitted a claim to the HRSA COVID-19 Uninsured Program and the patient is actually underinsured?** If a claim was submitted to the HRSA COVID-19 Uninsured Program for a patient who was actually insured, the provider should receive a notice that the claim was not eligible for reimbursement.

Huttinger Decl. ¶ 25 (quoting *FAQs for COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment and Vaccine Administration FAQs* (published June 2021)).

HRSA provided limited guidance regarding what it meant for the provider to "confirm" that a patient was uninsured. The Uninsured Program's website, in a section titled "Attestation," included the following for providers with direct contact with the patient:

> As part of this step, if you have direct contact with the patient, you should make *best efforts* to confirm that the patient was uninsured at the time the services were provided (i.e., *for claims for COVID-19 Testing and Testing-Related Items and Services*, verify that the patient *does not have coverage* through an individual or employer-sponsored plan, a federal health care program, or the Federal Employees Health Benefits Program; for claims for treatment of a COVID-19 diagnosis, verify that the patient did not have any health care coverage; for COVID-19 vaccine administration, verify that the patient did not have *any* health care coverage). If you do not have direct patient contact, you may rely on the attestation of the ordering health care provider that the patient's health coverage status is uninsured.

Huttinger Decl. ¶ 26 (quoting *Uninsured Program Patient Roster Attestation Webpage*) (emphasis added).[7]

---

[7] https://coviduninsuredclaim-stage.linkhealth.com/patient-details.html.

The same website provides a list of personal identifying information required for each individual on the Patient Roster, including first and last name, date of birth, gender, date of service, etc.  Amongst those identifiers, social security number and state of residence are listed with an asterisk, which directs the reader to the following elaboration:

> A SSN and state of residence, or state identification / driver's license is needed to verify patient eligibility.  If a SSN and state of residence, or state identification / driver's license is not submitted, you will need to attest that you attempted to capture this information before submitting a claim and the patient did not have this information at the time of service, or that you did not have direct contact with the patient and thus did not have an opportunity to attempt to capture this information.

*Id*.

The May 2021 FAQs had somewhat more relaxed language.  They accepted the notion that SSNs and state of residence might not be available even for a patient with whom the provider had direct contact and instructed that, if such information was not available, the provider should obtain the patient's state identification or driver's license, explaining that this information was "needed only for the purpose of verifying insurance status."  Huttinger Decl. ¶ 27.  If a provider could not obtain that information, it was required "to attest that [it] attempted to capture this information before submitting a claim."  *Id*.  A fact sheet issued by HRSA stated that free COVID-19 testing, treatment and vaccines would be provided to "[a]nyone without health insurance, no matter their immigration status.  A Social Security Number and/or government ID may be requested, but it is **NOT** required."  Dkt. No. 192-4 at 2.

### C.    Reimbursement

The Uninsured Program generally reimbursed providers at rates published by the Centers for Medicare and Medicaid Services ("CMS"), which published Healthcare Common Procedure Coding System ("HCPCS") codes that were used in providers' electronic claims submissions to the Uninsured Program.  Through these HCPCS codes, providers identified the specific services

11

rendered.  The Uninsured Program reimbursed providers as much as $100 for providing a

COVID-19 test, and an additional $23.46 for the collection of a specimen.  Huttinger Decl. ¶ 24.

These rates generally were lower than the reimbursement rates provided through private

insurance. Dkt. No. 192, Declaration of Esther Wurzberger ("Wurzberger Decl.") ¶ 10.

The Uninsured Program could only reimburse providers using the funds that had been

appropriated by Congress, and providers were on notice that reimbursement was subject to

available funding.  Dkt. No. 401; Dkt. No. 187, Declaration of David Glusman ("Glusman

Decl.") ¶ 62 n.65.[8]

On March 16, 2022, HRSA informed providers that the Uninsured Program would stop

accepting new claims for COVID-19 testing and treatment on March 22, 2022, due to a lack of

sufficient appropriated funds.  Huttinger Decl.  ¶ 28.  Other than that six-day period, HRSA

provided no advance notice to providers or patients that the government was going to close the

program.  Glusman Decl. ¶ 44; Wurzberger Decl. ¶ 86.

## III.    Defendant's Participation in the Uninsured Program

### A.    The Growth of the Testing Business

Moshe Landau opened a laboratory business in 2019 and, at that time, primarily provided

blood testing to nursing home patients.  Tszyan-Dai Decl. ¶ 16.  He began providing COVID-19

testing soon after the pandemic began.  Dkt. No. 182 at 7.  Each of the LabQ Corporate

Defendants had distinct functions within Landau's COVID-19 testing business: LabQ was the

public-facing provider that performed COVID-19 testing for tens of thousands of patients,

including for private clients and patients who walked up to testing tents and trucks, Tszyan-Dai

---

[8] The HRSA FAQ included the following language: "Are these claims subject to timely filing
limits?  Yes, for the HRSA COVID-19 Uninsured Program, claims must be submitted within 365
calendar days from the date of service or admittance, and are subject to available funding."
https://coviduninsuredclaim-stage.linkhealth.com/frequently-asked-questions.html.

Decl. ¶¶ 12, 19–20; Dart was utilized by Defendants to bill claims to the Uninsured Program and other health insurers, *see id.* ¶ 13; and CMT collected testing specimens from patients at LabQ-branded vans and tents throughout New York City, *see id.* ¶ 14. Landau was the CEO and owner (or part-owner) of all three companies, ultimately responsible for all aspects of their operations, including the way they billed their COVID-19 testing claims. *See id.* ¶¶ 11, 15.

Before the Uninsured Program opened, in 2019, LabQ earned "[l]ess than a few million." Tszyan-Dai Decl. ¶ 16 (citing Landau Dep. I. at 43:9-12). In 2020, the year the Uninsured Program opened, LabQ's income increased to over $10 million. Dkt. No. 32-9 (reflecting LabQ's 2020 income). In 2021, LabQ earned over $116 million. Dkt. No. 32-10 (reflecting LabQ's 2021 income). Ultimately, LabQ administered approximately 4.3 million COVID-19 tests, *see* Wurzberger Decl. ¶ 26, of which over 2.5 million were ultimately billed to private insurers, *id.*; Hearing Transcript at 43:21–25.

In May 2020, Defendants, through Dart, began billing COVID-19 testing claims to the Uninsured Program. Dkt. No. 42 at 9. In total, Dart submitted 3,932 patient rosters composed of 1,469,189 patient rows to the Uninsured Program. Huttinger Decl. ¶ 31. Between May 2020 and the close of the Uninsured Program in March 2022, HRSA paid 1,114,245 claims submitted by Dart to the UIP, with a total value of $131,649,783.98. Dkt. No. 36, Declaration of Karen Lowe ("Lowe Decl.") ¶ 5.

LabQ alleges that by the time the program ended in March 2022, LabQ had administered hundreds of thousands of COVID-19 tests that it believed qualified for reimbursement but for which it had not yet submitted claims to the UIP. Wurzberger Decl. ¶ 86.

### B.    LabQ's Different Business Lines

Defendants generated revenue through three business lines. *See* Tszyan-Dai Decl. ¶ 17–20. First, LabQ entered into agreements with institutional customers (the "Private Clients")

whereby LabQ agreed to provide COVID-19 testing to these institutions' beneficiaries (for example, their employees) in exchange for a fixed price paid by the institution on a per-test basis. *Id.* ¶ 18; *see also* Dkt. No. 32-11.  In the ordinary course, Defendants did not bill the UIP or private health insurance for such tests, because Private Clients paid Defendants directly. Wurzberger Decl. ¶ 18, 28, 69–70.  This business line constituted only 6% of Defendants' business.  *Id.* ¶ 69.

Second, LabQ entered into agreements with individuals and companies that, in turn, secured relationships with institutions (the "Referral Clients") for whom LabQ provided COVID-19 testing at no cost to the institutions.  Tszyan-Dai Decl. ¶ 19; *see also* Dkt. No. 32-12. LabQ billed the Uninsured Program and other payors for the tests administered via the Referral Clients.  *Id.* ¶ 31.

Third, LabQ provided COVID-19 testing to patients (the "Walk-Up Patients") at numerous LabQ-branded vans and tents located on public streets in New York City, known as LabQ Mobile Testing Sites.  *Id.* ¶ 20.  Those sites, operated by CMT employees or other LabQ representatives, collected specimens from patients.  *Id.*  LabQ would then perform COVID-19 testing on these specimens and return the results to the patients.  *Id.*  Dart sought and received reimbursement from the Uninsured Program for many of the tests performed pursuant to this business line.  *Id.*

### C.    "Checking" Insurance Information

#### 1.    Insurance Collection

LabQ and CMT generally provided Mobile Testing Site patients with intake forms that contained fields where patients could input their insurance information.  Dkt. No. 182 at 8; Compl. ¶ 74.  When Defendants first launched mobile testing sites in late 2020, shortly after the Uninsured Program was created, they required paper forms to be completed before a test was

14

administered.  Dkt. No. 183, Declaration of Daniel Adar ("Adar Decl.") ¶ 15.  In approximately

December 2020, Defendants adopted an electronic intake and patient-registration system called

IntakeQ, which called for patients to take a photograph of their insurance card using a tablet

provided at the test site.  Adar Decl. ¶ 17; Wurzberger Decl. ¶ 38.  For a period of time, intake

could be done either on a paper form or through IntakeQ.  Dkt. No. 185, Declaration of Eliona

Doci ("Doci Decl.") ¶¶ 30, 40.  In late August 2021, Defendants upgraded to GoMeyra, a third-

party web application that required patients to upload images of their insurance cards and

driver's licenses often on a tablet provided at the site and required patients to sign an attestation

if they claimed not to have insurance.  Adar Decl. ¶¶ 19–23; Doci Decl. ¶¶ 37–39; Wurzberger

Decl. ¶¶ 38–41.  The IntakeQ form, at least in the version provided by Defendants, does not

include a field for SSN.  Doci Decl. ¶ 33; Dkt. No. 185-1.

Patients were guided in the use of these forms by LabQ and CMT employees at the

testing sites.  Doci Decl. ¶¶ 24–26.  These employees—known internally as "technicians"—

received training from LabQ and CMT managers concerning how they were to handle patients

that appeared at LabQ Mobile Testing Sites.  *Id*. ¶¶ 22–24.  The parties dispute the instructions

given to the technicians regarding the collection of insurance information.  Defendants have

submitted the declaration of Eliona Doci, a testing site manager, who states:

> As part of the training, employees were taught that they were to collect insurance
> information, and how to accurately collect insurance information. . . . If a patient
> said that they did not have insurance, or failed to provide insurance information,
> employees were trained to ask patients for a State ID so that insurance discovery
> and verification could be conducted. . . . Employees were advised to not turn
> patients away if they stated they did not have health insurance, and employees were
> to test everyone, with or without insurance, and despite their immigration or legal
> status.

Doci Decl. ¶¶ 24–26.

However, the Government has submitted the declarations of two former LabQ employees, including former co-CEO of LabQ, Steve Kamalic, who attest that insurance collection did not take place systematically at the point of testing.  Dkt. No. 38, Declaration of Steve Kamalic ("Kamalic Decl."); Dkt. No. 41, Declaration of Frank Carlo ("Carlo Decl.").  Kamalic was employed by LabQ from September 15, 2021, to December 15, 2021.  Kamalic Decl. ¶ 1.  Kamalic was engaged by LabQ after having served as the Chief Operating Officer of two laboratory and diagnostic companies.  *Id.*  Kamalic was told by LabQ mobile testing employees in September or early October 2021 that the managers of LabQ's mobile testing sites had "instructed them not to collect patients' insurance information before taking a COVID test at LabQ's mobile testing sites."  *Id.* ¶ 7.  According to Kamalic, "over the course of my three-month employment with LabQ, approximately 10 to 15 mobile COVID-testing employees told me that Weiss or Eilona [sic] [Doci] instructed them not to collect patient insurance information.  [Esther] Wurzberger and [Daniel] Adar confirmed that LabQ rarely asked for insurance information from patients at LabQ's mobile COVID-testing sites and billed patients lacking such information to the Uninsured Program."  *Id.*

Another employee, Frank Carlo, worked for LabQ between October 2022 and May 2023 as a Billing Specialist in the Insurance Verification Department.  Carlo Decl. ¶ 1.  According to Carlo, his role was primarily to "attempt[] to collect and/or verify insurance information for people who took COVID-19 tests from LabQ dating as far back as early 2021," because in the wake of the UIP closure, LabQ wanted Carlo to "go back and see if any of the patients that had been tested for COVID-19 by LabQ had valid insurance when LabQ administered their tests."  *Id.* ¶ 3–4.  Most of the patients whose information he sought out had been tested by LabQ in 2021.  *Id.* ¶ 8.  Carlo declares that he "had the opportunity to speak to many individuals over the

phone who received COVID-19 testing through LabQ." *Id.* ¶ 11.  "Almost all of them said that

they were told by LabQ that they did not need to give insurance information." *Id.*  "Patients

reported that they were told by LabQ that COVID-19 testing was paid for by the government and

that testing was free." *Id.*

The Government has submitted evidence that in addition to their failure to collect

insurance information at Mobile Testing sites, Defendants also failed to systematically collect

insurance information from Referral Clients, which were generally institutions like schools for

which Defendants would have had more streamlined points of contact.  Tszyan-Dai Decl. ¶ 31;

Dkt. Nos. 32-16, 32-17, 32-18.  In the Government's proffered example, on October 18, 2021, a

LabQ sales representative told an independent contractor responsible for a Referral Client (a

New Jersey Town Board of Education) that information such as a patient's name, date of birth

and phone number was "[r]equired" but insurance information was merely "[p]referred."  Dkt.

No. 32-16.  A subsequent attachment to that thread provided LabQ with a list of seventy-seven

school district patients (such as teachers, paraprofessionals, substitutes, bus drivers, contract

workers, and interns) but provided none of their insurance information.  Dkt. No. 32-17.  Later,

an internal LabQ document reporting on the uninsured rate for Referral Clients showed that

Defendants subsequently billed almost 75% of the COVID-19 testing claims on behalf of that

school district's beneficiaries—426 in total—to the UIP, as they categorized these patients as

"[u]ninsured" in their own internal document.  Dkt. No. 32-18, *see* row 78 at ECF p. 3.  That

example does not appear to be an outlier.  In April 2022, after the UIP ended, Moshe Landau

received an analysis conducted by LabQ that showed that LabQ was classifying an enormous

percentage of its Referral Client patients as uninsured.  *See* Tszyan-Dai Decl. ¶ 36(e)(ii); Dkt.

No. 32-18.  Of the 184,327 COVID-19 tests performed on behalf of 373 of Referral Clients, 75%

of the tests were purportedly performed for uninsured patients.  *See* Tszyan-Dai Decl. ¶ 36(e)(ii);

Dkt. No. 32-18.  Many of the listed Referral Clients are schools and school districts.  *See*

Tszyan-Dai Decl. ¶ 36(e)(ii); Dkt. No. 32-18.

In an email exchange from March 7, 2022, just before the Uninsured Program ended, one

of LabQ's billing managers emailed LabQ leadership suggesting that they should change

practices.  Dkt. No. 32-19.  The manager stated:

> Billing is spending a tremendous amount of money paying an outside vendor to obtain the insurance information for our patients.  Now that our Covid testing volume has dropped off, I feel now that our mobile sites and Labq locations can *start* asking for insurance information if not given in advance for every patient that comes to be tested.

*Id.* (emphasis added).  The same employee followed up in the same thread the next day, stating:

> What if we add wording in GoMerya patient registration, in the insurance section? "Your insurance will be billed for Covid testing, but there will be no patient responsibility expense i.e deductible, coinsurance, or copay." or however you want to word it.  I can't tell you the amount of phone calls billing receives for patients upset that they were unaware that their insurance was going to be billed for Covid testing.

Dkt. No. 32-19.

## 2.    Insurance Discovery and Verification

It is undisputed that Defendants used staff resources and hired a third-party vendor,

Tevix, to assist with determining patient insurance status after the point of testing.  Dkt. No. 182

at 8, 20–21; Compl. ¶ 84.  The parties' accounts differ on the significance and the timing of these

efforts.

Defendants attest to engaging in insurance verification prior to the submission of a claim.

Wurzberger Decl. ¶ 10 ("[I]t was not our practice or policy to submit claims to the UIP, as

administered by HRSA, without first checking for insurance, and we had no incentive to bill to

the UIP over private insurance or other government payors."); *id*. ¶ 11 ("Generally, before claims

were submitted to the UIP, they first went through our multi-step insurance verification and discovery process.").

Defendants claim to have to have devoted "enormous resources trying to discover insurance information by manually checking patients against insurance-company websites and hiring multiple third-party vendors for insurance verification and discovery services." Dkt. No. 182 at 9; *see* Wurzberger Decl. ¶¶ 13–14, 17–19, 23–25. Defendants have submitted evidence to support that claim. Defendants' process of insurance discovery evolved over time. At the beginning of the pandemic, all insurance verification was done manually by LabQ employees. *Id.* ¶ 14. LabQ employees searched various insurance web portals using patients' identification information. *Id.* They also used insurance discovery software provider Tevix's online portal for manual checks. *Id.* Around May 2021, Defendants switched processes and began utilizing Tevix's batch automated verification feature. *Id.* ¶ 17. Tevix provided access to information that LabQ employees were not able to access through manual verification processes, such as bank records, and Tevix interfaced directly with insurance companies for verification information. *Id.* At the same time, LabQ employees continued to manually verify insurance where possible before sending to Tevix in an attempt to track down a patient's insurance. *Id.* ¶ 19. Upon receipt, Tevix reviewed the claims and returned five files, including a HRSA-ready file containing claims for patients for which no insurance had been identified and which was formatted specifically for the purpose of requesting a Temporary ID from Optum. *Id.* ¶¶ 20–21. Tevix also returned a "questionable" file, which contained claims for which Tevix was unable to verify insurance or lack thereof. *Id.* ¶ 22. LabQ re-reviewed these claims, which were often associated with dental plans or other partial insurance and, before submitting the claims, would

determine whether to add them to the HRSA-ready files in consideration of whether the patient's insurance would cover COVID-19 testing. *Id.*

During the time period at issue, LabQ spent more than $5 million on third-party vendors to develop and implement patient intake, insurance verification, and insurance discovery systems and processes. *Id.* ¶ 24. Defendants offer no breakdown of the allocation of this investment between intake processes like GoMeyra and insurance discovery processes like Tevix. LabQ also spent over $3 million in payroll to employees who conducted insurance verification. *Id.* ¶ 25.

Defendants do not dispute that the results of these efforts were imperfect. During intake, patients would often give inaccurate information, whether purposeful or inadvertent, making insurance verification extremely difficult. *Id.* ¶ 37. When patients filled out physical intake forms by hand, entries were sometimes illegible or contained inaccurately entered information, making verification difficult. *Id.* ¶ 38. Even with the IntakeQ system, there was significant room for human error as the patient manually entered their information. *Id.* Defendants attest that LabQ made efforts to identify the most reliable insurance discovery vendor by sending the same batch of claims to multiple verification services, including Waystar and Change Healthcare in addition to Tevix. *Id.* ¶ 23. Tevix's success rate was the highest as it searched the widest variety of sources, but its success rate was still only 20%–30%. *Id.* Insurance portals and/or discovery portals like Tevix would list multiple individuals, and LabQ would have to determine which was the correct patient based on any additional information the patient provided, such as an address or social security number. *Id.* ¶ 16. In addition, during the relevant time period, some insurance portals were more difficult to search than others; for example, Blue Cross Blue Shield worked only upon entry of the patient's accurate member identification number. *Id.* ¶ 15. If

patients did not provide the correct full member identification information, their insurance status was undiscoverable through the portal. *Id*. Similarly, UnitedHealth Care's portal had the option to search by name and date of birth without a member ID, but the portal's search function was not always accurate and at times provided inaccurate results when searching without a member ID. *Id*. LabQ attests that it generally erred on the side of caution. *Id*. ¶ 16.

The Government alleges that for some significant portion of claims, the above "insurance discovery" efforts occurred after, not prior to, Defendants' submission of claims to the Uninsured Program. *See, e.g.*, Tszyan-Dai Decl. ¶ 36(b); Dkt. No. 32-28. LabQ's own co-CEO, Kamalic, has attested that when he reviewed Defendants' billing information, he found that "LabQ used insurance discovery programs like Tevix/Frontrunner very selectively," and that it was rare for LabQ to conduct insurance discovery and/or verification for COVID-19 tests as opposed to for blood and urine tests. Kamalic Decl. ¶ 15. He further attests that LabQ's billing manager told him that LabQ generally did not conduct insurance discovery and/or verification for COVID-19 tests. *Id*. Kamalic swears that LabQ billed the UIP for COVID-19 tests as a matter of practice. *Id*. ¶ 6. Kamalic attests that between October and November 2021, he raised with a LabQ manager that Defendants "still lacked a program for insurance discovery," but was ignored. *Id*. ¶ 23. Kamalic attests that after he raised concerns about LabQ's insurance discovery processes, he was marginalized within Defendants' leadership and instructed to work from home, eventually resigning in December 2021. *Id*. ¶¶ 25–27.

In December 17, 2021, around the time of Kamalic's departure, Landau wrote to LabQ's third-party billing company, "[P]lease follow up we need a report and understanding on all recouped payments especially from HRSA." Dkt. No. 32-28. The employee of the billing company responded:

> Moshe I am not sure what you are looking for is this part of the reconciliation. *We bill HRSA then we receive notification that they have other coverage and then bill the insurance company after we receive the insurance information from you based on insurance discovery* . . . Solution: MDIQ generates a report that shows all denials in HRSA due to other coverage available and sends the report to LabQ[.]   HRSA denies claim due to duplicate or eligibility these are posted in the system and written off.

*Id.* (emphasis added).

In a July 2022 email from LabQ's third-party billing company to Landau and other LabQ employees, the billing company references "all the claims that LabQ didn't check for insurance first before they billed to HRSA" when the end date of the Uninsured Program was approaching. Dkt. No. 32-29.  In an email response, Esther Wurzberger, LabQ's IT Director, also discusses "[c]laims that were paid by HRSA" but states that, "after they were billed [LabQ] found out they have commercial insurance and they were paid by insurance." *Id*.

As to the ultimate effect of both front-end and back-end insurance collection and verification failures, an HHS-OIG analysis suggests that approximately 27% of the money paid by the Uninsured Program to Dart was for COVID-19 testing services provided to persons with Medicare or Medicaid coverage. Lowe Decl. ¶ 10. From this data, the Government reasons that an even greater number of claims were for services provided to individuals with private insurance. *See* Tszyan-Dai Decl. ¶ 24(b).  Defendants counter that they ultimately billed private insurers for over 2.5 million of the COVID-19 tests they administered, representing over half of all the COVID-19 tests Defendants performed.  Wurzberger Decl. ¶ 26.

### D.    LabQ Data Management

#### 1.    The OIG Audit

Defendants were the subject of an audit by OIG in September 2021.  Dkt. No. 188, Declaration of Wolf Hoffman ("Hoffman Decl.") ¶ 5–7; Dkt. No. 188-1; Wurzberger Decl. ¶¶ 76–77.  Defendants were asked to provide information regarding five claims submitted to the

UIP. Wurzberger Decl. ¶ 76. Of the five claims identified, Wurzberger identified one claim as an overpayment for an individual who had Medicare or Medicaid on the date of testing; Defendants voided that claim and then provided OIG with information showing the refund of that claim to HRSA. *Id.* ¶ 77; Dkt. No. 192-7. OIG did not identify any other claims for questioning.

### 2. Database Improvements

After the Uninsured Program ended, LabQ created a system that allowed it to look up patients' billing and insurance history in its own records. Tszyan-Dai Decl. ¶ 33; Dkt. No. 32-4, Deposition of Daniel Adar ("Adar Dep.") 17:9–18:14. In his deposition, Daniel Adar explained that after Defendants learned of the Government's investigation, he became more involved in Defendants data management, including the creation of the Record Merging System ("RMS") in July 2022 (i.e., after the Government's investigation began). Adar Dep. 16:7–17:21. Notwithstanding the system's name, its purpose was not actually to merge records but rather to match unbilled claims with previously billed claims for the same individual by looking for previous claims with the same name, date of birth, gender, address, etc. Adar Dep. 17:22–19:25.

Defendants' account of the timeline of database improvements is slightly different but not directly contradictory. According to Defendants, they realized after the September 2021 OIG audit that "a number of patients had multiple accounts in our system, often because of inaccurate and inconsistent information given at intake," Wurzberger Decl. ¶ 79, and "[o]nce we realized this issue, we began checking patient information given at intake against our system to see if there were any hits for similar names, dates of birth or addresses under other accounts," *id.* ¶ 80. Wurzberger states that she ultimately "created an entirely new layer of data in our system, Enterprise Patient ID, in order to join all of these accounts together and compile a complete picture of each patient's information." *Id.* ¶¶ 81–82. "Developing this application was a

months-long process, and Enterprise Patient ID finally became operational in September 2022."
*Id.* "Along with it, we created a system that allowed our employees to review these similar
accounts to determine if they are matches for the same individual." *Id.* "By developing
Enterprise Patient ID, I realized that through the creation of a new account for an already
existing patient, a patient who previously provided insurance at intake might have their claim
submitted to the UIP if they failed to provide consistent information at each intake opportunity."
*Id.* It is unclear, on the evidence provided, what the relationship was between Adar's RMS
improvements and Wurzberger's Enterprise Patient ID layer, but neither was operational prior to
the Government's investigation, let alone the end of the UIP.

### 3.    Social Security Numbers

LabQ did not require patients to provide social security numbers. *Id.* ¶ 44; Doci Decl.
¶ 47. The exemplary IntakeQ form provided with Defendants' opposition papers, *see* Doci Decl.
¶ 33; Dkt. No. 185-1, does not include a field "attempt[ing] to capture" SSNs, Huttinger Decl.
¶ 27. Defendants attest that their objective was to offer testing to all, including undocumented
immigrants or foreign visitors who did not have SSNs, and requiring SSNs for testing would
have excluded those individuals. Wurzberger Decl. ¶ 44. LabQ asserts that its practices were
consistent with the intention of the UIP to ensure that all who needed tests received them so as to
protect public health and safety—persons without SSNs who were undocumented or were
visitors to the United States could spread COVID as readily as United States citizens could. Dkt.
No. 182 at 17. Accordingly, while LabQ understood that requiring SSNs would make it easier to
verify insurance, it made the decision not to require such information due to the valid concerns
of its patients. Wurzberger Decl. ¶ 46.

When LabQ did submit SSNs in its patient rosters, those patients were frequently found
to be insured and thus not eligible for the UIP. From July 22, 2020, the date of Defendant's first

submitted roster, through July 1, 2021, Dart submitted Social Security Numbers for 17.8% (41,135) of their patient rows.  Huttinger Decl. ¶ 31.  Of the patients that Dart submitted with an SSN, 58% were not assigned a Temporary Patient ID because Optum was able to determine that those patients had insurance at the time services were rendered.  *Id*.  When these Temporary Patient IDs were not assigned, Dart was informed via the UIP Portal that the patient was determined to have been insured.  *Id*.  After July 1, 2021, Dart did not submit any Social Security Numbers in their patient rosters.  *Id*.  Of all patient rows submitted by Dart during the existence of the Uninsured Program, 84.3% were submitted after that date.  *Id*.

HRSA declares that in their preliminary analysis, in 4,387 instances, Defendants were denied a Temporary Patient ID for a patient but then subsequently re-submitted a patient roster with the same patient and the same date of service but that omitted the patient's SSN.  Dkt. No. 195 at 2.  In order to have done so, a representative of the Defendants would have had to attest, in an Attestation, that LabQ had "checked for health care coverage eligibility and confirmed that the patient is uninsured, and does not have employer-sponsored or individual coverage, Medicare or Medicaid and that no other payer will reimburse for COVID-19 testing or care for the patient," even though Dart would have received information via the UIP Portal that a patient with all of these identifying characteristics was insured.  *Id*.

### E.    LabQ Billing Practices

#### 1.    Billing to UIP for Insured Patients

The Government offers evidence that Moshe Landau was repeatedly shown that LabQ was billing the Uninsured Program at a rate inconsistent with the underlying prevalence of uninsured patients in his client base.  During his CID testimony, Landau gave different estimates of the uninsured rate among his clients, first stating that the rate was up to 50%, but then noting that "technically, it was less than a third. Much less than a third. I would say probably a quarter

that was uninsured." Dkt. No. 32-3, Deposition of Moshe Landau, Second Excerpt ("Landau Dep. II") at 186:21–187:8. Public information available to Landau at the time suggested a lower uninsured rate. For example, a February 11, 2021 Issue Brief, published by HHS, found that the uninsured share of the nonelderly in the United States was 11.1% in 2020. Tszyan-Dai Decl. ¶ 36(e) (citing HHS, Trends in the U.S. Uninsured Population, 2010-2020 ("HHS Trends") at 4[9]). In New York state, the rate was 6.3%. HHS Trends at 10. The Government has offered no evidence that Landau was aware of these figures, but Landau himself stated in his deposition that he understood the uninsured rate in New York to be approximately 15%. Landau Dep. II. at 188:3–6. Landau regularly received reports demonstrating that LabQ was billing a far greater percentage of its patients to the Uninsured Program. For example, one report received by Landau on July 5, 2021, showed that, for the months of July 2020 to December 2020, HRSA paid more claims from the Uninsured Program than all private insurers combined for the same months, with a total of 70% of claims paid by the Uninsured Program rather than private insurers, as set forth below.

| 2020 | | |
|---|---|---|
| Month-Collection Date | Paid HRSA | Paid Insurance |
| July | 6,959 | 3,343 |
| August | 7,661 | 3,288 |
| September | 8,950 | 2,841 |
| October | 19,344 | 11,967 |
| November | 46,444 | 7,842 |
| December | 18,719 | 11,332 |

*See* Tszyan-Dai Decl. ¶ 36(e)(i); Dkt. No. 32-13. LabQ internal records show that, for 2020–2021, at least 574,145 claims were billed to UIP while 526,409 claims were billed to private

---

[9] Available at https://aspe.hhs.gov/sites/default/files/private/pdf/265041/trends-in-the-us-uninsured.pdf.

insurers, meaning that Defendants were billing approximately 52% of their claims during the peak of the pandemic to the Uninsured Program.  *See* Tszyan-Dai Decl. ¶ 25; Dkt. Nos. 32-13, 32-14; Dkt. No. 182 at 33.

Defendants explain the difference between their billing rate to the UIP and the underlying uninsured rate as driven by the characteristics of LabQ's patient population, particularly at the Mobile Sites, noting that "mobile sites were particularly popular with patients who were uninsured, homeless, visiting from another country or in this country illegally."  Doci Decl. ¶ 46; *see also* Wurzberger Decl. ¶ 7 ("Our patients included foreign tourists visiting the city, undocumented immigrants, the homeless, and other individuals without insurance . . . .").  However, Defendants' characterization of their Mobile Testing population as largely uninsured is contradicted by Kamalic, who noted that the five boroughs of New York City and New Jersey where Mobile Testing occurred were "generally areas where patients have healthcare coverage through their employers, unions, or families."  Kamalic Decl. ¶ 11.  Indeed, "several mobile COVID-testing employees told [Kamalic] that LabQ's mobile-site patient population often wanted COVID-testing to get back to work."  *Id.*

The Government offers evidence purporting to show that Defendants were warned, by Kamalic and others, that individuals with *any* health insurance coverage were ineligible for the UIP.  *See e.g.*, Kamalic Decl. ¶¶ 13, 17–18, 22.  For example, LabQ emails sent to Landau also reflect that, in December 2020, a LabQ employee spoke to a representative from HRSA regarding several instances in which patients were found by Optum to be insured on the date of testing, and HRSA told the LabQ representative that those claims could not be paid "at all."  Tszyan-Dai Decl. ¶ 36(c); Dkt. No. 32-38.  In the same exchange, however, the LabQ employee conveyed to Landau that HRSA was paying other similar claims once Defendants appealed the

claim, including by providing HRSA the denial letter sent by the 1199 union insurance plan that

covered nursing home employees.  Dkt. No. 32-38 at 1.  Landau noted in his deposition that:

> We spoke to HRSA. I don't know who answered the phone, it's Optum or it's other
> agencies . . . . We're getting different answers.  We did get a confirmation once that
> it could all be billed, then we got a confirmation that they don't know, then we got
> another confirmation that—it was a conflict.  Constant conflict.  And the health
> department, we couldn't get the normal answer.  We started to upload the
> documents from 1199 claiming that they're not covering the testing and appealing
> all this rejections.  That's how we got paid.

Dkt. No. 184-1, Deposition of Moshe Landau, Third Excerpt ("Landau Dep. III") at 105:12–

106:5.

In October 2021, in an email chain in which a LabQ contractor was marketing LabQ's

COVID-19 testing services as "government-funded through the Cares Act," a LabQ employee

was informed by a pharmacy owner who had "researched [federal payments for COVID-19

testing] extensively" that he had "not been able to find any program through the Cares Act that

allows labs to be reimbursed for COVID testing in schools," and that he was "concerned

whomever [was] handling [their] billing through [their] lab [was] doing something that [was]

illegitimate to bill the federal government for COVID testing."  Tszyan-Dai Decl. ¶ 36(a); Dkt.

No. 32-12.

### 2.    Double-Billing to UIP

It is undisputed that there were instances in which Defendants simultaneously submitted

claims to the Uninsured Program and to another payor, though Defendants contest the frequency

and significance to be attributed to such instances.  *See id.* ¶ 23; Hearing Transcript at 65:1–3;

68:2–6.  The Government has alleged that such double-billing occurred systematically with

respect to both Defendants' Private Clients and Private Insurers.

The Government has identified instances in which Defendants submitted claims to UIP

for tests that were paid for by Private Clients.  *See* Tszyan-Dai Decl. ¶ 28; Landau Dep. I. at

97:4–7 (regarding double-billing to the Bedford Center); *see also id.* 98:22–99:17 ("And am I correct in understanding that LabQ billed HRSA for the—those same Covid-19 tests [paid for by other nursing homes]?  Yes. Some of them.").  For example, in November 2021, Defendants sent claims to the Uninsured Program for the patients of a Private Client, the Permanent Mission of Singapore, even though the client was committed to paying for the testing services.  *See* Tszyan-Dai Decl. ¶ 34(b), Dkt. No. 32-23 (email discussing instances in which LabQ "had sent private bills" to their Private Clients such as "Singapore," but that they "didn't notify billing that those accounts should[n't] be sen[t] to insurance companies or discovery."); Dkt. No. 32-24; Lowe Decl. ¶ 11(c).  The Government itself ascribes the billing as an "error[]."  Tszyan-Dai Decl. ¶ 34(b).  Defendants do not deny that the error occurred but explain that "claims from private clients were not supposed to be sent to Tevix or the UIP."  Wurzberger Decl. ¶ 70.  "LabQ's systems were largely automated to minimize any such occurrences, but when dealing with such a large volume of tests and the chaos of the early days of the pandemic, occasional private client claims were sent to Tevix, and ultimately, the UIP."  *Id.*  Defendants concede that the UIP and Private Clients were billed for 3,408 claims, *id.* ¶ 69, less than half of the Government's estimated total (see *infra* at p. 33 for the Government's estimate).

The Government has also offered evidence of a subset of UIP claims simultaneously billed to both the UIP and private insurance, the majority of which post-date the closure of the UIP in March 2022, on the eve of the end of the program.  A March 2022 email shows that Landau instructed LabQ employees to bill "both HRSA and insurance" for COVID-19 testing.  Tszyan-Dai Decl. ¶ 29; Dkt. No. 32-8.  Specifically, Landau stated: "We need a way to sometimes bill for both HRSA and insurance and if we [sic] paid from insurance we will pay back HRSA."  *Id*.  Later email communications involving LabQ's third-party billing company

29

show that LabQ effectuated this policy: in a May 13, 2022 email, a third-party billing company employee emailed a LabQ employee with billing responsibilities, Esther Wurzberger, to memorialize a prior telephone call between them in which they discussed claims previously submitted to the Uninsured Program. *Id.*; Dkt. No. 32-15. In the email, the third-party company employee noted that, during their call, Wurzberger had "said some [claims] [i.e. some of LabQ's claims for reimbursement] are claims that were paid by HRSA, that now will be billed by Insurance and if paid, you will reverse the HRSA claim back." *Id.* Wurzberger replied that the process described by the third-party billing employee was "correct." *Id.* Defendants, however, sent no refunds and submitted no cancellation claims to the Uninsured Program on or after March 1, 2022. Huttinger Decl. ¶ 39.

### F. HRSA Offsets

On hundreds of occasions, HRSA offset future claims for reimbursement submitted by Dart pursuant to an Optum post-payment retrospective eligibility review because that review identified health insurance coverage for the patients on the relevant dates of service. *Id.* ¶ 37.

Defendants point out that Defendants and HRSA routinely engaged in reconciliations throughout the life of the UIP, resulting in Defendants refunding less than $1 million in claims. Compl. ¶ 65. The UIP program stopped accepting claims on March 22, 2022. Wurzberger Decl. ¶ 86. Defendants received a letter from HRSA in May 2022 stating that Defendants' pending claims would be assessed for compliance purposes and that any claims Defendants had successfully submitted that were placed on hold "may be paid subject to the availability of funding." *See* Wurzberger Decl. ¶ 92, Dkt. No. 192-8. Defendants followed up repeatedly to try to engage HRSA in a reconciliation process regarding amounts HRSA allegedly owed to Defendants and any amounts Defendants owed to HRSA. Hoffman Decl. ¶¶ 11–13; Dkt. Nos. 188-3, 188-4, 188-5; Wurzberger Decl. ¶ 92; Dkt. Nos. 192-10, 192-11. According to

Defendants, "[s]uch reconciliation has still not been completed and, consequently, HRSA has never made a final determination of an overpayment at all."  Dkt. No. 182 at 37–38.  Defendants insist that they have been and remain "ready, willing, and able to repay through a reconciliation process," Dkt. No. 239 at 16, and allege that LabQ is owed an estimated $80 million for "tests that we performed for patients without insurance coverage for COVID-19 testing, but for which we were never reimbursed."  Wurzberger Decl. ¶ 91.

## IV.    The Government's Estimates of the Debt Owed by Defendants

Based on the analyses that follow, the Government estimates that Dart billed $82.86 million to the UIP for tests that the Government claims were ineligible for reimbursement because the patients had some form of health insurance at the time of testing, regardless of whether that insurance covered COVID-19 testing.  *See* Tszyan-Dai Decl. ¶¶ 23–26.  It estimates that Dart billed the Government approximately $4.38 million for tests for which Dart was also paid by public or private insurance or had already been paid by the Uninsured Program.  *Id.* Because many (although not all) of the double-billed claims would also be ineligible for the additional reason that they were submitted on behalf of individuals with healthcare coverage, the Government's estimated total of the debt owing is approximately $82 million.  Dkt. No. 42 at 39, n.7.

### A.    Estimated Billing for Ineligible Individuals

The Government estimates that 62.94% of Dart's claims billed to the Uninsured Program were submitted on behalf of patients who had some form of healthcare coverage at the time of service.  Tszyan-Dai Decl. ¶ 24.  At that rate, and based on the understanding that healthcare coverage alone made the patient ineligible, approximately $82.86 million of Dart's paid claims would have been ineligible, based on the analysis that follows.  *Id.* ¶ 26, 38.

An HHS-OIG data analysis estimated that approximately 27.8% of Dart's claims paid by the Uninsured Program were for patients who had Medicare or Medicaid coverage at the time they received testing services from the Defendant, totaling $36,629,101.63 as payment for 315,526 separate claims.  Lowe Decl. ¶ 10.

Starting from New York state data showing that in 2023, 41.9% of New York state residents had public health coverage and 5.2% were uninsured, the Government estimates that 52.9% of New York state residents have exclusively private coverage.  Tszyan-Dai Decl. ¶ 24(b). From the ratio of New Yorkers with public health insurance to New Yorkers with private health insurance, the Government estimates that 35.12% of the Defendants' patients with claims paid by the Uninsured Program would have had private health coverage.  Id.

Combining the 27.8% of claims the Government argues were ineligible because they were covered by public health insurance with the 35.12% that the Government estimates were ineligible because they were covered by private health insurance, the Government estimates that approximately 62.94% of the claims that Dart submitted to the Uninsured Program would have been for individuals with healthcare coverage.  Id. ¶ 24.[10]

### B.    HHS-OIG Double-Billing Estimates

The Government also estimates that Dart double-billed the Uninsured Program for over 35,500 claims, either by submitting the same claim multiple times to the Uninsured Program, or by submitting the same claim to both the Uninsured Program and another payor, resulting in

---

[10] The Government suggests that this estimate is conservative in light of the fact that for 2020–2021, at least 574,145 claims were billed to or paid by HRSA, and only 526,409 claims were billed to or paid by private insurers, suggesting that the Defendants were billing approximately 52% of their claims to the Uninsured Program when public reporting suggests that only approximately 5.2% of New Yorkers are uninsured.  Tszyan-Dai Decl. ¶ 25.

approximately $4.38 million in ineligible payments. *Id.* ¶ 23. It bases that figure on an HHS-OIG analysis which identified the following:

(1) 5,073 unique claim numbers, reflecting the same patient name, date of birth, date of service, and procedure code, for which Dart received payments from both the Uninsured Program and Medicare or Medicaid, with a total of $540,924.19 paid by the Uninsured Program to Dart for these claims, Lowe Decl. ¶ 6;

(2) 5,296 instances in which Dart billed the Uninsured Program for claims that had already been paid by the Uninsured Program, i.e., billed the UIP twice for claims that had the same patient name, date of birth, procedure code, and date of service, totaling payments of $790,675.13, Lowe Decl. ¶ 7;

(3) an estimated 7.9% rate of double billing to the Uninsured Program and to Private Clients based on an analysis of invoices sent to two of LabQ's private clients, Lowe Decl. ¶ 8, which, combined with Defendants' billing records for 98,530 total claims invoiced to Private Clients in 2020 and 2021, Tszyan-Dai Decl. ¶ 23(c), Dkt. No. 32-13, the Government extrapolates to an estimated 7,783 claims paid by the Uninsured Program that were also invoiced to Private Clients, which at a rate of $123.46 per claim would have resulted in approximately $960,889 paid by the Uninsured Program to Dart, *id.*; and

(4) an estimated 8.0% rate of double billing to the Uninsured Program and to Private Insurance providers based on an analysis of claims paid by a BlueCross BlueShield insurance plan between January 31, 2021 and January 29, 2022, Lowe Decl. ¶ 9, which, combined with Defendants' billing records for 217,279 total claims paid by private insurers in 2020 and 2021, Tszyan-Dai Decl. ¶ 23(d), Dkt. Nos. 32-13–32-14, the Government extrapolates to an estimated

17,382 claims paid by the Uninsured Program that were also paid by private insurers, resulting in approximately $2,145,981.72 paid by the Uninsured Program to Dart.  *Id.*

## PROCEDURAL HISTORY

This case was initiated by a qui tam complaint filed on May 27, 2022, in the United States District Court for the Eastern District of New York.  Dkt. No. 1.  The case was ordered transferred to this District on November 16, 2022.  Nov. 16, 2022 Minute Entry.

The Government filed a complaint in intervention on June 13, 2024.  Dkt. No. 11.

The Government filed its initial application for writs of garnishment and writs of attachment pursuant to the FDCPA on July 24, 2024.  Dkt. No. 31.  With the application, it also filed the declarations of Lu Tszyan-Dai, Paul Miccarelli, Karen Lowe, Steve Kamalic, Alexandra Huttinger, and Frank Carlo.  Dkt. Nos. 32–41.  It filed a memorandum of law in support of the motion.  Dkt. No. 42.

On August 2, 2024, the Court signed a Stipulation and Order, granting the writs of garnishment and writs of attachment requested in the Government's application.  Dkt. No. 60. The Court set a schedule for the Defendants to make an application to have the writs lifted and for the Government to reply to that application.  *Id.*  The Stipulation and Order made accommodation for the use by the Defendants of the properties being restrained for the purposes of paying reasonable business expenses of LabQ, Dart, and CMT, the reasonable personal expenses of Moshe Landau, and the reasonable attorney's fees of any of the Defendants.  *Id.* Writs of attachment and an order for the issuance of prejudgment writs of garnishment and attachment issued that day.  Dkt. Nos. 61–95.

On September 19, 2024, the Government filed a supplemental application for writs of attachment supported by a memorandum of law, Dkt. No. 172, and the supplemental declaration

of Lu Tszyan, Dkt. Nos. 173–174.  The Court granted that application on September 20, 2024,

Dkt. No. 176, and issued the writs on December 13, 2024, *see* Dkt. Nos. 241–298.

On October 2, 2024, Defendants filed a joint memorandum of law in opposition to the

Writs.  Dkt. No. 182.  Defendants also filed declarations from Daniel Adar, Laurie A. Allen,

Eliona Doci, David H. Glusman, Wolf Hoffman, Bo Martin, Teresa Tobal, and Esther

Wurzberger.  Dkt. Nos. 183–193.

The Government filed a reply memorandum of law on October 23, 2024, Dkt. No. 230,

along with declarations from Zachary Bannon and Karen Lowe.  Dkt. Nos. 231–233.

On November 15, 2024, Defendants filed a reply memorandum of law in further support

of their cross-motion to quash the Writs, Dkt. No. 239, alongside a supplemental declaration

from Esther Wurzberger, Dkt. No. 239-1.

## LEGAL STANDARD

### I.    Federal Debt Collection Procedures Act

The FDCPA provides the exclusive civil procedure for the United States to seek

prejudgment remedies.  28 U.S.C. § 3001(a)(2).  The FDCPA authorizes district courts to secure

a debtor's property through several different prejudgment remedies, *see* 28 U.S.C. § 3101,

including attachment, 28 U.S.C. § 3102, and garnishment, 28 U.S.C. § 3104, of real and personal

property.  The purpose of these prejudgment remedies is to establish "security to satisfy such

judgment, and interests and costs, as the United States may recover on such claim" for a debt.

28 U.S.C. § 3102(a).  A court may only grant such a remedy "if the United States shows

reasonable cause to believe" that, inter alia, the debtor "has or is about to assign, dispose,

remove, conceal, ill treat, waste, or destroy property" or "to convert the debtor's property into

money, securities, or evidence of debt in a manner prejudicial to the United States," "with the

effect of hindering, delaying, or defrauding the United States."  28 U.S.C. § 3101(b)(1)(B), (C).

The United States is entitled to a prejudgment remedy when it establishes, "with particularity to the court's satisfaction facts supporting the probable validity of the claim for a debt and the right of the United States to recover what is demanded in the application." 28 U.S.C. § 3101(c)(1). To do so, the United States must apply to the court with an affidavit that "shall state," among other things, "specifically the amount of the debt claimed by the United States and any interest or costs attributable to such debt," 28 U.S.C. § 3101(c)(2)(A), and that the specific requirements for the individual prejudgment remedies sought (like attachment or garnishment) have been satisfied, 28 U.S.C. § 3101(c)(2)(B). The statute does not "require that the debtor intend to hinder or defraud the Government. The sole consideration is the effect of the debtor's actions." *United States v. Cent. Med. Sys., LLC*, 2018 WL 5112911, at *7 (M.D. Fla. Oct. 19, 2018).

Amounts claimed as owing to the United States under the FCA are considered a "debt" that may be subject to the FDCPA, *United States v. First Choice Armor & Equip.*, 808 F. Supp. 2d 68, 79 (D.D.C. 2011), as are amounts claimed under theories that could result in payment "owing to the United States," such as the Government's common-law claims in this case, 28 U.S.C. § 3002(3)(B).

Establishing the "probable validity" of a claim of debt "does not require proof rising to the level of that required at trial but rather requires only that the Government meet the probable cause standard." *Cent. Med. Sys.*, 2018 WL 5112911, at *4; *see also CFPB v. Carnes*, 2023 WL 7407576, at *13 (D. Kan. Nov. 9, 2023) ("[T]he probable validity requirement is akin to probable cause."). "Probable cause exists when known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that an offense has been or is being committed." *See United States v. Davis*, 458 F.2d 819, 821 (D.C. Cir. 1972). There must be "a fair probability" that a violation has occurred. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "In

evaluating probable validity, the totality of the circumstances are considered." *Carnes*, 2023 WL 7407576, at *13 (quoting *United States v. Stabl, Inc.*, 2018 WL 6068424, at *4 (D. Neb. Nov. 19, 2018)) (internal quotations omitted); *see also Gates*, 462 U.S. at 238. The court may consider all information submitted by the parties, regardless of whether it would be admissible under the Federal Rules of Evidence. *See United States v. Teeven*, 862 F. Supp. 1200, 1217 n.22 (D. Del. 1992) ("For purposes of this [FDCPA] hearing, the Court need not exclude from its consideration any evidence, whether admissible at trial or not, supporting or contradicting the probable validity of the debt."); *cf. 725 Eatery Corp. v. City of N.Y.*, 408 F. Supp. 3d 424, 455 (S.D.N.Y. 2019) ("In the Second Circuit, courts 'routinely consider hearsay evidence in determining whether to grant preliminary injunctive relief,' including affidavits, depositions, and sworn testimony." (quoting *Mullins v. City of N.Y.*, 626 F.3d 47, 52 (2d Cir. 2010)).

After the Government has demonstrated "probable validity" and the court has issued a prejudgment order, the FDCPA provides for a post-deprivation hearing, at which time "the party seeking to have a prejudgment order quashed must make an affirmative showing as to why the debt is not probably valid." *Teeven*, 862 F. Supp. at 1211. Specifically, the statute provides:

> At the hearing you may explain to the judge why you think you do not owe the money to the Government, why you disagree with the reason the Government says it must take your property at this time, or why you believe the property the Government has taken is exempt or belongs to someone else. You may make any or all of these explanations as you see fit.

28 U.S.C. § 3101(d). "At a post-deprivation hearing, a defendant, by exercising the statutory right to move to quash the writ, is essentially claiming that the Court was in error in its decision to initially grant the writ." *Teeven*, 862 F. Supp. at 1216 (citing 28 U.S.C. § 3101(d)(2)). "In challenging the issuance of the writs the Defendants can bring forth any evidence relevant to the four issues to be addressed at a post-deprivation hearing." *Id.* at 1216 (citing 28 U.S.C. §

3101(d)(2)).  The defendant's "statutory burden at the post-deprivation hearing is to place in dispute the Government's showing of probable validity," which may be done "through cross-examination of the affiant or other witnesses relied on by the Government."  *U.S. ex rel Doe v. DeGregorio*, 510 F. Supp. 2d 877, 885–86 (M.D. Fla. 2007).  "Where, for example, the Government's affidavit is not based on personal knowledge and the reliability of the source of information is not established, a defendant could successfully place in dispute the Government's showing of probable validity."  *Id.*  "But where the affidavit is particularized and the affiant's sources of information are reliable because they have personal knowledge of the events to which they provided information, the debtor must come forward with 'some substantive evidence at the hearing.'"  *United States v. Berkeley Heartlab, Inc.*, 225 F. Supp. 3d 460, 465 (D.S.C. 2016) (quoting *DeGregorio*, 510 F. Supp. 2d at 885).  "[T]he Section 3101(d)(2) hearing is not intended to be a trial on the merits."  *Teeven*, 862 F. Supp. at 1211.  Rather, the question for the court at the 3101(d)(2) hearing is whether the defendant has been able "to cast a cloud over the Government's showing of probable validity."  *Id*.

As in the context of probable cause, a defendant cannot undermine "probable validity" with a claim that the government did not exhaust every possible investigative lead or alternate explanation.  *See Panetta v. Crowley*, 460 F.3d 388, 395–96 (2d Cir. 2006) ("[T]he fact that an innocent explanation may be consistent with the facts alleged does not negate probable cause, and an officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause." (cleaned up)); *D.C. v. Wesby*, 583 U.S. 48, 68 (2018) (observing that suspect's "innocent explanations—even uncontradicted ones—do not have any automatic, probable-cause-vitiating effect"); *Savarese v. City of N.Y.*, 547 F. Supp. 3d 305, 327 (S.D.N.Y. 2021) ("[E]ven accepting Plaintiff's claim that there is a factual dispute regarding whether

[officers] interviewed the two nonvictim witnesses to the robbery, the mere failure to interview potential witnesses does not overcome the presumption of probable cause." (citing *O'Brien v. City of Yonkers*, 2013 WL 1234966, at *16 (S.D.N.Y. Mar. 22, 2013)); *Parisi v. Suffolk County*, 2009 WL 4405488, at *12 (E.D.N.Y. Nov. 30, 2009) (officers' alleged failure to locate and interview potential witnesses did not overcome probable cause).

Nor is the court required to credit the defendant's denial of a given fact in the face of evidence from someone with percipient knowledge who is not shown to be unreliable. *See Fabrikant v. French*, 691 F.3d 193, 216 (2d Cir. 2012) ("[A] law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity. . . . Moreover, information provided by an identified bystander with no apparent motive to falsify has a peculiar likelihood of accuracy, and . . . an identified citizen informant is presumed to be reliable." (quoting *Panetta*, 460 F.3d 388, 395 (internal citations omitted)); *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) ("When information is received from a putative victim or an eyewitness, probable cause exists . . . unless the circumstances raise doubt as to the person's veracity," such that "probable cause [may be found] where a police officer was presented with different stories from an alleged victim and the arrestee"); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997) (identifying probable cause where arresting officer chose to believe the claimed victim's account of a fight based on his visible injuries, notwithstanding the alleged assailant's cries of innocence); *Overby v. Fabian*, 2018 WL 3364392, at *9 (S.D.N.Y. July 10, 2018) (holding the statement of an employee and representative of the putative corporate victim of a fraud sufficient for a finding of probable cause).

In the criminal context, probable cause does not require "the arresting officer . . . to prove [defendant's] version wrong."  *Curley*, 268 F.3d at 70; *see U.S. ex rel. Povlin v. Hecht*, 48 F.2d 90, 92 (2d Cir. 1931) ("Clearly, denial of guilt by the accused, even though corroborating testimony is offered, is not necessarily enough [to overcome the probable cause finding manifest in an indictment].  . . ..  On the other hand, evidence of innocence may be such as to rebut the case made by the indictment."); *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989) ("It would be unreasonable and impractical to require that every innocent explanation for activity that suggests criminal behavior be proved wrong, or even contradicted, before an arrest . . . could be [made]."); *Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988) (officer was "under no obligation to give any credence to a suspect's story" because "[t]o hold otherwise would be to allow every suspect, guilty or innocent, to avoid arrest simply by claiming 'it wasn't me.'").  It follows that in the FCA context, the Government need not refute every alternative theory of nonliability at this early stage in order to obtain the prejudgment remedy necessary to preserve the possibility of recovery at the end of the case.

## II.    False Claims Act

The False Claims Act imposes liability for false claims made to the United States government in a variety of ways, including the presentation of a false or fraudulent claim, the knowing use of false record, and avoidance of a known obligation to repay.  The first and second of these arise when a party either "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B); *United States v. Strock*, 982 F.3d 51, 58 (2d Cir. 2020).  The third, a so-called "reverse" FCA claim, arises when one "knowingly makes, uses, or causes to be made or used, a false record or statement" or "knowingly conceals or knowingly and improperly

avoids or decreases an obligation to pay or transmit money or property to the Government." 31

U.S.C. § 3729(a)(1)(G); *see Miller v. U.S. ex rel. Miller*, 110 F.4th 533, 542 (2d Cir. 2024).

"'Knowingly' means that a person '(i) has actual knowledge of the information; (ii) acts

in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard

of the truth or falsity of the information.'" *Strock*, 982 F.3d at 58–59 (quoting 31 U.S.C. §

3729(b)(1)(A)); *see also U.S. ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749 (2023)

(holding that "knowingly" refers "to respondents' knowledge and subjective beliefs—not to what

an objectively reasonable person may have known or believed"); *U.S. ex rel. Siewick v. Jamieson*

*Sci. & Eng'g, Inc.,* 214 F.3d 1372, 1376–78 (D.C. Cir. 2000) (holding that a mere

"misunderstanding" of legal entitlements is not sufficient to fulfill the "knowingly" standard

under the FCA). The FCA's knowledge standard "tracks traditional common-law fraud."

*SuperValu*, 598 U.S. at 752; *see Bernstein v. Silverman*, 2024 WL 3595621, at *18 (N.D.N.Y.

July 31, 2024).

"'Material' means 'having a natural tendency to influence, or be capable of influencing,

the payment or receipt of money or property.'" *Bernstein*, 2024 WL 3595621, at *16 (quoting

31 U.S.C. § 3729(b)(4)). "In determining materiality a court considers: (1) whether the

government expressly designates compliance with a particular statutory, regulatory, or

contractual requirement as a condition of payment; (2) the government's response to

noncompliance with the relevant contractual, statutory, or regulatory provision; and (3) whether

the defendants' alleged noncompliance was minor or insubstantial." *United States v. Anthem*

*Inc.*, 2022 WL 4815978, at *4 (S.D.N.Y. Sept. 30, 2022) (internal quotations and citations

omitted). "No one factor is dispositive" and a court's "inquiry is holistic." *U.S. ex rel. Foreman*

*v. AECOM*, 19 F.4th 85, 110 (2d Cir. 2021) (citation omitted). However, "[t]he materiality

standard is demanding." *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 194 (2016). "The False Claims Act is not 'an all-purpose antifraud statute,' or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* (internal citation omitted) (quoting *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 672 (2008)).

Under the FCA, claims and statements may be factually false or legally false. *See United States ex rel. Quartararo v. Catholic Health System of Long Island Inc.*, 84 F.4th 126, 130 (2d Cir. 2023); *United States ex rel. Fox Rx, Inc. v. Omnicare, Inc.*, 38 F. Supp. 3d 398, 408 (S.D.N.Y. 2014) ("A certification may be either factually or legally false."). A claim or certification is factually false when it includes "an incorrect description of goods or services provided." *AECOM*, 19 F.4th at 104 n.7 (quoting *United States v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 154 (D.D.C. 2011)). "A claim is legally false when it falsely certifies—expressly or impliedly—compliance with a governing statutory, regulatory, or contractual provision." *Catholic Health System*, 84 F.4th at 130. "When . . . a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided." *Escobar*, 579 U.S. at 187.

"The primary source of liability is subparagraph (a)(1)(A), which prohibits knowingly submitting false or fraudulent claims. This subsection often works in tandem with subparagraph (a)(1)(B), which prohibits making or using a false statement or record that is material to a false or fraudulent claim. Courts do not always distinguish between the two subparagraphs, and both are often involved in the same case. For example, a false claim for payment under (a)(1)(A) may be made in the form of a record or statement, which also would support an allegation under

(a)(1)(B)."  Claire M. Sylvia, The False Claims Act: Fraud Against the Government, § 4:1 (2024); *see also Silverman*, 2024 WL 3595621, at *23 ( "[T]he elements for a count brought under section 3729(a)(1)(B) are practically identical to the requirements for a count brought under section 3729(a)(1)(A)."); *U.S. v. Bouchey*, 860 F. Supp. 890, 893 (D.D.C. 1994) (stating that for a claim under former subsections (a)(1) or (a)(2), now (a)(1)(A) and (a)(1)(B), the Government must show the existence of a request for payment and that this request was fraudulent)[11]; *U.S. ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991); *Laymon, Jr. v. Bombardier Transp. (Holdings) USA, Inc.*, 2009 WL 793627, at *8 (W.D. Pa. Mar. 23, 2009) (observing that where the false claim for payment is made by a false statement or record, the inquiries under sections (a)(1)(A) and (a)(1)(B) are coterminous); *United States v. Strock*, 2018 WL 647471, at *6 (W.D.N.Y. 2018) (noting courts often analyze (a)(1)(A) and (a)(1)(B) together because elements overlap significantly); *U.S. ex rel. Riedel v. Boston Heart Diagnostics Corp.*, 332 F. Supp. 3d 48, 82 (D.D.C. 2018) (finding that false claim and false statement causes of action based on same factual allegations may both proceed); *U.S. ex rel. Gardner v. Vanda Pharm, Inc.*, 2020 WL 2542121, at *8 n.6 (D.D.C. 2020) (not distinguishing between (a)(1)(A) and (a)(1)(B) because elements are "practically identical" (quoting *U.S. ex rel. Scott v. Pac. Architects and Eng'rs (PAE), Inc.*, 270 F. Supp. 3d 146, 154 (D.D.C. 2017)).

In order to establish a violation of Section (a)(1)(B), the plaintiff bears the burden of proving that: (1) the defendant made or used a record or statement; (2) the record or statement was false; (3) the defendant knew it was false; and (4) the record or statement was material to a

---

[11] For clarity, where the caselaw on Section 3729 predates the reorganization of the statute in 2009, Pub.L. 111-21, § 4(a), May 20, 2009, 123 Stat. 1621, the Court hereafter refers to the current subsections (a)(1)(A) and (a)(1)(B) even where the case originally referred to (a)(1) or (a)(2).

false or fraudulent claim.  *See U.S. ex rel. Scott v. Actus Lend Lease*, 2011 WL 13177635, at *6

(C.D. Cal. Apr. 22, 2011).

A variety of types of statements or records may support a cause of action under Section

(a)(1)(B).  *See, e.g.*, *U.S. ex rel. Bierman v. Orthofix Intern., N.V.*, 748 F. Supp. 2d 123 (D. Mass.

2010), as amended, (Dec. 9, 2010) (false certification of compliance with Medicare requirements

alleges a violation of both (a)(1)(A) and (a)(1)(B)); *U.S. ex rel. Thompson v. Columbia/HCA*

*Healthcare Corp.*, 20 F. Supp. 2d 1017 (S.D. Tex. 1998) (annual cost reports that contained

allegedly false certification of compliance with federal laws stated a claim under (a)(1)(B) as

false records or statements used to obtain payment or approval*); U.S. ex rel. Lamers v. City of*

*Green Bay*, 998 F. Supp. 971, 986, 989 (E.D. Wis. 1998) (standard assurances of compliance

with grant requirements as well as letters in support of application could constitute false

statements or records to get a claim paid), *aff'd*, 168 F.3d 1013 (7th Cir. 1999).

To be actionable under the FCA, "[a] misrepresentation about compliance with a

statutory, regulatory, or contractual requirement must be material to the Government's payment

decision." *Escobar*, 579 U.S. at 181.  The FCA defines materiality as "having a natural tendency

to influence, or be capable of influencing, the payment or receipt of money or property."

31 U.S.C. § 3729(b)(4).  "[U]nder *Escobar*, relevant factors in evaluating materiality include:

(1) whether the government expressly designates compliance with a particular statutory,

regulatory, or contractual requirement as a condition of payment; (2) the government's response

to noncompliance with the relevant contractual, statutory, or regulatory provision; and

(3) whether the defendants' alleged noncompliance was minor or insubstantial."  *AECOM*, 19

F.4th at 110 (internal quotations and citation omitted); *see Anthem Inc.*, 2022 WL 4815978, at

*4.  "No one factor is dispositive" and a court's "inquiry is holistic."  *AECOM*, 19 F.4th at 110

(citation omitted).  However, "[i]f [the relevant federal agency] absolutely would have refused to pay had it known of the misrepresentation, that misrepresentation would certainly be material." *Anthem Inc.,* 2022 WL 4815978, at *5.

A "reverse" FCA claim provides penalties for avoiding an "obligation" to repay the government.  31 U.S.C. § 3729(a)(1)(G).  A "claim" under this provision of the FCA "is a false statement used not to obtain payments from the government, but to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."  *U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 835 (7th Cir. 2011) (quotation omitted); *see also U.S. ex rel. Mat hen y v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012) ("[L]iability results from avoiding the payment of money due to the government" in a "reverse false claim" action.).  A reverse FCA claim cannot simply be redundant of affirmative claims under sections (a)(1)(A) or (a)(1)(B).  *See AECOM*, 19 F.4th at 119–20 (holding that reverse false claims that mirrored (a)(1)(A) and (a)(1)(B) claims are not actionable; *U.S. ex rel. Davern v. Hoovestol, Inc.*, 2015 WL 6872427 (W.D.N.Y. 2015) (declining to adopt interpretation of (a)(1)(G) that failure to repay money owed as a result of violation of (a)(1)(A) or (a)(1)(B)) violates this section); *United States v. Mount Sinai Hosp.*, 256 F. Supp. 3d 443 (S.D. N.Y. 2017) (dismissing reverse false claims allegations based on same acts supporting claims under (a)(1)(A) and (a)(1)(B)); *see also U.S. ex rel. Askari v. PharMerica Corp.*, 2024 WL 1132191, at *4 (2d Cir. 2024); *U.S. ex rel. Gelbman v. City of N.Y.*, 2018 WL 4761575, at *8 (S.D.N.Y. 2018).  However, overlap in facts or damages does not mean the claims are redundant, and alternative theories of recovery are permissible.  *See, e.g., United States v. Omnicare, Inc.*, 2021 WL 1063784 (S.D.N.Y. 2021) (complaint adequately alleged alternative theory of failure to return overpayment); *United States ex rel. Morsell v. NortonLifeLock, Inc.*, 651 F. Supp. 3d 95,

190 (D.D.C. 2023) (recognizing overlap between reverse false claims liability arising from a self-executing clause and a theory of implied certification with the same clause, both of which may be brought).

Reverse FCA claims require a higher level of intent than a direct false claim: the Government must establish that defendants acted "knowingly and improperly."  31 U.S.C. § 3729(a)(1)(G).  The term "obligation" in a reverse FCA claim refers to "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  *Id.* § 3729(b)(3).  It does not suffice under the FCA that the Government overpays a vendor and the vendor keeps the payment knowing of the overpayment.  Such circumstances may give rise to a claim for unjust enrichment or even for breach of contract.  But they would not give rise to a treble-damages claim under the FCA.  The Government must show an independent obligation to repay, not merely that Defendants retained Government funds to which they were not entitled.  *See U.S. ex rel. SW Challenger, LLC v. EviCore Healthcare MSI, LLC*, 2021 WL 3620427, at *1 (S.D.N.Y. 2021) (stating that absent allegations of an independent obligation to pay the government, a reverse false claim is not sufficiently pleaded based only on allegations that a defendant retained Government funds to which they are not entitled); *see also Gelbman*, 2018 WL 4761575, at *8 (allegations of "various providers allegedly receiving payment on false claims and thus retaining Government funds to which they were not entitled" are "not an adequate basis on which to allege a reverse false claim").  The standard is high.  A duty to pay is "established" for a reverse FCA claim "only when it triggers an immediate and self-executing duty to pay."  *Miller*, 110 F.4th at 546 (emphasis added).  "[A]

potential or contingent exposure to penalties does not create an 'established' duty to pay."  *Id.* at 545.

"[A] party that violates the [FCA] incurs a debt to the [G]overnment as soon as the [G]overnment pays the fraudulent claim."  *Berkeley Heartlab*, 225 F. Supp. 3d at 466; *see Cent. Med. Sys.*, 2018 WL 5112911, at *5.  "Thus by alleging that the defendants submitted false claims and made false statements under the [FCA], the [G]overnment sufficiently alleges the existence of a debt."  *Id.*; *see First Choice Armor & Equip.*, 808 F. Supp. 2d at 79.

## DISCUSSION

The Government sought relief under the FDCPA to preserve the status quo while it prosecutes its FCA and common-law claims against Defendants, based on the "probable validity" of the Government's claims as to the $82.86 million, plus civil penalties, treble damages, and costs, totaling an estimated $248 million under 31 U.S.C. § 3729(a)(1), or at least $82 million to make the Government whole under its common-law theories.  Dkt. No. 42 at 39.  The Court found that the Government made an initial showing of reasonable cause to believe that Defendants had assigned or disposed of property with the effect of hindering the Government in the collection of the debts owed to it, such that the prejudgment relief sought by the Government was appropriate under the FDCPA.  Because at this stage Defendants are "unable to cast a cloud over the Government's showing of probable validity," *Teeven*, 862 F. Supp. at 1211, Defendants' request to quash the prejudgment writs of attachment and garnishment is denied.

The Government asserts three FCA claims against Defendants, in addition to common-law claims for payment-by-mistake and unjust enrichment.  First, the Government asserts that Defendants knowingly presented or caused to be presented false or fraudulent claims for payment to the Uninsured Program for COVID-19 testing where those claims were not eligible for reimbursement because: (a) COVID-19 testing was provided to an individual who had

healthcare coverage on the date of service, regardless of whether the individual was covered for the costs of the testing; and/or (b) the cost of the testing had been (or would be) reimbursed from another source, in violation of 31 U.S.C. § 3729(a)(1)(A).  Compl. ¶¶ 113–118.  Second, the Government asserts that Defendants made false records or statements in service of those same false and fraudulent claims, in the form of the Attestations, in violation of 31 U.S.C. § 3729(a)(1)(B).  *Id.* ¶¶ 119–124.  Third, the Government asserts that Defendants knowingly concealed and evaded their obligation to reimburse the Uninsured Program for payments to which Defendants were not lawfully entitled, in violation of 31 U.S.C. § 3729(a)(1)(G).  *Id.* ¶¶ 125–128.

The Government argues that for each of the three FCA claims, there is probable validity for each of the following elements of FCA liability: (1) the claims and statements at issue were false; (2) Defendants knew or were willfully blind to the fact that these claims and statements were false; (3) Defendants presented or caused to be presented the claims and statements that were false; and (4) the false statements and claims were material to HRSA.  Dkt. No. 42 at 23.

Defendants do not dispute that the third element of "present[ing]" or "causing to be presented," "making" or "causing to be made" under 31 U.S.C. § 3729(a)(1)(A)–(B) is met here where claims to the UIP were made by LabQ representatives, using Dart as a billing entity, both directly and through third-party billing contactors acting at their direction, and that Moshe Landau and CMT caused these claims and attestations to be submitted.  Neither do Defendants dispute the Government's characterization of the roles of the various Defendants, nor Defendant Moshe Landau's controlling leadership role in LabQ and Dart Medical's decision-making on billing issues.  Tszyan-Dai Decl. ¶¶ 15, 28–29, 36, 41–43.  Defendants do not contest that Moshe Landau would be liable individually for his companies' FCA violations on an alter ego theory of

liability, such that at this stage the corporate veil may be pierced. *See United States v. Dynamic Visions, Inc*., 220 F. Supp. 3d 16, 24–26 (D.D.C. 2016) (holding owner and chief corporate officer liable for FCA violations of alter ego company); *see also Caro Cap., LLC v. Koch*, 653 F. Supp. 3d 108, 121 (S.D.N.Y. 2023) (citation omitted) ("[T]o pierce the corporate veil," a plaintiff "must show that (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury.").

The core of Defendants' rebuttal is that their submissions to the Uninsured Program, and the accompanying Attestations, were neither false nor made with knowledge of falsity within the meaning of the FCA. *See* Dkt. No. 182 at 2. Defendants rely on guidance issued to providers by HRSA regarding insurance verification that "If you have direct contact with the patient, you should make *best efforts* to confirm that the patient was uninsured at the time services were provided." *Id.* at 17. Defendants argue that the submissions and corresponding attestations they made were not actually false because "[c]onfronted with the challenge of navigating the government's web of confusing and conflicting guidance regarding the brand-new [Uninsured Program], Defendants made appropriate best efforts . . . to collect and verify insurance information while providing hundreds of thousands of critical diagnostic tests amidst the chaos of a raging public health crisis." *Id.* at 2. They also argue that the Government cannot show that the Defendants had the requisite knowledge of falsity under the FCA's scienter standard because Defendants were operating under a reasonable, contemporaneous interpretation of the Uninsured Program's eligibility requirements, pursuant to which they properly sought reimbursement for claims of individuals who were insured at the time of testing but whose insurance did not cover the tests at issue. *Id.*

For the reasons set out below, the Court finds that the Government has established, and Defendants have not undermined, the probable validity of Defendants' FCA claims under the theories of presentation of a false or fraudulent claim, 31 U.S.C. § 3729(a)(1)(A) and the knowing use of false record, 31 U.S.C. § 3729(a)(1)(B) to the required probable cause threshold. The Government has also succeeded in establishing a reasonable belief that Defendants have taken steps to transfer or encumber their property with the ultimate effect of "hindering, delaying, or defrauding the United States," 28 U.S.C. § 3101(b)(1)(B), (C), such that the Writs sought and entered are necessary and appropriate to ensure the satisfaction of "such judgment, and interest and costs, as the United States may recover" on their claims for the Defendants' alleged misconduct, 28 U.S.C. § 3102(a).

Because the value of the property which the Government has sought to attach and garnish is independently supported by the claims arising under 31 U.S.C. § 3729(a)(1)(A) and (B) for claims submitted to the UIP for individuals ineligible by virtue of having health insurance at the time of testing, the Court does not assess at this stage the independent strength of the Government's claims with respect to double-billing, claims arising under 31 U.S.C. § 3729(a)(1)(G) for "reverse" false claims, or common-law claims.

## I.    Probable Validity of FCA Claims

The Court separately addresses the Government's arguments that Defendants made actionable false claims during the Uninsured Program's period of regular operations and its arguments that Defendants made false claims on the eve of the closure of the Program.

### A.    False Claims Prior to UIP Closure

The Government asserts that Defendants made false claims in their Attestations and corresponding submission of claims to the UIP during the period of the UIP's regular operations,

prior to any rumors of the UIP's impending closure. The Government has established the probable validity of that claim and Defendants have not undermined that probable validity.

Before any claim could be submitted by Defendants through MEDI to be paid by HRSA, Defendants were required to attest that they had:

> checked for health care coverage eligibility and confirmed that the patient is uninsured, and does not have employer-sponsored or individual coverage, Medicare or Medicaid and that no other payer will reimburse for COVID-19 testing or care for the patient.

Dkt. No. 40-1 at ECF p. 2. Defendants also were required to attest that they had "read and agree[d] to the applicable HRSA COVID-19 Terms and Conditions," with the Terms and Conditions linked in the Attestation itself. *Id*. In turn, the Terms and Conditions required providers to certify, to the best of their knowledge, that patients for whom reimbursement was sought were "Uninsured Individuals at the time the services were provided." Huttinger Decl. ¶ 18 (quoting Terms and Conditions). Prior to May 31, 2021, "Uninsured Individuals" were defined as "individuals who, as of the date of service for which Recipient seeks Payment, are not *enrolled* in [a] Federal health care program . . . or [a] group health plan or health insurance coverage offered by a health insurance issuer in the group or individual market." Terms and Conditions (mirroring Pub. L. No. 116–127, 134 Stat. 182 (2020)) (emphasis added).[12] After May 31, 2021, "Uninsured Individuals" were defined as "individuals who do not have *any* health care coverage at the time the services were provided." Huttinger Decl. ¶ 19 (quoting Terms and Conditions) (emphasis added).[13]

---

[12] Prior to May 31, 2021: https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/terms-conditions-ffcra-relief-fund.pdf.

[13] After May 31, 2021: https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/terms-conditions-uninsured-relief-fund.pdf

The Government has established probable cause that Defendants made false statements when they attested that they had checked for healthcare coverage and had confirmed that the patient did not have coverage and, after submitting those Attestations, made false claims by submitting claims for patients that in fact had coverage at the time of testing. There is evidence that, as a matter of practice, Defendants did not ask for insurance information directly from the patients before submitting the Attestations and that they knew their post-testing insurance discovery processes had a high rate of error and could not therefore serve as a substitute for asking patients directly. Defendants thus did not "check[]" for healthcare coverage and "confirm[]" the lack of coverage. Dkt. No. 40-1 at ECF p.2. Defendants routinely submitted Attestations and corresponding claims knowing that many of the patients for whom claims were submitted did have health insurance.

The Court rejects the argument that the Attestation could be completed truthfully for a patient that Defendants knew had healthcare coverage on the date of testing but whose health insurance did not cover COVID-19 testing specifically.[14] Interpreting the Attestation objectively, based on its plain language and applicable law, *see U.S. ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 463 (9th Cir. 1999), the limiting clause "for COVID-19 testing or care for the patient" modifies only the last antecedent—that the patient would not receive reimbursement from another source—and does not modify the prior antecedents, that the patient was "uninsured" and that the patient did not "have employer-sponsored or individual coverage, Medicare or Medicaid." Dkt. No. 40-1 at ECF p. 2; *see Lockhart v. United States*, 577 U.S. 347,

---

[14] The Court bases its decision on the arguments that have been presented at this preliminary stage before the Complaint has been tested by a motion to dismiss. The Court decides nothing more than that the Government's reading is probably correct. It does not reach a definitive decision on the issue, which it will review at the motion to dismiss and at later stages.

351 (2016) (holding that under the rule of the last antecedent, generally applicable to the interpretation of statutes, "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows").  Thus, in submitting the Attestations, Defendants represented that they had checked and confirmed the absence of health insurance for each patient for whom reimbursement was sought.  That interpretation is consistent with the Terms and Conditions of the UIP to which Defendants attested prior to each claim.  It is also consistent with the statute which originally funded the Uninsured Program, which limited the provision of funding to "Uninsured Individuals," meaning individuals who were "not enrolled in" public or private health insurance—not individuals whose public or private health insurance declined to cover tests for COVID-19.  *See* Pub. L. No. 116–127, 134 Stat. 182 (2020).  The representation that the patient was not enrolled in any health insurance program was a precondition for any reimbursement.  In the FFCRA, Congress did not provide funding under the UIP for patients who were enrolled in a healthcare plan, whether or not that plan provided coverage for COVID-19 testing or care—if a patient was enrolled in such a plan and took at COVID-19 test, he or she was required to go to the insurer for reimbursement and not to the federal government.  Within the same statutory scheme, Congress introduced a requirement that private insurers cover testing for COVID-19 without cost-sharing or prior authorization, during the emergency period which began with the enactment of the FFCRA.  Sec. 6001 (Division F), Pub. L. No. 116-127, 134 Stat. 182 (2020); *see also* Dkt. No. 182 at 5.  These provisions of the FFCRA reinforce the view that Uninsured Program was not designed to allow private insurers to deny coverage for COVID-19 testing and thereby impose the cost on the federal government.  Finally, the last representation in the Attestation was designed to ensure that the provider was not

paid by HRSA if the cost of the testing would, in fact, be covered by another payor besides a health insurer.[15]

The Court accepts Defendants' second argument, that "confirm[ing]" patients' uninsured status under the Attestation and corresponding Terms and Conditions required only that Defendants exercise their "best efforts" to determine the patient had no health insurance coverage. Dkt. No. 182 at 17. Defendants were not required to warrant that the patient had no healthcare coverage. Unlike those cases in which government contractors are required to make warranties about their own conduct, Defendants had no sure way to guarantee that a patient did not, in fact, have coverage when she said that she had none. HRSA's Uninsured Program Patient Roster Attestation Webpage provided the guidance that "if you have direct contact with the patient, you should make *best efforts* to confirm that the patients was uninsured at the time the services were provided." Huttinger Decl. ¶ 26.[16] It did not require that the provider make every effort, or even specific efforts. But, at this stage, that argument only gets Defendants so far. Defendant is correct that "best efforts" accords a "degree of discretion" and "no absolute requirement" can "be read into these words." Dkt. No. 239 at 7 (citing *W. Geophysical Co. of Am. v. Bolt Assocs., Inc.*, 584 F.2d 1164, 1171 (2d Cir. 1978)). For that reason, the Government is mistaken to the extent it suggests that the Defendants were required in every instance to collect

---

[15] The May 2020 HRSA FAQs noted that for "Medicaid enrollees who have limited Medicaid benefits (e.g., those enrolled in Medicaid for family planning benefits)" the UIP would reimburse eligible claims for COVID-19 testing "if the Medicaid plan does not cover these services." HRSA, *FAQs for COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment and Vaccine Administration FAQs*, https://www.hrsa.gov/provider-relief/about/covid-uninsured-claim/faq (published May 2021, updated version published July 2021). The Government points to this clarification, which addresses limited Medicaid benefits and not other types of insurance, as further evidence that claims for patients with other types of were not eligible for reimbursement.

[16] Citing webpage archived at https://coviduninsuredclaimstage.linkhealth.com/patient-details.html.

insurance information or SSNs directly from the patient.  The Attestation and Terms and Conditions did not impose absolute requirements.  However, "best efforts" required Defendants to "actively" and "in good faith" attempt to determine the patient's insured status.  *Aeronautical Indus. Dist. Lodge 91 of Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Techs. Corp., Pratt & Whitney*, 230 F.3d 569, 578 (2d Cir. 2000); *cf. Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 613 n.7 (2d Cir. 1979) (Friendly, J.) (suggesting that under New York law a "best efforts" clause imposes an obligation to act with good faith in light of one's own capabilities).

Defendants attested in connection with each patient claim that they were complying with the Terms and Conditions of the UIP, linked within the Attestation.  Those Terms and Conditions required that Defendants to determine to the "best of [their] knowledge" that the patients to whom they had administered tests and for whom they were seeking reimbursement did "not have *any* health care coverage at the time the services were provided."  Huttinger Decl. ¶¶ 18–19 (emphasis added).  If Defendants submitted claims for patients that they actually knew had such coverage, regardless of any question of "best efforts," those claims would be false within the meaning of the FCA.  *Strock*, 982 F.3d at 66 ("[D]efendants 'knowingly violated a requirement that the defendants know is material to the Government's payment decision." (cleaned up) (quoting *Escobar*, 579 U.S. at 181)).

The Government has put forward evidence suggesting that Defendants (1) as a matter of policy or practice declined to ask for, or even discouraged patients from giving insurance information, while knowing that they had no other system that could reliably determine insurance coverage and (2) were aware that they were submitting claims for reimbursement to

UIP at a rate far in excess of any plausible estimate of the underlying rate of uninsurance in their testing population.

The Government's evidence includes the declaration of the former co-CEO of LabQ, Steve Kamalic. Kamalic was employed by LabQ from September 15, 2021, to December 15, 2021. Kamalic Decl. ¶ 1. He attests that he was told by LabQ mobile testing employees early in his employment, in September or early October 2021, that the managers of LabQ's mobile testing sites had "instructed them not to collect patients' insurance information before taking a COVID test at LabQ's mobile testing sites." *Id.* ¶ 7. His account is not limited to a single isolated conversation. According to Kamalic, "over the course of my three-month employment with LabQ, approximately 10 to 15 mobile COVID-testing employees told me that Weiss or Eilona [sic] instructed them not to collect patient insurance information. Wurzberger and Adar confirmed that LabQ rarely asked for insurance information from patients at LabQ's mobile COVID-testing sites and billed patients lacking such information to the Uninsured Program." *Id.* Defendants did not just fail to collect insurance information directly from the patient at mobile testing sites. Kamalic further attests that, after expressing concern about the company's process for billing a COVID test, he was told "the company generally bills the Uninsured Program for COVID tests." *Id.* ¶ 6. According to Kamalic, the insurance discovery process did not serve as a backstop for the failure to check for insurance coverage from the patients directly. He swears that when he reviewed Defendants' billing information,

> [I]t appeared that LabQ used insurance discovery programs like Tevix/Frontrunner very selectively. In files for patients taking blood or urine tests, I generally noticed a file indicating that LabQ conducted insurance discovery and/or verification. But in files for patients taking COVID-tests, I very rarely saw files indicating that LabQ conducted insurance discovery and/or verification. When I asked Terico about this discrepancy, *he confirmed that LabQ generally does not conduct insurance discovery and/or verification for COVID tests.* The standard industry practice, including at [Kamalic's previous employers], is to collect all identifying

56

information (including insurance cards) to input into Tevix or Frontrunner to verify:
(I) whether that patient has any insurance; and (2) whether there is insurance
coverage for a COVID test taken by a patient on a particular day.  It is not industry
practice to selectively use Tevix/Frontrunner depending on whether the test is for
blood, urine, or COVID testing.

*Id.* ¶ 15 (emphasis added).  Further, Kamalic attested that "Wurzberger and Adar told me that if

Medicaid, Medicare, or a private insurer denied a patient's claim for COVID testing, LabQ's

practice was to rebill that denied claim to the Uninsured Program for reimbursement," *id.* ¶ 9,

suggesting that as a matter of policy Defendants were submitting claims for reimbursement

knowing that the individuals had health insurance.  Kamalic states that he conveyed to Landau,

Wurzberger, and Adar that Defendants were responsible for verifying insurance coverage.  *Id.*

¶¶ 17–18.  He "suggested to Landau, Wurzberger, and Adar that they change the company's

policies and procedures to ensure LabQ did not bill the Uninsured Program without checking if a

patient has insurance," *id.* ¶ 18, as reflected in a WhatsApp thread in which he writes, in October

2021, "I spoke w Daniel and Esther. We will make some changes to ensure we don't bill HRSA

with[out] our checking if they have insurance.  I implemented this at 2 labs it saves headaches

later." *id.*; Dkt. No. 38-1.  Kamalic attests that when he followed up with LabQ leadership, he

was met with either no response or dismissiveness, Kamalic Decl. ¶¶ 21, 23, 24, or, in the case of

Wurzberger, with confirmation of his suspicions, as he attests that she "agreed with me that

LabQ was fraudulently billing the Uninsured Program and promised to be 'the first witness in a

whistleblower lawsuit,'" but allegedly took no actions in response to his concerns, *id.* ¶ 22.

Shortly after these discussions, in early November 2021, Kamalic attests that Landau instructed

him to work from home going forward, where he did not have access to Defendants' databases.

*Id.* ¶ 26.  Kamalic states that he "asked Adar and others for certain information from and

concerning LabQ's databases," but that "[d]espite promises from Adar and others to follow up,"

he "never got the requested information." *Id.*  Kamalic decided to resign from LabQ in early

December 2021, and his last day of work was approximately December 15, 2021. *Id.* ¶ 27. If Kamalic's testimony is to be credited, Defendants made false statements when they attested to having made "best efforts" to check for the patient's healthcare coverage and confirmed that there was none, when they in fact knew or recklessly disregarded that patients had health insurance.

Kamalic's testimony is corroborated by that of Frank Carlo, who worked for LabQ as a Billing Specialist in the Insurance Verification Department between October 2022 and May 2023, after the Uninsured Program closed and long after Kamalic resigned. Carlo Decl. ¶ 1. He attests that he attempted to "collect and/or verify insurance information for people who took COVID-19 tests from LabQ dating as far back as early 2021," and learned from many individuals who received tests from LabQ in 2021 that LabQ told them that "they did not need to give insurance information." Carlo Decl. ¶ 11. Carlo's testimony is consistent with Kamalic's. Kamalic swears that in 2021, managers told Mobile Site workers not to collect insurance information, and Carlo swears that when he investigated whether insurance information was collected at the Mobile Sites in 2021, he was told that it was not.

There is also documentary evidence that supports Kamalic's account and the Government's claim that Defendants made false statements when they attested to having checked for healthcare coverage and confirmed that the patient had none. On December 17, 2021, around the time of Kamalic's departure, Landau wrote an email to LabQ's third-party billing company in which Landau requested, "[P]lease follow up we need a report and understanding on all recouped payments especially from HRSA." Dkt. No. 32-28. The employee of the billing company responded, "Moshe I am not sure what you are looking for is this part of the reconciliation. We bill HRSA then we receive notification that they have other coverage and

then bill the insurance company after we receive the insurance information from you based on insurance discovery." *Id.* The email exchange suggests that the employee, who would have percipient knowledge, understood that Defendants made the Attestations and submitted the claims before having confirmed that the patient had no healthcare coverage. Based on the record before the Court, Landau may be deemed to have adopted the admission. There is no evidence of a response from Landau. The inference plainly arises that Defendants systematically failed to confirm that patients lacked health insurance before submitting claims to the UIP for reimbursement.

As further evidence that Defendants did not exercise best efforts to determine the patient's insurance coverage before attesting that they had done so, the Government proffers an email exchange from March 7, 2022. Just before the Uninsured Program ended but well after Kamalic had ended his employment, one of LabQ's billing managers emailed LabQ leadership that they should change practices, writing "Billing is spending a tremendous amount of money paying an outside vendor to obtain the insurance information for our patients. Now that our Covid testing volume has dropped off, I feel now that our mobile sites and Labq locations can *start* asking for insurance information if not given in advance for every patient that comes to be tested." Dkt. No. 32-19 (emphasis added). If Defendants' testing sites were in fact asking for insurance information at the time of testing, it appears there would have been no reason for the email. The Court infers from this email that, before March 2022, LabQ did not as a matter of practice ask for insurance information from patients.

The Government further offers evidence that Defendants knew that they had no other reliable system for collecting and verifying insurance information before submitting the Attestation. As noted, Kamalic swears that LabQ used insurance discovery selectively rather

than consistently for COVID-19 testing patients.  Kamalic Decl. ¶ 15.  Landau testified during the investigative stage of this case that it was "100 percent" true that it was better to collect insurance information directly from the patient than to rely on Tevix, Defendants' third-party insurance discovery provider.  Tszyan-Dai Decl. ¶ 30; Landau Dep. II. at 214:11–23).  The HRSA Uninsured Program Patient Roster Attestation Webpage directs: "[I]f you have direct contact with the patient, you should make best efforts to confirm that the patients was uninsured at the time the services were provided."  Huttinger Decl. ¶ 26.  Wurzberger admits that there was only a 20–30% success rate of insurance discovery through Tevix, the highest among the programs that Defendants piloted.  Wurzberger Decl. ¶ 23.

The Government's evidence also supports the claim that Defendants knew the Attestations were false with respect to the verification of uninsured status for patients served through Referral Clients, which were generally institutions like schools for which Defendants would have had more streamlined points of contact.  Tszyan-Dai Decl. ¶ 31; Dkt. Nos. 32-16, 32-17, 32-18.  On October 18, 2021, a LabQ sales representative told an independent contractor responsible for a Referral Client (a New Jersey Town Board of Education) that information such as a patient's name, date of birth and phone number was "required" but insurance information was only "preferred," Dkt. No. 32-16, and the client accordingly provided no insurance information for the seventy-seven patients, Dkt. No. 32-17.  Defendants subsequently billed almost 75% of the COVID-19 testing claims on behalf of that school district's beneficiaries— 426 in total—to the UIP.  Dkt. No. 32-18, *see* row 78 at ECF 3.  As the Government points out, a high percentage of district employees would have had employer-sponsored health insurance.  Tszyan-Dai Decl. ¶ 31; Dkt. Nos. 32-16, 32-17, 32-18.  At this stage, the Court has no basis to infer that such correspondence was idiosyncratic and did not reflect a general practice.

Defendants billed claims for most Referral Client patients to the UIP.  *See* Tszyan-Dai Decl.

¶ 36(e)(ii); Dkt. No. 32-18.  Of the 184,327 COVID-19 tests performed on behalf of 373 of

Referral Clients, Defendants claimed 75% of the tests were performed for uninsured patients.

*See* Tszyan-Dai Decl. ¶ 36(e)(ii); Dkt. No. 32-18.  Based on the identity of those Referral

Clients—many are, for example, school districts—it is reasonable to assume that many of those

patients were, in fact, insured.  *See* Tszyan-Dai Decl. ¶ 36(e)(ii); Dkt. No. 32-18.

The Government also offers evidence that many of the patients with respect to whom

Defendants falsely attested that they checked for health insurance coverage and for whom they

sought reimbursement were in fact enrolled in health insurance, and that Defendants would have

been aware of that fact.  Landau regularly received reports that LabQ was billing the UIP for the

majority of the tests it administered.  For example, one report received by Landau on July 5,

2021, showed that for the months of July 2020 to December 2020, HRSA paid more claims from

the Uninsured Program than all private insurers combined for the same months, with a total of

70% of claims paid by the Uninsured Program rather than private insurers.  *See* Tszyan-Dai

Decl. ¶ 36(e)(i); Dkt. No. 32-13.  LabQ internal records show that, for 2020–2021, Defendants

were billing approximately 52% of their claims during the peak of the pandemic to the

Uninsured Program. *See* Tszyan-Dai Decl. ¶ 25; Dkt. Nos. 32-13, 32-14; Dkt. No. 182 at 33.

According to the Government's evidence, Defendants would have known that nothing close to

the majority of its patients were uninsured.  Landau himself testified during the investigative

stage that he estimated that only approximately 25% of Defendants' patient population was

uninsured.  Tszyan-Dai Decl. ¶ 36(e) (citing Landau Dep. II. at 186:21–187:24).  Public

information available to Landau at the time suggested a lower uninsured rate, as low as 6.3% for

the nonelderly population of New York state.  HHS Trends at 10.  Landau stated in his

deposition that he understood the uninsured rate in New York to be approximately 15%.  Landau

Dep. II. at 188:3–6.  According to the data analysis conducted during the investigation by HHS-

OIG, approximately 27% of the money paid by the Uninsured Program to Defendants was for

COVID-19 testing services provided to persons with Medicare or Medicaid.  Lowe Decl. ¶ 10.

The Government's evidence, viewed in isolation, tends to show that the Defendants made

false statements via the Attestations and that such false statements were material to HRSA's

decision to pay the corresponding claims for reimbursement.  The statements were false because

Defendants did not make best efforts to check for health insurance coverage prior to making the

Attestations and corresponding claims and/or did not believe, to the best of their knowledge, that

the patients were uninsured, knowing in fact that many of the patients had health insurance.  The

false statements were material because they would have had a "tendency to influence, or be

capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

In particular, the Government has offered evidence that HRSA "would have refused to pay had it

known of the misrepresentation."  *Anthem Inc.,* 2022 WL 4815978, at *5.  The Government

alleges, with evidentiary support, that Defendants did not just falsely attest to having checked for

coverage when they had not, but also that they falsely attested that they had confirmed the

patient was uninsured when they were aware that the patient was insured or recklessly

disregarded a high likelihood of coverage.  If the Government's claims are to be credited, the

Attestations and claims were material.  The Uninsured Program's eligibility requirements were

express conditions of payment, as set forth in the Attestations and the Terms and Conditions.

*See* Huttinger Decl. ¶¶ 16–19; *see also id*. ¶ 20 (noting that the Terms and Conditions include the

following provision: "The Recipient acknowledges that the Recipient's full compliance with all

Terms and Conditions is material to the Secretary's decision to disburse funds to the Recipient.

Non-compliance with any Term or Condition is grounds for the Secretary to recoup some or all of the payments made.").  There was no way to submit a claim to the UIP for reimbursement without having previously submitted an Attestation corresponding to that patient.  A provider who did not make an Attestation could not submit that patient's claim for reimbursement through MEDI.  Moreover, when HRSA learned through its contractor Optum that a provider had submitted claims for insured individuals, it would not pay them as a matter of course.  *Id.* ¶¶ 22, 36–37; Tszyan-Dai Decl. ¶ 9; Dkt No. 32-1.  Of course, there would be "strong evidence" to rebut materiality "if the Government regularly pa[id] a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position." *Escobar*, 579 U.S. at 195.  Though Defendants point to evidence that HRSA sometimes reimbursed claims that it had previously denied for a person with health insurance, Dkt. No. 32-38; Landau Dep. III. at 105:12–106:5, the Government has put forward evidence suggesting that some such reimbursements after denials may have resulted from SSNs not being included in the resubmitted patient rows, Dkt. No. 195.  In any event, those disputed facts do not at this stage suggest a course of regular reimbursement.  Finally, Defendants' noncompliance with the central program eligibility requirements was not minor or insubstantial but went to "the heart of the[ir] bargain" with HRSA.  *See AECOM*, 19 F.4th at 116.  "The financial costs to the Government here are substantial and not merely administrative costs." *Anthem Inc.*, 2022 WL 4815978, at *6.

The Government offers further evidence that Defendants knew at the time that they made their Attestations and corresponding claims that patients who had *any* health insurance on the date of testing were ineligible for reimbursement.  The FCA "covers not just those who set out to defraud the government, but also those who ignore the obvious warning signs." *U.S. ex rel.*

*Ervin & Assocs., Inc. v. Hamilton Sec. Grp., Inc.*, 370 F. Supp. 2d 18, 42 (D.D.C. 2005) (internal

citation omitted); *see also U.S. ex rel. Hartpence v. Kinetic Concepts, Inc.*, 44 F.4th 838, 852

(9th Cir. 2022) (noting that email from billing employee "express[ing] serious concerns to higher

management" that internal policies contradicted legal guidance can support inference of

scienter); *United States v. Lakeshore Med. Clinic, Ltd.*, 2013 WL 1307013, at *3 (E.D. Wis. Mar.

28, 2013) (noting that evidence that "defendant ignored audits disclosing a high rate of

upcoding" can support claim that "defendant acted with reckless disregard for the truth and

submitted some false claims").

Defendants claim that they understood at the time that the UIP would provide

reimbursement for patients whose health insurance would not cover COVID-19 testing.  They

claim to have believed that, in the interests of promoting widespread testing, HRSA did not

require them to take the risk that a patient's insurance would not cover the test provided by

Defendants.  However, Defendants also concede that they knew at the time that private insurers

were required by the FFCRA to cover COVID-19 tests, Doci Decl. ¶ 24 ("[W]e understood that

private insurance was mandated by the government to cover COVID-19 testing."), which tends

to weigh against their view that Congress intended for the UIP to cover insured individuals.  The

Government has offered evidence that Defendants' purported program eligibility interpretation

was only a post hoc explanation, as Defendants knew that the UIP covered only patients who had

no health insurance.  In the first instance, the language of the Attestation itself tends to

undermine the reasonableness of Defendants' interpretation, as it required them to attest that they

had:

> checked for health care coverage eligibility *and* confirmed that the patient is uninsured,
> *and* does not have employer-sponsored or individual coverage, Medicare or Medicaid
> *and* that no other payer will reimburse for COVID-19 testing or care for the patient.

Dkt. No. 40-1 at ECF p. 2 (emphasis added).  The Terms and Conditions to which they likewise

attested to have read and agreed required them to certify that the patients for whom they sought

reimbursement were "Uninsured Individuals at the time the services were provided,"  Huttinger

Decl.  ¶ 18, defined as either "individuals who, as of the date of service for which Recipient

seeks Payment, are not *enrolled* in [a] Federal health care program . . . or [a] group health plan or

health insurance coverage offered by a health insurance issuer in the group or individual

market," *id*. (emphasis added),[17]  or "individuals who do not have *any* health care coverage at the

time the services were provided," *id*. ¶ 19 (emphasis added).[18]  The Act of Congress which

originally funded the UIP used the same language of eligibility for "Uninsured Individuals,"

meaning individuals "not enrolled in" public or private health insurance.  *See* Pub. L. No. 116-

127, 134 Stat. 182 (2020).  The language of the HRSA FAQs likewise undermines Defendants'

interpretation.  *See* HRSA, *FAQs for COVID-19 Claims Reimbursement to Health Care

Providers and Facilities for Testing, Treatment and Vaccine Administration FAQs* (published

May, 2020).[19]  Defendants cannot avoid liability under the FCA by claiming they were simply

unaware of the UIP's requirements, as set forth in the Terms and Conditions.  *See United States

v. Bourseau*, 2005 WL 8169208, at *5 (S.D. Cal. Nov. 2, 2005) ("[A] provider who fails to

inform itself of the reimbursement requirements may be found to act in reckless disregard or in

deliberate ignorance of those requirements.").  Moreover, Defendants were warned by Kamalic

---

[17] Prior to May 31, 2021: https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/terms-conditions-ffcra-relief-fund.pdf.

[18] After May 31, 2021: https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/terms-conditions-uninsured-relief-fund.pdf

[19] The FAQs state: "**Who is considered to be an "uninsured individual" for purposes of providers requesting reimbursement for testing, treatment, or vaccine administration?**  For claims for COVID-19 testing and testing-related items and services, treatment of positive cases of COVID-19, and vaccine administration claims, a patient is considered uninsured if the patient did not have *any* health care coverage at the time services were rendered."  *Id.* (italics added).

and others that individuals with *any* health insurance coverage were ineligible for the UIP. [20]

After reviewing the HRSA website to understand who was responsible for confirming that a

patient was uninsured when administering a COVID-19 test, Kamalic told Wurzberger and Adar

that Defendants were responsible for ensuring that the patient was uninsured when administering

the COVID-19 test.  Kamalic Decl. ¶ 13.  He gave the same information to Landau.  *Id.* ¶ 17.

Although Adar and Wurzberger reacted with surprise and Landau stated that he disagreed,

Kamalic Decl. ¶¶ 13, 17, the three were on notice that LabQ itself was required to confirm

healthcare coverage.  It is telling that Kamalic was forced to resign shortly after pointing out to

Defendants their obligations under the UIP.  *See id.* ¶¶ 25–27.

 The Government also offers evidence that an "an industry expert" warned LabQ and Dart

that their practices were not permissible.  Tszyan-Dai Decl. ¶ 36(a), (c); Dkt. Nos. 32-12, 32-38.

In October 2021, in an email chain in which a LabQ contractor was marketing LabQ's COVID-

19 testing services as "government-funded through the Cares Act," a LabQ employee was

informed by a pharmacy owner who had "researched [federal payments for COVID-19 testing]

extensively" that he had "not been able to find any program through the Cares Act that allows

labs to be reimbursed for COVID testing in schools," and that he was "concerned whomever

---

[20] The Government also offers a January 2022 email exchange in which a health concierge
service asks whether tests provided by LabQ will be covered by the CARES Act.  Dkt. No. 300-
1.  One LabQ employee, whom the Government characterizes as "a LabQ Regional Service
Manager with responsibilities relating to Defendants' private clients" (a characterization
Defendants do not dispute), writes back, "if the patient does not have insurance."  *Id.*  Another
LabQ employee, level of seniority unknown, writes, "so why do we bill them?"  *Id.*  The
Regional Services Manager responds, "The CARES ACT covers only for patients who don't
have insurance at all.  The patients we are billing [the health concierge] are patients who have
insurance who get tests for leisure purposes (movie actors, celebrities) which the CARES ACT
does not cover."  *Id.*  From this exchange, the inference may be drawn that at least in January
2022, some LabQ managers understood UIP eligibility to be limited to individuals with no
insurance at all.

[was] handling [their] billing through [their] lab [was] doing something that [was] illegitimate to bill the federal government for COVID testing." *See* Tszyan-Dai Decl. ¶ 36(a); Dkt. No. 32-12. Defendants dismiss the credibility and qualifications of "an unknown pharmacy owner." Dkt. No. 182 at 33. However, it is undisputed that the communication would have put Defendants on notice of their obligations.

In addition, LabQ emails sent to Landau reflect that, in December 2020, a LabQ employee spoke to a representative from HRSA regarding a set of reimbursements which were reversed by HRSA because the patients were found to have been insured at the time of testing. Tszayan-Dai Decl. ¶ 36(c); Dkt. No. 32-38. Each of the reversed payments were for nursing home employees covered by the 1199 union health insurance plan. Dkt. No. 32-38. The employee explained to Landau, "They claim that we can't get paid for these at all but it seems like we are getting paid for others once they are appealed with the [1199] denial letter. We have to determine if these were denied or if we should bill them to 1199 first." *Id*. The Government argues that this exchange is evidence that a LabQ employee was definitively told by HRSA at one point, and relayed to Landau, that claims for individuals with health insurance could not be billed to UIP, even if their insurance declined to cover the COVID-19 testing. The exchange implies that Defendants knew already that the 1199 plan was denying coverage for the given tests, but that Defendants were systematically billing such tests to the UIP both before and after billing to and being denied by the 1199 plan.

Defendants have several responses to the Government's evidence. They may be convincing at trial or even at the summary judgment stage where the parties are limited to

admissible evidence. [21]   However, "the Section 3101(d)(2) hearing is not intended to be a trial on

the merits." *Teeven*, 862 F. Supp. at 1211.  None of Defendants' evidence or explanations casts

a sufficient "cloud over the Government's showing of probable validity," *id*., to justify vacating

the Writs.  In the first instance, Defendants question the reliability and credibility of Kamalic's

testimony.  He was employed by Defendants for only a few months and, in their view, his

credibility is undermined by the fact that "[d]espite being co-CEO of a company he says was

defrauding the Government, Kamalic did not immediately resign or make a report to the

government[,] [n]or does he contend that he—even once—instructed one subordinate at LabQ to

stop submitting the claims he insists were fraudulent."  Dkt. No. 182 at 12–13 n.3.  Defendants

dismiss both Kamalic's and Carlo's statements as "[c]onclusory, self-serving contentions." *Id.*

at 33.

   The Government, however, has offered evidence both of the "veracity" of the statements

of Kamalic and Carlo and of their "basis of knowledge." *Gates*, 462 U.S. at 238.  As to the basis

of their knowledge, both Kamalic and Carlo testify to information they obtained in the course of

their professional duties working for LabQ.  That lends support to the reliability of the

information. *Cf.* Fed. R. Evid. 803(6); 5 Weinstein's Federal Evidence § 803.08 (noting "the

general trustworthiness of regularly kept records," and noting "some guarantee of reliability" for

opinions in the records of regularly conducted activity because "the transmitter of the

information on which the record is based must have had personal knowledge of the matter . . .").

And, as to veracity, the Government offers substantial cause for a jury to credit Kamalic's

testimony.  Kamalic has had extensive relevant experience in the healthcare industry both before

---

[21] In this preliminary decision, the Court does not prejudge Defendants' motion to dismiss.  Nor
does the Court foreclose reconsideration of the asset restraints as the evidence develops.

and after his employment with Defendants. Prior to joining LabQ, he was Chief Operating Officer of Acupath Laboratories from 2014 to 2020 and of ProPhase Diagnostics, Inc. from 2020 to 2021. Kamalic Decl. ¶ 1. After leaving LabQ and since May 2023, he has been CEO of Solaris Diagnostics. *Id.* Defendants thought enough of Kamalic to hire him as co-CEO after three in-person interviews. *Id.* ¶ 2. Defendants seek to discredit him on the grounds that he did not "immediately" resign from LabQ, but he did raise concerns about the practices at LabQ almost from the start of his employment and consistently throughout and, after he raised those concerns, he was asked to work from home without full access to LabQ's database. Dkt. No. 182 at 12–13 n.3; *id.* ¶ 26. He decided to resign shortly thereafter, and this investigation began shortly after that. Defendants offer no reason to doubt Carlo's credibility, beyond characterizing him as "a low-level contractor." Dkt. No. 182 at 33. Moreover, Kamalic and Carlo corroborate one another. Kamalic speaks to insurance collection practices in 2021, and Carlo speaks to the information he collected in his job regarding insurance collection practices in 2021. Their testimony is further corroborated by the documentary and statistical evidence proffered by the Government.

To be sure, Kamalic's testimony is hotly disputed. Defendants offer evidence from one of their employees, Eliona Doci, that in substance contradicts Kamalic's statements. Doci swears that "[a]s part of the training, employees were taught that they were to collect insurance information, and how to accurately collect insurance information." Doci Decl. ¶ 24. Defendants also point to the systems that they used to collect patient insurance information at intake, initially through paper requisition forms and later through computerized intake processes, as well as related policies and procedures. Adar Decl. ¶¶ 15–29; Dkt No. 183-1; Doci Decl. ¶¶ 30, 35–37; Dkt. Nos. 185-2, 185-3; Wurzberger Decl. ¶ 12. But the fact that Defendants had systems for

collecting insurance information does not prove that they consistently used those systems. And

at the probable validity stage, the Court need not credit the testimony offered by the accused

against that offered by the accuser. *See Curley*, 268 F.3d at 70 ("When information is received

from a putative victim or an eyewitness, probable cause exists . . . unless the circumstances raise

doubt as to the person's veracity," such that "probable cause [may be found] where a police

officer was presented with different stories from an alleged victim and the arrestee"); *Ricciuti,*

124 F.3d at 128 (identifying probable cause where arresting officer believed the claimed victim's

account of a fight based on his visible injuries, notwithstanding the alleged assailant's cries of

innocence); *Savarese*, 547 F. Supp. 3d at 326 ("The officers were not required to take the words

of Plaintiff and Reen that Plaintiff had not committed the crime in the face of direct evidence

from the victim himself."); *Povlin*, 48 F.2d at 92 ("Clearly, denial of guilt by the accused, even

though corroborating testimony is offered, is not necessarily enough [to overcome probable

cause finding]."); *Fabrikant*, 691 F.3d at 216.[22]  The Kamalic and Carlo declarations remain

powerful evidence in support of the Government claims.

      Next, Defendants offer Esther Wurzberger's testimony regarding the employee and

third-party resources that they devoted to conducting manual insurance verification and

---

[22] In *Fabrikant v. French*, the Court held that "[D]efendants had probable cause to believe
Fabrikant committed animal cruelty" because "[c]rucially, Fabrikant does not contest that
multiple witnesses reported to the SPCA that Fabrikant was abusing of her animals; she merely
argues that the witnesses were lying."  691 F.3d at 216.  The Court found that "Fabrikant has
failed to raise any genuine issue of material fact as to the motives of the complaining witnesses.
Instead, she makes only vague claims about the witnesses' conspiring against her, even though
she admitted in her deposition that she had no evidence of any such conspiracy."  *Id.*  "[T]he
complaining witnesses' status as identified citizen informants provides an indicia of reliability,
and the fact that their descriptions were based on eyewitness accounts also carries additional
weight in assessing the reasonableness of the investigators' probable cause determination."  *Id.*
(internal quotations omitted).  "[E]ven assuming that Fabrikant's explanations are plausible, the
fact that an innocent explanation may be consistent with the facts alleged does not negate
probable cause."  *Id.* (internal quotations omitted).

automated insurance discovery after testing.  Wurzberger Decl. ¶¶ 14–15, 17, 25.  Defendants point out that LabQ spent considerable time and money testing other insurance verification services to compare their performance in finding patient insurance.  *See id*. at ¶ 23.  Defendants offer undisputed evidence that LabQ spent more than $5 million on third party vendors to develop and implement patient intake, insurance verification, and insurance discovery systems and processes.  *Id*. at ¶ 24.  Why, they ask, would they have spent so much money on patient intake and insurance verification and discovery if they were intent on defrauding the Government by submitting claims for the insured and ineligible for reimbursement?

One of Defendants' other arguments provides an answer.  Private insurance paid more per COVID-19 test than the federal government did.  It could not hurt and could only help if Defendants also checked for private health insurance.  If, after submitting an Attestation or a claim to the Government, Defendants discovered that the patient also had healthcare coverage, they could always then bill private health insurance and, if the UIP had already reimbursed for the test, they could in theory reimburse UIP and retain the difference.  They would thereby ensure that they were never out of pocket.  For that reason, the evidence offered by Defendants that they ultimately billed private insurers for over 2.5 million of the COVID-19 tests they administered, representing over half of all the COVID-19 tests Defendants performed, Wurzberger Decl. ¶ 26, does not get Defendants over the hump.  Defendants may have still intended to make false claims to the Government while also hoping that they could get more from private insurance.

More fundamentally, Esther Wurzberger and Eliona Doci are interested witnesses.  Wurzberger is a current employee of Defendants who joined LabB in February 2021.  Wurzberger Decl. ¶ 3.  Doci likewise has been employed by Defendants since February 2021.

Doci Decl. ¶ 3.  It is fair to infer that they have interests in the case and thus their credibility is at issue at this stage.  *See Duke Labs., Inc. v. United States*, 222 F. Supp. 400, 407 (D. Conn. 1963) ("In passing on the credibility of a witness, you may consider whether that witness has any bias or interest in the outcome of the case; and, if so, whether he has permitted that bias or interest to color his testimony."), *aff'd*, 337 F.2d 280 (2d Cir. 1964); *see also* 4 L. Sand et al., Modern Federal Jury Instructions 76.01 (2024).  The Government has also offered evidence that puts into question their reliability.  While she had responsibilities that at times covered Defendants' billing practices, *id.*, Wurzberger admits that she never reviewed the UIP's Terms and Conditions, Dkt. No. 231-1, Deposition of Esther Wurzberger ("Wurzberger Dep.") 150:20–151:13, 159:21–160:4.  Doci is one of the individuals that Kamalic identifies as having instructed employees not to collect insurance information. Kamalic Decl. ¶ 7.  And, ultimately, the believability of each witness will be for the jury.  The fact that one witness contradicts the report of the other does not, without more, undermine a showing of probable cause.  *Fabrikant*, 691 F.3d at 216 (2d Cir. 2012); *Finigan v. Marshall*, 574 F.3d 57, 61–62 (2d Cir. 2009); *Panetta*, 460 F.3d at 395; *Savarese*, 547 F. Supp. 3d at 327.

Defendants also respond that they were not on notice that a high percentage of their claims were ineligible by virtue of billing approximately 52% of their 2020–2021 claims to the UIP, because, given the nature of Mobile Testing, their patient population would have had higher than average rates of uninsurance, as many were allegedly homeless, visiting from another country, or in the United States illegally.  *See* Dkt. No. 182 at 33; Landau Dep. II. at 186:21–25; Doci Decl. ¶ 46; Wurzberger Decl. ¶ 7.  That proposition raises a contested question of fact.  As the Government points out, Landau agreed that he ultimately "reached the conclusion [that] about a third of [LabQ's patients] or less will be uninsured."  Landau Dep. III. at 189:22–25.

Further, Defendants' characterization of their Mobile Testing population as majority uninsured is challenged by Kamalic, who noted that the five boroughs of New York City and New Jersey where Mobile Testing occurred were "generally areas where patients have healthcare coverage through their employers, unions, or families." Kamalic Decl. ¶ 11. "Indeed, several mobile COVID-testing employees told me that LabQ's mobile-site patient population often wanted COVID-testing to get back to work." *Id.*

Defendants argue that to the extent their insurance discovery and verification methods were flawed, the Government cannot reasonably hold providers to a higher standard than the Government's own flawed auditing processes. Dkt. No. 182 at 25. This argument is without merit. Defendants were required to attest that they had confirmed that the patient did not have insurance for health care. Defendants were not relieved of that obligation because Optum also checked for patient coverage. Defendants essentially recharacterize Optum's preauthorization process, by which Temporary Patient IDs were issued, as a "stamp of approval . . . of the patients' eligibility" for the Uninsured Program. Dkt. No. 182 at 31; *accord* Dkt. No. 239 at 13. However, "Defendants cite no authority for their proposition that a provider may make false statements to a federal program so long as the agency fails to catch the resultant claims." Dkt. No. 230 at 12. The law is to the contrary. "The United States is entitled to guard the public fisc against schemes designed to take advantage of overworked, harried, or inattentive disbursing officers; the False Claims Act does this by insisting that persons who send bills to the Treasury tell the truth." *United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008).

As discussed above, Defendants argue that even knowledge that a patient was insured on the date of testing cannot constitute per se knowledge of falsity "because when Defendants submitted claims to the UIP for reimbursement, they understood the term 'uninsured' applied to

patients who had no insurance coverage *for the COVID-19 test Defendants administered*." Dkt. No. 182 at 28. Defendants also point to HRSA's website, which advised providers to "make best efforts to confirm that the patient was uninsured at the time the services were provided" and then specifically noted that the question was whether the patient was uninsured "for claims for COVID-19 Testing and Testing-Related Items and Services." Dkt. No. 184-4; Huttinger Decl. ¶ 26; Compl. ¶ 30. HRSA's website further advised that providers must attest that "the patient does not have health care coverage, and no other payer will reimburse them for COVID-19 testing." Dkt. No. 184-5. Defendants urge that they "naturally and sensibly" understood the words "for COVID-19 testing" to mean that the key question was whether patients lacked healthcare coverage for the COVID-19 testing being submitted for reimbursement. Dkt. No. 182 at 29 (citing Glusman Decl. ¶ 24; Wurzberger Decl. ¶ 7). Defendants contend that their contemporaneous interpretation was "not only reasonable but it actually effectuated the UIP's purpose of providing cost-free testing to the public." *Id*. at 28. Defendants point to the continuation of the exchange on which the Government relies (described *supra* at p. 67) in which Defendants were told that they could not be reimbursed for claims made on behalf of nursing home employees covered by the 1199 union plan. Dkt. No. 32-38. The LabQ employee conveyed to Landau that HRSA was paying other similar claims once Defendants appealed the claim, including by providing HRSA the denial letter sent by the 1199 union insurance plan which covered nursing home employees. *Id*. According to the Defendants, the email shows LabQ investigating why HRSA sometimes paid claims denied by the 1199 plan but did not pay others, and supports Defendants' argument that HRSA sometimes did pay for tests that Defendants explicitly informed HRSA that private insurance refused to cover. Dkt. No. 182 at

35; Dkt. No. 239 at 11–12.  Defendants assert that Landau sought out guidance from HRSA in support of Defendants' good-faith best efforts to comply with the program:

> We spoke to HRSA. I don't know who answered the phone, it's Optum or it's other agencies . . . . We're getting different answers.  We did get a confirmation once that it could all be billed, then we got a confirmation that they don't know, then we got another confirmation that—it was a conflict.  Constant conflict.  And the health department, we couldn't get the normal answer.  We started to upload the documents from 1199 claiming that they're not covering the testing and appealing all this rejections.  That's how we got paid.

Landau Dep. III. at 105:12–106:5.  Defendants further note that New York State had mandated that nursing home employees receive COVID-19 screening tests, *see* Allen Decl. ¶¶ 13–14; Dkt. No. 184-2 (directive from the New York State Department of Health requiring twice weekly COVID-19 testing for nursing home personnel), but the 1199 union health plan declined to cover twice weekly COVID-19 testing unless it was "medically necessary," see Dkt. No. 184-3 (1199 memorandum).  In Defendants' view, the Uninsured Program existed to fill just such a gap.  *See* Dkt. No. 239 at 1–2.  "Where there are legitimate grounds for disagreement over the scope of a . . . regulatory provision, and the claimant's actions are in good faith, the claimant cannot be said to have knowingly presented a false claim."  *U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 130 F. Supp. 3d 866, 877 (S.D.N.Y. 2015) (quoting *United States v. Southland Mgmt. Corp.,* 326 F.3d 669, 684 (5th Cir. 2003) (Jones, J., concurring)); *see also Lamers,* 168 F.3d at 1018–20; *Siewick,* 214 F.3d at 1378; *Oliver*, 195 F.3d at 464 ("A contractor relying on a good faith interpretation of a regulation is not subject to liability, not because his or her interpretation was correct or 'reasonable' but because the good faith nature of his or her action forecloses the possibility that the scienter requirement is met.").

However, as the Government points out, "continuing to seek reimbursement from a program after being told by the agency that you may not do so is in itself reckless."  Dkt. No. 230 at 15 n.15.  Further, it is not clear that Defendants' policy argument as to the 1199 plan

holds water: Kamalic, who had a family member employed at a nursing home controlled by Defendant Landau's brother, understood that "nursing home owners and operators paid for the twice-weekly testing out-of-pocket to avoid the state penalties for owners and operators that did not test." Kamalic Decl. ¶¶ 8, 12. Nonetheless, when Kamalic reviewed the billing for his own family member's bi-weekly tests, he found that LabQ billed all of her tests to the UIP. *Id*. ¶ 12. When he reviewed different date ranges, nursing home locations, etc., he found that Defendants "regularly billed COVID-testing for virtually all nursing home employees to the Uninsured Program—not just my family member." *Id*.

In short, neither the Court nor a jury would be required to accept Landau's self-serving statements, particularly where there is no record of the alleged conversation with HRSA. Scienter may be found where Defendants were "aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statement's truth or falsity" or were "conscious of a substantial and unjustifiable risk that their claims are false," *SuperValu Inc.*, 598 U.S. at 751, yet still submitted them to the Uninsured Program. *See Bourseau*, 2005 WL 8169208, at *5 ("[A] provider who fails to inform itself of the reimbursement requirements may be found to act in reckless disregard or in deliberate ignorance of those requirements."). Indeed, Congress's purpose in adding the "deliberate ignorance" and "reckless disregard" criteria for the meaning of "knowingly" within the meaning of the FCA in 1986 was to address "ostrich-like" behavior, or the "refusal to learn of information which an individual, in the exercise of prudent judgment, had reason to know." Claire M. Sylvia, The False Claims Act: Fraud Against the Government § 4:59 (quoting S. Rep. No. 99-345, at 15 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5280, and in Appendix B-2). As the Supreme Court held in *Supervalu*, "facial ambiguity alone is not sufficient to preclude a finding that [a defendant] knew their claims were false." 598

U.S. at 749.  The FCA's scienter element refers to the defendant's "knowledge and subjective beliefs—not what an objectively reasonable person may have known or believed."  *Id*.  "In assessing scienter, the FCA is concerned with 'what the defendant thought when submitting the false claim—not what the defendant may have thought after submitting it.'"  *U.S. ex rel. McSherry v. SLSCO, L.P.*, 2024 WL 1934443, at *2 (E.D.N.Y. May 2, 2024) (quoting *SuperValu Inc.*, 598 U.S. at 752).  "As such, the focus is not . . . on *post hoc* interpretations that might have rendered their claims accurate."  *SuperValue Inc.*, 598 U.S. at 752.

As laid out above, the Government has offered evidence that Defendants knew or recklessly disregarded that the UIP covered only patients who were not enrolled in any health insurance at all, and not those whose plans refused to cover a COVID-19 test.  Without prejudging Defendants' motion to dismiss, the Court credits that Congress could simply have meant what it appears to have said: that it was providing a pool of funding for individuals who had *no insurance at all*, Pub. L. No. 116-127, 134 Stat. 182 (2020), while simultaneously imposing a requirement that private insurers cover the cost of COVID-19 testing for their enrollees, *id*., § 6001.  The fact that Congress's undisputed goal at that time was to increase the accessibility of testing for COVID-19 does not mean that it intended to achieve that goal at all costs.  As the Supreme Court has repeatedly noted, "it frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law."  *Norfolk S. Ry. Co. v. Sorrell*, 549 U.S. 158, 171 (2007) (quoting *Rodriguez v. United States*, 480 U.S. 522, 526 (1987) (per curiam)).

At this stage, the Government has established probable cause to infer that either Defendants did not genuinely and contemporaneously believe in their theory of program eligibility, or else they had sufficient warning of the falsity of their interpretation that they acted

with reckless disregard to its falsity. The Defendants' proffered evidence does not cast doubt on the showing of probable validity.

## B.    False Claims on the Eve of UIP Closure

The Government has also established probable validity with respect to its claim that Defendants violated the FCA when, beginning in early March 2022, they simultaneously submitted claims to the UIP and to private insurance. Defendants' argument that they have hundreds of thousands of unbilled claims which would fully offset any amount owing to HRSA is, at this stage, both unsubstantiated and irrelevant as to the probable validity of the Government's FCA case. Wurzberger Decl. ¶¶ 86–87, 91.

The evidence before the Court tends to show that by early March 2022, rumors were circulating that HRSA was going to close the Uninsured Program. Wurzberger Decl. ¶¶ 86–87. The program ultimately did close on March 22, 2022. The Government has submitted evidence that on the eve of the program's closure and in the face of those rumors, on March 6, 2022, Landau gave the direction to LabQ employees by email that they were to bill "both HRSA and insurance" for COVID-19 testing. Tszyan-Dai Decl. ¶ 29; Dkt No. 32-8. Specifically, Landau stated: "We need a way to sometimes bill for both HRSA and insurance and if we [sic] paid from insurance we will pay back HRSA." *Id.* At the time, Defendants allege that they had hundreds of thousands of unbilled claims and insufficient time to conduct full discovery before the program would close. Wurzberger Decl. ¶¶ 86–87. The Government points out that Defendants never, in fact, returned any funds to HRSA on or after March 1, 2022. Huttinger Decl. at ¶ 39.

Later email communications involving LabQ's third-party billing company show that LabQ effectuated this policy of simultaneous billing. On May 13, 2022, a third-party billing company employee emailed Esther Wurzberger to memorialize a prior telephone call between them in which they discussed claims previously submitted to the Uninsured Program. Tszyan-

Dai Decl. ¶ 29; Dkt. No. 32-15.  According to the email, the third party noted that, during their call, Wurzberger had confirmed that "some of them [i.e. some of LabQ's claims for reimbursement] are claims that were paid by HRSA, that now will be billed by Insurance and if paid, you will reverse the HRSA claim back."  Tszyan-Dai Decl. ¶ 29; Dkt. No. 32-15. Wurzberger replied that the process described by the third-party billing employee was "correct." Tszyan-Dai Decl. ¶ 29; Dkt. No. 32-15.

The evidence suggests that for that population for which Defendants made Attestations and submitted claims simultaneously to both the UIP and to health insurers on or after approximately March 6, 2022, the Attestations and claims were materially false and made with scienter.  If, in fact, Defendants were submitting claims to insurance at the same time they were making Attestations for those claims and submitting them to the UIP for reimbursement, Defendants could not have confirmed that the patients were not enrolled in a health insurance plan or that to the best of their knowledge the patient had no health insurance.  The fact that the Defendants were able to submit the claims to insurance for reimbursement tends to suggest that Defendants knew, for that population, that the patients had insurance.  Defendants' very conduct demonstrates that they had not checked for healthcare coverage and confirmed that there was none.

Defendants argue that in context, the email which Landau sent instructing LabQ employees to bill "both HRSA and insurance" for COVID-19 testing "simply reflects Defendants best efforts to deal with the program's wind-down as efficiently and effectively as they could," Dkt. No. 182 at 26, and indicates they planned to repay HRSA for any reimbursement later covered by another insurer.  *See* Wurzberger Decl. ¶¶ 84, 88, 92.  Defendants also rely on the declaration of their proffered healthcare billing expert, not alleged to have personal knowledge of

Defendants' actual contemporaneous practices or motives, that "[w]hen patients have multiple potential sources of coverage, the coordination of benefits process can be complicated, and it is not always clear which sources are proper payors."  Dkt. No. 182 at 25 (citing Glusman Decl. ¶¶ 60, 63).  Thus, "providers routinely bill and collect payments for services through a variety of insurance carriers and governmental programs . . . with the understanding that the coordination-of-benefits process will take place after the claims are submitted."  *Id*. (citing Glusman Decl. ¶ 61).  Defendants note that many insurers denied claims for COVID-19 testing, *see* Glusman Decl. ¶ 26(e), and that testing providers, including Defendants, also faced HRSA's strict 365-day claims submission deadline.  Dkt. No. 184-8; Glusman Decl. ¶ 62; Wurzberger Decl. ¶ 86.  Defendants claim that they acted reasonably and responsibly by billing every available or potentially available source (including HRSA and any potential private coverage) in certain situations, knowing that adjustments (such as refunds, revised billing, or withdrawal of pending bills) would occur later.  Glusman Decl. ¶ 64.

Defendants also claim that they reasonably believed that HRSA was reviewing submissions for ineligible claims, because HRSA's FAQs stated that "[t]he program identifies overpayments and has a process to collect the overpaid funds from future claims related to the HRSA COVID19 Uninsured Program.  *See* Dkt. No. 184-11; Glusman Decl. ¶ 54; Dkt. No. 187-2.  HRSA's Terms and Conditions state that if a provider "subsequently receives reimbursement" for any services for which it requested payment from the Uninsured Program fund, then the provider "will return to HHS that portion of the Payment which duplicates payment or reimbursement from another source."  Huttinger Decl. ¶ 25.  Defendants reason that a provider could "subsequently receive reimbursement" from another source only if it had submitted a claim to both that payor and the UIP, and HRSA's guidance did not specify any required order or

sequence of claim submission.  Glusman Decl. ¶ 63.  Defendants point out that while some government programs such as the Medicare Secondary Payor program specify a particular order of billing, *see* 42 C.F.R. § 411.33, the Uninsured Program did not.  *Id*.  Neither HRSA's Terms and Conditions nor its FAQs expressly set any order of billing where multiple payors may be responsible for payment of a claim.  *See* Dkt. No. 42 at 5–8; Compl. ¶ 25 (citing HRSA Terms and Conditions from various time periods).

The fact that HRSA's Terms and Conditions required repayment if a provider "subsequently receive[d] reimbursement" from another source does not support the conclusion that the provider could submit a claim simultaneously to the UIP and to an insurer.  Dkt. No. 184-9 at ECF p. 3; Glusman Decl. ¶ 63; Compl. ¶ 25.  A provider could, for example, bill a claim to the Uninsured Program then later learn, despite their efforts to confirm that the patient was uninsured, that another source would reimburse a claim.  "Requirements for how to address inevitable errors do not vitiate the requirement to confirm a patient is uninsured before billing HRSA."  Dkt. No. 230 at 7.

In the end, Defendants assert that their conduct is understandable.  Their decision may not have been malicious.  They may even have intended ultimately to reimburse HRSA when they received payment from health insurers.  It does not follow, however, that their Attestations and claims were not knowingly false.  The Attestations and the Terms and Conditions required Defendants to confirm that the patient was not covered by or enrolled in health insurance before submitting a claim for reimbursement.  The language was unqualified.  It required Defendants to check and confirm first, bill later.  HRSA may not have specified a required order or sequence of claims submissions *in haec verba*.  But it did require providers to confirm prior to submitting a claim to the UIP that they had confirmed that the patient was uninsured.  Thus, while it may be

that, in connection with some programs, providers simultaneously bill to more than one provider for the same service (a proposition the Court need not address), that decidedly was not the procedure required in connection with the UIP.  Providers were permitted to submit a claim only if they confirmed that the patient had no health insurance.  Defendants may have been faced with a dilemma: if they did not submit the claim for reimbursement to the UIP before the program expired, they would never be able to be reimbursed for those patients for whom they would have been entitled to reimbursement if the program continued.  However, that did not permit them to claim that they had checked for healthcare coverage and confirmed that there was none when they had not done so.  The Government has established the probable validity of this subset of claims.

## II.    Probable Validity of Amount of Debt

Defendants argue that, even if the Government has established the probable validity of *a* debt and even if it were to prevail at a trial, it has not established that it would be able to obtain anything close to the amount of the assets it has attached.  *See* Dkt. No. 239 at 17–18; Dkt. No. 182 at 44.  The Government advocates for the wrong standard, but viewed under the correct standard, it has nonetheless satisfied its burden with respect to the current Writs.

The Government argues that, to satisfy the requirements of the FDCPA, it need only "specifically state the amount of the debt claimed," Hearing Transcript at 30:1–30:9, and that it need not establish the probable validity of the amount of that debt.  Dkt. No. 172 at 7; Dkt. No. 230 at 20–21.  The Government's argument turns upon Section 3101(c)(2)(A) of Title 28.  That subsection states that the affidavit submitted by the Government shall state "specifically the amount of the debt claimed by the United States and any interest or costs attributable to such debt."  28 U.S.C. § 3101(c)(2)(A).  From that language, the Government reasons that to obtain a prejudgment remedy of asset restraint, it need not offer any proof that it will be entitled to obtain

recovery of the specified amount.  Dkt. No. 172 at 7; Dkt. No. 230 at 20–21.  The Government is wrong.

The Court interprets Section 3101 as a whole, according to its plain meaning, avoiding an interpretation that would render any of its language surplusage.  *See United States v. Kinzler*, 55 F.3d 70, 72 (2d Cir. 1995) ("Statutory interpretation starts with the language of the statute itself, and we read a statute applying the ordinary, contemporary, common meaning of the words used.") (cleaned up); *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme."); *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme . . . and fit, if possible, all parts into an harmonious whole." (cleaned up)).  Section 3101(c)(2)(A) cannot be read in isolation.  It is preceded by Section 3101(c)(1).  The relevant terms of the statute are as follows:

> (1) The application under subsection (a) shall include an affidavit establishing with particularity to the court's satisfaction facts supporting the probable validity of the claim for a debt and the right of the United States to recover what is demanded in the application.
>
> (2) The affidavit shall state--
>
>> (A) specifically the amount of the debt claimed by the United States and any interest or costs attributable to such debt;

28 U.S.C. § 3101(c).

The operative provision is Section 3101(c)(1).  That subsection makes clear that, in order to obtain a prejudgment asset restraint, the Government must establish two separate propositions "to the court's satisfaction" and "with particularity": "the probable validity" of (1) "the claim for a debt" and (2) "the right of the United States to recover what is demanded in the application."  The Court's role is not merely passive.  To discharge its obligation, the Court must satisfy itself

both that the Government has a "claim for a debt" and that the Government has (or will have) "the right to recover what is demanded in the application."  The language of subsection 3101(c)(2), then, does not speak to what the Government must establish but rather to the contents of the affidavit.  The affidavit must state the amount of the debt claimed.  In other words, subsection 3101(c)(2) refers back to subsection 3101(c)(1)—subsection 3101(c)(1) requires the Government to satisfy the Court as to the Government's right to recover what is demanded in the application and subsection 3101(c)(2) makes clear that what is demanded in the application includes the ultimate debt claimed by the Government.  Structurally, Section (c)(1) and (c)(2) do not set out two disjunctive requirements, one for the facts relating to the existence of *a* debt and the other for a number pulled out of a hat.  Section (c)(1) sets out the general burden that the government must carry in its application as supported with the required affidavit, and Section (c)(2) then details specific elements that must be contained in that affidavit—(c)(2) is an elaboration of the requirements of (c)(1).

The language of 3101(c)(1) does raise the question: what is necessary to "satisfy" the Court that the Government should receive a prejudgment asset restraint?  The first part of subsection 3101(c)(1) is clear enough.  The language of "probable validity" is borrowed from a line of Supreme Court cases predating adoption of subsection 3101(c) that required the government in the civil context to establish the "probable validity" of the government's case in order to deprive an individual of property prior to final adjudication.  *See Sniadach v. Fam. Fin. Corp. of Bay View*, 395 U.S. 337, 343 (1969) (Harlan, J., concurring); *Fuentes v. Shevin*, 407 U.S. 67, 97 (1972) (quoting *Sniadach* concurrence); *Comm'r v. Shapiro*, 424 U.S. 614, 629 (1976).  "Probable validity" is akin to probable cause.  *Shapiro*, 424 U.S. at 629 n.11; *Krimstock v. Kelly*, 306 F.3d 40, 48–49 (2d Cir. 2002), *abrogated on other grounds by Culley v. Marshall*,

601 U.S. 377 (2024); *Cent. Med. Sys.*, 2018 WL 5112911, at *4; *Carnes*, 2023 WL 7407576, at *13. To satisfy the first part of the subsection, the Government need only establish probable cause that it has a valid claim. That is the significance of the indefinite article "a"—the probable validity of the claim "for *a* debt," not a specific amount of debt. *See McFadden v. United States*, 576 U.S. 186, 191 (2015) ("When used as an indefinite article, 'a' means '[s]ome undetermined or unspecified particular.'" (quoting Webster's New International Dictionary 1 (2d ed. 1954)). By contrast, the second part of subsection 3101(c)(1), "the right of the United States to recover what is demanded," must contemplate a specific amount of debt and associated penalties because "what is demanded" can only be assessed with respect to the value of the specified property or money that the Government seeks to attach in its application. The question remains whether "probable validity" applies only to (1) "the claim for a debt" or also to (2) "the right of the United States to recover what is demanded in the application."

The most natural reading is that the Government must show "probable validity" or probable cause with respect to both the "claim for a debt" and "the right of the United States to recover what is demanded in the application" in order to "satisfy" the Court. The Government need not establish its right to recover what is demanded in the application by a preponderance of the evidence. That is the standard the Government would have to meet to obtain a final judgment and is too high a threshold for a prejudgment remedy. *See* 31 U.S.C.A. § 3731(d) ("[T]he United States shall be required to prove all essential elements of the [FCA] action, including damages, by a preponderance of the evidence."); *Grogan v. Garner*, 498 U.S. 279, 288 (1991). On the other hand, it is not sufficient for the Government to show "reasonable cause." "Reasonable cause" is the standard set out in subsection 3101(b) for evaluating when a debtor is about to transfer or dispose of assets "with the effect of hindering, delaying, or defrauding" the

Government; the Court is directed to assess whether "the United States shows reasonable cause to believe" that such criteria are met. 28 U.S.C. § 3101(b). "[R]eason to believe to is not a particularly high standard," *United States v. Bohannon*, 824 F.3d 242, 257, 255 (2d Cir. 2016), and is "less demanding than probable cause," *United States v. Cartagena*, 2022 WL 95931, at *4 (D. Conn. Jan. 10, 2022) (citing *United States v. Lauter*, 57 F.3d 212, 215 (2d Cir. 1995)). If Congress intended that the Government be required only to state its "reasonable belief" as to the amount claimed, it clearly could have chosen wording to that effect, rather than "probable validity" "establish[ed] with particularity to the court's satisfaction." *Avon Nursing & Rehab. v. Becerra*, 119 F.4th 286, 292 (2d Cir. 2024) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983) (alteration adopted and internal quotation marks and citation omitted)). Indeed, at the time Congress drafted the FCA, "probable validity" was the standard that the courts assumed the government would have to establish to obtain a prejudgment restraint at all, as a matter of Due Process. *Fuentes*, 407 U.S. 67; *see also Citizens Against Casino Gambling in Erie Cnty. v. Chaudhuri*, 802 F.3d 267, 286 (2d Cir. 2015) (holding that Congress is presumed to know background law against which it legislates). It is logical that Congress would have intended that standard to be applied with respect to the amount of the debt for which the Government seeks the security of an attachment.[23]

---

[23] This standard is consistent with that which has been applied by courts in the past, albeit *sub silentio* without grappling with the language of the statute. In *DeGregorio*, 510 F. Supp. 2d 877, the court scrutinized the Government's calculation of the amount of the debt, first setting forth the standard under which the amount of the debt would be calculated and then determining whether the Government's calculation was reasonable. *Id.* It stated that "[t]he measure of damages the United States is entitled to recover under the FCA is the amount of money the

On the facts presented, however, the Government has established probable validity with respect to sufficient of its claims to support the prejudgment Writs. The Government is asserting single damages of roughly $82 million, which when trebled would equal $248 million for the FCA claims. Dkt. No. 172 at 7. Because the total amount of all payments by HRSA to the Defendants is alleged to be $131.6 million, for 1,114,245 claims, Tszyan-Dai Decl. ¶ 21; Lowe Decl. ¶ 5, the Government estimates that roughly 62% of the value of all reimbursements paid to the Defendants by HRSA was premised on false claims within the meaning of the FCA. The

---

government paid out by reason of the false claims over and above what it would have paid out if the claims had not been false or fraudulent . . . The civil penalty the Government is entitled to recover is assessed for each false claim." *Id.* at 890 (internal citations and quotations omitted). The court then calculated the number of false claims and assessed whether the Government's computation, though not "done with mathematical precision" was "a reasonable estimate of the loss." *Id.* The Government relies on two district court decisions in urging its more relaxed standard, but neither is convincing. In *Berkeley Heartlab*, the United States District Court for the District of South Carolina held that the Government had met the requirements of 28 U.S.C. § 3101(c) with an affidavit that, under a heading entitled "Amount of Debt Claimed by the United States—28 U.S.C. § 3101(c)(2)(A)," included two short paragraphs in which the total payments by third parties alleged to be kickbacks to defendants were set out, *see* 9:14-cv-00230, Dkt. No. 173-2, Ex. 6, ¶¶ 29–30, without specifying "the exact amount . . . received from federal healthcare programs." The court found that "[b]ased on the heading—and allegations contained in the complaint and averments contained in the application and affidavits—it is clear that the Government's position is that the entirety of the funds derived from [defendants'] relationships with [third parties] are subject to recovery if its FCA or common law claims are meritorious." 225 F. Supp. 3d 460, 469 (D.S.C. 2016). The court did state that "the affidavit need only 'state specifically the amount of debt claimed by the United States.'" *Id.* at 469–70. But it is not clear from its analysis that the mere statement of an amount of debt claimed without some connective tissue to the allegations in the complaint and factual averments in the affidavit would have sufficed. The second case upon which the Government relied, *United States v. Johnson*, 438 F. Supp. 3d 1185 (D. Idaho 2020), is even further afield from the Government's proposed interpretation. The court there rejected the Government's request for prejudgment remedies on multiple grounds. The case thus cannot stand for the proposition that the Government need only state an amount of a debt in order to obtain a prejudgment remedy securing that amount. In a footnote, the court made the unexceptional observation that the amount obtained by the Government when a final judgment was rendered might turn out to be more or less than the amount claimed in connection with a prejudgment remedy. *Id.* at 1190 n.5. The court pondered the possibility that, consistent with the statutory language, the Government could provide "a specific number, even at random," but did not hold that it would be sufficient for the government simply to offer a specific number. *Id.*

writs of attachment sought by the Government encumber $49 million in value of Defendants' property, Dkt. No. 172 at 2, and the writs of garnishment cover eight bank accounts alleged to have held approximately $8.869 million at the time of attachment. Dkt. No. 42 at 42–43.

The Government reaches its total of $82 million by estimating the number of claims submitted for individuals who were allegedly ineligible by virtue of having insurance coverage at the time Defendants administered their test, corresponding to approximately $82.9 million in payments, as well as the number of allegedly "double-billed" claims, estimated to be approximately $4.4 million in payments. The Government does not total the two estimates, on the theory that many double-billed claims would by definition also fall into the ineligible category. Dkt. No. 42 at 40. Because the total value of the assets which the Government has sought to restrain is justified with respect to the claims submitted for individuals with health insurance, the Court need not at this stage assess the probable validity of the Government's estimates related to double-billing.

The estimated $82.9 million in payments for individuals who had insurance coverage at the time of testing is based first on the reimbursements Defendants received for patients that the Government claims were ineligible cause they were covered by Medicare or Medicaid. The Government calculates that Defendants billed the UIP for 315,526 separate claims of patients with Medicare or Medicaid coverage, totaling $36.6 million or roughly 28% of the money paid by the UIP to Defendants. To arrive at these figures, HHS-OIG analyst Karen Lowe compared UIP program data to Medicare and Medicaid data, determining "what percentage of the claims paid by the Uninsured Program to Dart Medical were for patients that had Medicare or Medicaid coverage at the time they received COVID-19 testing services from Defendants." Lowe Decl. ¶ 10. Individuals were determined to "match" if a claim submitted to the UIP by Defendants was

for a patient who (1) had the same date of birth and SSN as an individual enrolled in Medicare or Medicaid on the date of service; or (2) had the same first name, last name, and date of birth as an individual enrolled in Medicare or Medicaid on the date of service. *Id.* Lowe's calculations were based on that matching analysis. *Id.* Defendants' only substantive rebuttal to this calculation comes from the declaration of their expert in healthcare accounting and billing, who suggests that Lowe used flawed matching criteria because she "failed to consider addresses or other unique identifiers of the patients," which "would have been available to Ms. Lowe based on my understanding of the type of data that was collected." Glusman Decl. ¶ 70. In the expert's view, Lowe's matching analysis would have been stronger if she had also used "address, county, or driver's license number, which can help eliminate instances where the name and date of birth and procedure code may be the same but for different patients." *Id.* The expert does not offer any quantification of the potential error rate that Lowe's method would yield in relation to his suggested alternatives. Defendants' argument provides grist for cross-examination or maybe even for a Daubert challenge, but it does not undermine probable validity. Even if the number is ultimately lower, the Government has established with the Medicare and Medicaid coverage evidence the probable validity of a debt in excess of the amounts secured by the current Writs— based on the probable validity of $36.6 million in overpayments out of the $82.9 million that the Government claimed in its application.[24]

---

[24] The Court need not reach the question of the probable validity of the debt with respect to claims that were ineligible because submitted on behalf of individuals with private health coverage, but it expresses significant doubt that the Government's calculation is reliable. The Government takes data from New York State, which shows that 41.9% of New York State residents have public health coverage and 5.2% are uninsured, and uses that data to estimate that the remaining 52.9% of New Yorkers have exclusively private health insurance coverage. Tszyan-Dai Decl. ¶ 24. Then, "[a]ssuming that LabQ and Dart Medical submitted a proportional number of ineligible claims for individuals with public and private health coverage," the

### III.    Likelihood of Hindrance or Delay

To establish entitlement to relief under the FDCPA, the Government must show "reasonable cause to believe" that a debtor has taken or is about to take action which will have "the effect of hindering, delaying, or defrauding the United States in its effort to recover a debt." 28 U.S.C. § 3101(b)(1)(A)–(D).  Under 28 U.S.C. § 3101(b)(1), such action may include steps taken or about to be taken by the debtor to "assign, dispose, remove, conceal, ill treat, waste, or destroy property," 28 U.S.C. § 3101(b)(1)(B), or to "convert the debtor's property into money, securities, or evidence of debt," 28 U.S.C. § 3101(b)(1)(C).  Section 3101(b) "contains no intent requirement." *Berkeley Heartlab*, 225 F. Supp. 3d at 470.  "The sole consideration is the effect of the debtor's actions." *Cent. Med. Sys.*, 2018 WL 5112911, at *7.

Despite having received $131.6 million from the Uninsured Program, *see* Tszyan-Dai Decl. ¶¶ 23–26, Lowe Decl. ¶ 5, Defendants had less than $10 million in their bank accounts at the time the Government filed its original application in July 2024, *see* Dkt. No. 34, Declaration of Paul Miccarelli ("Miccarelli Decl.") ¶ 6; Dkt. No. 42 at 42–43 (describing eight bank accounts with an approximate value of $8.8 million, most of which was held in a Metropolitan Community Bank ("MCB") account (account number x5407, approximately $6.8 million as of May 31, 2023) and a Signature/Flagstar Bank account (account number x6587, approximately $1.2 million as of August 31, 2023)).  By the time of the Government's supplemental application in November 2024, those two accounts were largely depleted.  *See* Dkt. No. 173, Supplemental

---

Government estimates that "35.12% of the Defendants' patients with claims paid by the Uninsured Program would have had private health coverage."  *Id.*  As Defendants point out, the Government used "a generic uninsured rate in New York State for the year 2021, not the population that Defendants tested on the streets of New York City throughout the years of the pandemic."  Dkt. No. 182 at 41.  The Government's failure to making any adjustments based on the Defendants' actual patient population casts doubt on the reliability of their calculations at this stage.  *Id.*

Declaration of Lu Tszyan-Dai ("Supp. Tszyan-Dai Decl.") ¶ 3; Dkt. No. 173-1 (reflecting $280

in the MCB account as of June 28, 2024); Supp. Tszyan-Dai Decl. ¶ 4; Dkt. No. 173-2

(reflecting $2,000 in the Flagstar account as of August 29, 2024). In other words, $8 million of

the $8.8 million that the Government sought to protect through writs of garnishment is now

gone.

The Government alleges that this lack of funds results directly from Defendants'

dissipation of assets, which has had the effect of hindering or delaying the United States' ability

to recover its debts. Landau testified that, between 2020 and 2023, he took approximately $150

million in distributions from the LabQ Corporate Defendants. Tszyan-Dai Decl. ¶ 41 (citing

Landau Dep. II. at 170:17–22). He claims that, after paying taxes, he gave $90 million of his

remaining $100 million to what he describes as "charity." *Id.* ¶ 42 (citing Landau Dep. II. at

172:25–173:5). Of that $90 million, Landau testified that he gave: (1) around $19 million to NJJ

Institutions—a non-profit that funds schools in New Jersey for which Landau is a board member,

*see id.* 174:13–175:22; (2) around $19 million to a synagogue at which Landau serves as the

rabbi, *see id.* 175:23–177:11; (3) "smaller amounts" to other charities, like $250,000 to a charity

that sent Landau's children to Israel during the pandemic, *see id.* at 177:18-178:3; and (4) the

remaining funds to a charitable trust run by Landau's son, over which Landau exercises decision-

making authority, *see id.* 178:11–180:24. Landau claims that he spent his remaining $10 million

on real estate for himself in New Jersey and Israel. *Id.* ¶ 43 (citing Landau Dep. II. at 168:22–

169:1, 180:17–22). Landau now claims to be "left with" only "a few dollars." *Id.*

Bank records show transfers of over $19 million from Dart Medical's bank account to an

LLC of which Landau is the sole member—Har Hazayis'm Realty LLC ("Har Hazayism")—

dated on or after Defendants received the CIDs issued by the Government. Miccarelli Decl. ¶¶

8–10 (discussing bank transfers); Tszyan-Dai Decl. ¶ 51; Dkt. No. 32–39 (Har Hazayism

Certificate of Formation listing Landau as its sole member).  Har Hazayism and a related entity

then bought real property.  Dkt. No. 42 at 44–48.  Defendants have also purchased property

through other LLCs and a trust, including the Yampola 2022 Charitable Lead Annuity Trust; 27

Peckwell, LLC; 240 Winding Hill, LLC; and 143 West 72nd Street Owner, LLC.  Supp. Tszyan-

Dai Decl. ¶ 5; Dkt. No. 173-3.

     Defendants' principal argument is that the Government "has pointed to absolutely no

evidence that Defendants ever transferred assets in secret, or to a foreign jurisdiction, or in any

manner that suggests they were trying to hide them."  Dkt. No. 182 at 45.  Defendants object to

the Government's characterization of transfers that occurred after the April 2022 CID as

"fraudulent," arguing that Defendants were not obligated to assume, upon receipt of a CID at the

outset of an investigation, that they would someday lose a large judgment to the government.  *Id*.

at 47.  Defendants assert "there is absolutely nothing unusual or problematic about a person

transferring property into an LLC he owns 'for no consideration' in order to limit personal

liability."  *Id*.  Nor is there anything unusual, they contend, about giving to charity, to a non-

profit school at which Landau is a board member, to a synagogue at which Landau is a rabbi, or

to a charitable trust run by Landau's son.  *Id*. at 48.

     Defendants misconstrue the Government's burden under 28 U.S.C. § 3101(b)(1).  The

Government does not have to "show[] reasonable cause to believe" that Defendants' transfers

were intended to deceive or defraud—just that transfers would have the *effect* of rendering the

Government's ultimate recovery more difficult, should it occur.  *See Berkeley Heartlab*, 225 F.

Supp. 3d at 470; *Cent. Med. Sys.,* 2018 WL 5112911, at *7.  It is thus immaterial whether

Defendants intended to hide assets from the Government.  The relevant question is whether the transfers had or would have the effect of hindering the Government's asset recovery efforts.

Defendants further assert, however, that the real property purchased with Defendants' assets is "if anything [] more secure for future recovery by the government than cash would be." Dkt. No. 182 at 48.  They note that they have turned over to the Government a list of the properties that have been purchased with the assets.  *Id*.  Defendants argue that many of the transfers were executed from accounts that Defendants themselves identified to the Government, *see* Dkt. Nos. 184-12, 184-13, and many were made to purchase real property located in New Jersey and New York, property which is by its nature immovable.  Dkt. No. 172 at 9-12; Dkt. No. 173-3.  Many of those properties are held in the names of LLCs associated with Landau that Defendants identified in a spreadsheet shared with the government, without disguising that association.  Defendants argue that "[i]f anything, the conversion of assets from liquid cash that is easily transferable into real property located in nearby states makes it *easier* for the government to find and recover those assets."  Dkt. No. 182 at 46.

The effect of the transfers will be to make the Government's recovery efforts more difficult if a restraint is not put in place.  The Government's original application discussed twenty-five properties that the Defendants purchased after learning of the Government's investigation in April 2022.  *See* Dkt. No. 42 at 40–41.  On August 23, 2025, Defendants disclosed an additional thirty-seven properties that were purchased after the Defendants learned of the Government's investigation in April 2022, including purchases through 2024.  *See* Supp. Tszyan-Dai Decl. ¶ 5; Dkt. No. 173-3.  Moreover, of these thirty-seven properties, two were purchased in July of 2024, approximately a month after the Government filed its complaint-in-intervention.  *Id.*  Defendants produced information showing that the value of these thirty-seven

properties is over $33 million and that the properties are subject to liens of over $8 million.  *Id.*

Accordingly, there is approximately $25 million of equity in those thirty-seven properties.  *Id.*  In

total, the fifty-eight properties attached pursuant to the Government's supplemental application

were encumbered with approximately $17 million in liens.  *Id*.  The Government cannot collect

the value of property that has already been encumbered.[25]

By transferring funds to LLCs and thereafter into real property, Defendants have

rendered the chain of ownership more obscure, forcing the Government to attempt to locate

numerous real properties and continue to monitor ongoing real estate transactions and transfers

to other limited liability companies, *see* Dkt. No. 172 at 8, sort through a web of limited liability

companies and their nominal and actual ownership structures, and potentially foreclose on and

sell dozens of properties to collect a judgment.  *See In re Womble*, 289 B.R. 836, 854 (Bankr.

N.D. Tex. 2003) (explaining that to "hinder or delay" means to "make it more difficult for

creditors to reasonably collect on their debts.").  The fact that Defendants might also have

---

[25] The Government offers one illustrative example of the Defendants' transfers way from their
own names.  On July 24, 2024, the Government sought a writ of attachment against a property
located at 96 Hiawatha Boulevard, Lake Hiawatha, New Jersey 07034, which was owned in
Moshe Landau's name.  *See* Tszyan-Dai Decl. ¶ 47; Dkt. No. 32-34.  The Court granted this writ
on August 2, 2024, *see* Dkt. No. 60, and the United States Marshal Service served the property
on August 23, 2024, *see* Dkt. No. 167.  But on the same day that the Government filed its
FDCPA Application, Moshe Landau transferred the Hiawatha Boulevard property to "Smithfield
Group LLC" for $1 consideration.  Supp. Tszyan-Dai Decl. ¶ 6; Dkt. No. 173-4.  The Defendants
did not disclose this transfer to the Government in their August 23, 2024 disclosure, made
pursuant to the Stipulation which required them to "disclose in writing to the Government each
and every real property in which each Defendant has an interest, irrespective of the name on the
deed of the property."  Stipulation ¶ 9.  In fact, their disclosure claimed that Moshe Landau still
held title to that property.  Supp. Tszyan-Dai Decl. ¶ 5; Dkt. No. 173-3.  After the Government
brought this to the Defendants' attention, counsel for the Defendants informed the Government
that this omission was an inadvertent mistake.  Regardless whether this omission was inadvertent
or not, Landau's actions further hindered the Government's ability to collect on a judgment by
transferring the Hiawatha Boulevard property from his own name to another LLC without
disclosing the true ownership of the property to the Government despite being required to do so
by order of this Court.

legitimate business or charitable purposes for these transfers does not undermine the Government's claim.  *See Berkeley Heartlab*, 225 F. Supp. 3d at 471 (corporate defendant disposed of property with effect of hindering the United States by "making transfers into other accounts"); *Stabl*, 2018 WL 6068424, at *6 (dissipation of $6.6 million from accounts over five years "demonstrate[s] reasonable cause" on this element); *Carnes*, 2023 WL 7407576, at *16 (dissipation of $5.5 million from bank and brokerage accounts "satisfies the reasonable cause standard"); *United States v. DuBois*, 2023 WL 9692124, at *6 (S.D. Fla. Nov. 14, 2023) (admission that cash was being spent satisfies same element).

This result does not offend Due Process.  "As other courts have noted, compliance with § 3101 of the FDCPA satisfies the requirements of the Due Process Clause to show 'compelling need and exigent circumstances' sufficient to justify" even *ex parte* relief, which the Government did not seek here.  *DuBois*, 2023 WL 9692124, at *2; *see also Teeven*, 1992 WL 683683, at *6 (finding "compelling need" where the Government met the requirements of 28 U.S.C. § 3101(b)(1)).

## IV.    Propriety of Prejudgment Remedies Sought

"Any property in the possession, custody, or control of the debtor and in which the debtor has a substantial nonexempt interest, except earnings, may be attached pursuant to a writ of attachment in an action or proceeding against a debtor on a claim for a debt and may be held as security to satisfy such judgment, and interest and costs, as the United States may recover on such claim."  28 U.S.C.A. § 3102(a)(1).  The value of the property attached pursuant to 28 U.S.C. § 3102(a)(1) "shall not exceed the amount by which the sum of the amount of the debt claimed by the United States and the amount of interest and costs reasonably likely to be assessed against the debtor by the court exceeds the aggregate value of the nonexempt interest of

the debtor in any . . . property securing the debt; and. . . property garnished or in receivership, or income sequestered, under this subchapter."  28 U.S.C.A. § 3102(a)(2).

"[A] court may issue a writ of garnishment against property (excluding earnings) in which the debtor has a substantial nonexempt interest and which is in the possession, custody, or control of a person other than the debtor in order to satisfy a claim for a debt."  28 U.S.C. § 3104(a).  The value of property garnished pursuant to 28 U.S.C. § 3104(a) "shall not exceed the amount by which the sum of the amount of the debt claimed by the United States and the amount of interest and costs reasonably likely to be assessed against the debtor by the court exceeds the aggregate value of the nonexempt interest of the debtor in any . . . property securing the debt; and . . . property attached or in receivership, or income sequestered, under this subchapter."  28 U.S.C. § 3104(c).

The Government has established the probable validity of an FCA claim for reimbursements paid to Defendants for individuals covered by health insurance on the date of testing.  At present, the Government has established the probable validity of the amount of Defendants' debt of $36.6 million for claims submitted on behalf of individuals covered by Medicare or Medicaid at the time of testing.  With treble damages, the amount owing would be up to $109.8 million.  The cumulative value of Defendants' interest in the eighty-six parcels of property which the Government has sought to attach, purported to be approximately $49 million, Dkt. No. 172 at 5, and the eight bank accounts which the Government has sought to garnish, alleged to have held approximately $8.869 million at the time of attachment but now alleged to hold roughly $800,000, Dkt. No. 42 at 42–43; Dkt. No. 172 at 5; Hearing Transcript at 35:2–5, is not greater than the "amount of debt claimed" plus "interests and costs."  Besides the attached

and garnished property, Defendants allege no other property securing their purported debt to the Government.

## CONCLUSION

This is a close case.  The Government's evidence is not overwhelming.  But at this stage, the threshold is not high.  The Writs survive simply pending further proceedings.  The motion to quash the Writs is DENIED.

A prior version of this Opinion and Order was filed under seal at Dkt. No. 357, with instructions to the parties to advise the Court of any portions of the Order which should be redacted, *see* Dkt. No. 358.  Having received no proposed redactions, *see* Dkt. No. 359, the Court now files an unsealed Opinion and Order, identical in all other respects to the version at Dkt. No. 357.

SO ORDERED.

Dated: March 24, 2025
       New York, New York                    _____
                                             LEWIS J. LIMAN
                                             United States District Judge