JAY CLAYTON
United States Attorney for the
Southern District of New York
By:    ZACHARY BANNON
        RACHAEL DOUD
        LAWRENCE H. FOGELMAN
        CHARLES S. JACOB
        MOLLIE KORNREICH
        DANIELLE J. MARRYSHOW
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Tel.: (212) 637-2800
zachary.bannon@usdoj.gov
rachael.doud@usdoj.gov
lawrence.fogelman@usdoj.gov
charles.jacob@usdoj.gov
mollie.kornreich@usdoj.gov
danielle.marryshow@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* RESOLUTE 3 LLC,<br><br>Plaintiff,<br><br>v.<br><br>LABQ CLINICAL DIAGNOSTICS, LLC; DART MEDICAL LABORATORY, INC.; COMMUNITY MOBILE TESTING INC.; MOSHE LANDAU; DANIEL ADAR; JACOB WEISS, and DOES 1-10,<br><br>Defendants. | No. 22 Civ. 751 (LJL) |
| UNITED STATES OF AMERICA, the STATE OF NEW YORK, and the STATE OF NEW JERSEY *ex rel.* NJ CHALLENGER LLC,<br><br>Plaintiffs,<br><br>v. | No. 22 Civ. 10313 (LJL) |

LABQ CLINICAL DIAGNOSTICS LLC; LABQ
CLINICAL 3 DIAGNOSTICS LLC; DART
MEDICAL LABORATORY, INC. d/b/a LABQ
DIAGNOSTICS; COMMUNITY MOBILE
TESTING INC.; MOSHE LANDAU, LIEBEL
RUBIN; SOLOMON RUBIN; MARVIN RUBIN;
JOEL LANDAU; LUREINA BARRIO-GONZALEZ;
DANIEL GONZALEZ; BREANNA IRIS;
BREANNA IRIS LLC; MARTIA IRIS-CAPELLO;
DANIEL MENDOZA; KAYRA MEDONZ;
MEDONZA MEDICAL LLC; RICHARD FRANCO;
SOLOMON BROWN; DANIEL ADAR; JACOB
WEISS; ELIONA DOCI; ARJOLA DOCI; and
ESTHER WURZBERGER,

        Defendants.

UNITED STATES OF AMERICA,

        Plaintiff-Intervenor,

        v.

LABQ CLINICAL DIAGNOSTICS, LLC;
COMMUNITY MOBILE TESTING, INC.; DART
MEDICAL LABORATORY, INC.; MOSHE
LANDAU; MLK BLVD UPSCALE LLC; 175 PARK
AVENUE LLC; THE MALON RESORT NJ LLC;
THE THOMAS G. ROSANO PHD LLC D/B/A
NATIONAL TOXICOLOGY CENTER; DAVID
LANDAU; HAR HAZAYIS'M REALTY LLC;
REALTY AT HH LLC; NJJ INSTITUTIONS;
CONGREGATION KOLEL VYASHKEM
AVRHOM INC.; YAMPOLA 2022 CHARITABLE
LEAD ANNUITY TRUST; CAREBOT ABA LLC;
OVALAB LLC; and CARE BIO CLINICAL CORP.,

        Defendants.

**AMENDED COMPLAINT-IN-INTERVENTION OF THE UNITED STATES**

**JURY TRIAL DEMANDED**

Plaintiff the United States of America (the "United States" or "Government"), by its attorney, Jay Clayton, United States Attorney for the Southern District of New York, files this Amended Complaint-in-Intervention against: (1) defendants LabQ Clinical Diagnostics, LLC

2

("LabQ"); Community Mobile Testing, Inc. ("Community Mobile Testing" or "CMT"); Dart Medical Laboratory, Inc. ("Dart Medical" and, with LabQ and CMT, the "LabQ Corporate Defendants"); Moshe Landau ("Landau" and, with the LabQ Corporate Defendants, the "Defendants"); and (2) the following people or entities that received fraudulent transfers from Defendants: MLK Blvd Upscale LLC; 175 Park Avenue LLC; The Malon Resort NJ LLC; the Thomas G. Rosano PhD LLC d/b/a National Toxicology Center; David Landau; Har Hazayis'm Realty LLC; Realty at HH LLC; NJJ Institutions; Congregation Kolel Vyashkem Avrhom Inc.; Yampola 2022 Charitable Lead Annuity Trust; Carebot ABA LLC; OvaLab LLC; and Care Bio Clinical Corp. (together, the "Transferee Defendants"), alleging as follows:

## PRELIMINARY STATEMENT

1.      This is a civil fraud action against Defendants arising from their violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, in connection with their submission of false claims to the Government for reimbursement for COVID-19 testing services. The Government seeks to recover treble damages sustained by, and civil penalties owed to, the Government as a result of the submission of false and fraudulent claims for reimbursement to the federal program that reimbursed health care providers that furnished COVID-19 testing to uninsured persons (the "Uninsured Program") from September 2020 through March 2022 (the "Relevant Time Period") and the subsequent unlawful retention of payments from the Uninsured Program, through 2024. The Government also seeks to recover damages under the common law for payment by mistake of fact and unjust enrichment. Further, the Government asserts claims under the Federal Debt Collection Procedures Act ("FDCPA"), 28 U.S.C. § 3001 *et seq.*, in order to avoid fraudulent transfers made by the Defendants to the Transferee Defendants after Defendants became aware of the Government's investigation relating to this case.

3

2.     The Uninsured Program reimbursed eligible health care providers and facilities for COVID-19 testing, treatment, and vaccine administration provided to uninsured individuals. Prior to seeking reimbursement from the Uninsured Program, however, COVID-19 testing providers like LabQ had to attest to the Health Services and Resources Administration ("HRSA"), a component agency within the U.S. Department of Health and Human Services, that they had confirmed their patients were uninsured and that no one else would pay for the cost of the COVID-19 testing. These requirements protected the integrity of the program and ensured that health insurance providers—rather than taxpayer-funded emergency relief funds—would pay for COVID-19 testing for persons with health care coverage, as mandated by Congress.

3.     Defendants' practices during the Relevant Time Period were in direct contravention of their promises and attestations to HRSA. During the Relevant Time Period, Defendants frequently submitted, or caused to be submitted, ineligible and fraudulent claims to the Uninsured Program for COVID-19 testing in instances: (a) when the cost of the COVID-19 testing had been (or would be) reimbursed by another source; and/or (b) the COVID-19 testing had been provided to persons who had health coverage on the relevant date of the service.

4.     LabQ, Dart Medical, and Landau routinely billed, or caused to be billed, the Uninsured Program for COVID-19 testing actually paid for by other organizations. The LabQ Corporate Defendants also frequently discouraged insured patients and other customers from providing patient insurance information, but then sought reimbursement from the Uninsured Program for persons who, in fact, had health care coverage. Even in instances when Defendants possessed information in their own files showing that their patients had health coverage, LabQ, Dart Medical, and Landau nonetheless often submitted claims, or caused claims to be submitted, to the Uninsured Program for those patients. By knowingly disregarding their obligation to only seek reimbursement

4

from the Uninsured Program for eligible COVID-19 testing, Defendants fraudulently obtained tens of millions of dollars from HRSA.

5.      Defendants prioritized their profits over their promises to HRSA. During the entire Relevant Time Period, Landau controlled the LabQ Corporate Defendants' operations. Indeed, each LabQ Corporate Defendant is an alter ego of Landau—Landau has used the LabQ Corporate Defendants as an extension of himself. Landau founded LabQ a year prior to the COVID-19 pandemic, without any prior professional experience or education relating to health care or laboratories. By Landau's estimate, LabQ generated less than a few million dollars in revenue in 2019, and the company primarily performed blood testing diagnostic laboratory services on behalf of nursing home residents. But in 2020, when the world was stricken by the global pandemic, Defendants expanded into COVID-19 testing. At first, LabQ and Dart Medical offered COVID-19 testing to its nursing home clientele, and later Defendants expanded their services to patients on the streets of New York City and at schools and workplaces across the country.

6.      Landau knew that LabQ and Dart Medical were submitting claims to the Uninsured Program for COVID-19 testing for which LabQ could receive (and often did receive) payment from other entities. Landau also repeatedly learned of instances where LabQ and Dart Medical had submitted claims to the Uninsured Program for persons with health coverage, and regularly received reports demonstrating that a virtually impossible percentage of the LabQ Corporate Defendants' patients were supposedly uninsured. LabQ's revenue ballooned to over ten million dollars in 2020, and then to over one-hundred million dollars in 2021.

7.      This growth was fueled by the Uninsured Program. Between May 2020 and March 2022, LabQ and Dart Medical received approximately $130 million from the Uninsured Program. During this time, LabQ's billing department was plagued by chronic errors such as submitting

5

claims to the Uninsured Program in instances where LabQ's own records showed a patient had insurance, and automatically "flipping" claims paid for by private insurers to the Uninsured Program for additional payment. Even more, Defendants often failed to train their employees on adequately collecting insurance information, and took no corrective actions despite the fact that their own data showed that a virtually impossible percentage of their patient population was supposedly uninsured.

8.      The extraordinary profits that Defendants obtained through their fraudulent scheme came at the expense of the public fisc and, ultimately, patients who lacked health insurance. Defendants' fraudulent scheme drained limited funds appropriated by Congress to cover COVID-19 testing costs for uninsured persons. In March 2022, HRSA announced that it would stop accepting claims for reimbursement for COVID-19 testing due to a lack of sufficient funding.

9.      Once the Uninsured Program was exhausted of funds, however, Landau instructed LabQ employees to "cut dramatically all payrolls" because "we just cannot continue like this when we don't have HRSA anymore."  But any purported cash crunch was also fueled by the fact that by 2023, Landau had transferred millions of dollars from the LabQ Corporate Defendants to himself and others, including, for instance, transfers to Har Hazayis'm Realty LLC, a limited liability company that he wholly owns and controls. This company and Landau's related company, Realty at HH LLC, in turn, purchased dozens of houses in New Jersey using money provided by the LabQ Corporate Defendants.

10.      Indeed, since April 2022—*i.e.* the date the Government issued Civil Investigative Demands to the LabQ Corporate Defendants and, accordingly, Defendants knew of the Government's investigation—Defendants have transferred at least tens of millions of dollars to the Transferee Defendants, which consist of Landau's son along with numerous entities that Landau

owns and/or controls. As a result of these transfers, Defendants have minimal amounts remaining in their own bank accounts and would be unable to pay a judgment of anywhere near the magnitude the Government alleges is warranted. Defendants made these transfers without consideration and with the effect of hindering, delaying, or defrauding the United States.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over: (i) claims brought under the False Claims Act pursuant to 31 U.S.C. § 3730(a), and 28 U.S.C. §§ 1331 and 1345; (ii) claims brought under the FDCPA pursuant to 28 U.S.C. §§ 1331 and 1345; and (iii) the common law claims pursuant to 28 U.S.C. § 1345.

12.    This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which provides for nationwide service of process. This Court may exercise personal jurisdiction over Transferee Defendants pursuant to 28 U.S.C. § 3004(b), which provides for nationwide service of process.

13.    Venue is appropriate in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because Defendants and certain Transferee Defendants transact business in this District, and a substantial part of the acts complained of took place in this District. Defendants submitted or caused to be submitted claims to the Uninsured Program for COVID-19 testing provided to numerous individuals who reside in this District.

## PARTIES

14.    Plaintiff is the United States of America and is suing on its own behalf and on behalf of the United States Department of Health and Human Services ("HHS"), and its component agency, HRSA, which administered the Uninsured Program.

15.    Relator Resolute 3 LLC is a Delaware limited liability company whose members include a former LabQ employee and two other individuals with experience in the laboratory services industry.

16.    Relator NJ Challenger LLC is a Delaware limited liability company whose members include former LabQ employees.

17.    Defendant Moshe Landau is the Chief Executive Officer of each of the LabQ Corporate Defendants. Landau is the majority owner of Community Mobile Testing, and owns 30% of both LabQ and Dart Medical.

18.    Defendant LabQ Clinical Diagnostics, LLC is a New York limited liability company whose members include Landau. During the Relevant Time Period, LabQ operated laboratories located at 100 International Drive, Budd Lake, New Jersey 07828, and 140 58th St., Bldg A Suite 3L, Brooklyn, NY 11220. Further, during the Relevant Time Period, LabQ performed COVID-19 testing for tens of thousands of patients that lived in Manhattan.

19.    Defendant Dart Medical Laboratory, Inc. is a New York corporation owned by Landau and others. In 2019, Landau and LabQ's other members acquired Dart Medical from its prior shareholders. Dart Medical is a diagnostic laboratory company that previously owned the laboratory now operated by LabQ in Brooklyn, New York. Dart Medical also possesses a National Provider Identifier ("NPI"), a unique numeric identifier that permits qualified health care providers, including laboratories, to bill federal health care programs such as the Uninsured Program and Medicare. For the entirety of the Relevant Time Period, Dart Medical did not have employees separate from LabQ's employees, and Dart Medical did not operate any business other than on behalf of Landau and LabQ. Moreover, LabQ employees used Dart Medical's NPI or Tax Identification Number to submit claims for reimbursement to federal health care programs

(including the Uninsured Program and Medicare) for COVID-19 testing performed by LabQ. In turn, the Uninsured Program sent payments to Dart Medical's bank accounts for approved claims for services rendered by LabQ, Dart Medical, and Community Mobile Testing.

20.    Defendant Community Mobile Testing, Inc. is a New York corporation majority-owned and operated by Landau. During the Relevant Time Period, Community Mobile Testing operated over one hundred "LabQ Mobile Testing Sites" in New York City, including at least forty such sites in Manhattan and the Bronx. These sites consisted of LabQ-branded vans and tents, generally located on public streets, where Community Mobile Testing and LabQ employees collected specimens from walk-up patients for the purpose of COVID-19 testing. LabQ would use specimens collected by Community Mobile Testing employees to perform COVID-19 testing for these patients, and return the results to them.

21.    Defendant MLK Blvd Upscale LLC is a New York limited liability corporation. MLK Blvd Upscale LLC's last known address is 140 58th Street Bldg A Suite 3L Brooklyn, NY 11220.

22.    Defendant 175 Park Avenue LLC is a New Jersey limited liability corporation owned by MLK Blvd Upscale LLC. 175 Park Avenue LLC's last known address is 102 Drakestown Road, Hackettstown, NJ 07840.

23.    Defendant The Malon Resort NJ LLC is a New Jersey limited liability corporation. Transferee Defendant David Landau owns The Malon Resort NJ LLC. David Landau and Moshe Landau have signatory authority over The Malon Resort NJ LLC's bank account. The Malon Resort NJ LLC's last known address is 175 Park Ave, Florham Park, NJ 07932.

24.    Defendant Thomas G. Rosano PhD LLC d/b/a National Toxicology Center is a New York limited liability corporation owned by Landau. National Toxicology Center's last known address is 353 South Manning Blvd, Albany NY 12208.

9

25.    Defendant David Landau is Moshe Landau's son. He resides in Brooklyn, New York.

26.    Defendant Har Hazayis'm Realty LLC is a New Jersey limited liability corporation owned by Landau. Har Hazayis'm Realty LLC has identified its address as both 100 International Drive, Budd Lake, NJ 07828 and 199 Lee Avenue, Suite 730, Brooklyn NY 11211.

27.    Defendant Realty at HH LLC is a New Jersey limited liability corporation owned by Landau. Realty at HH LLC's last known address is 299 Winding Hill Road, Hackettstown, NJ 07840.

28.    Defendant NJJ Institutions is putatively a 501(c)(3) non-profit organization. Landau was, at least until recently, NJJ Institutions' Board Member, Trustee, and President, and Landau and Transferee Defendant David Landau have signature authority over at least one of NJJ Institutions' bank accounts. NJJ Institutions' last known addresses are 102 Drakestown Road, Hackettstown, NJ 07840, a property owned by Har Hazayis'm Realty LLC, and 199 Lee Avenue, Brooklyn, New York, 11211.

29.    Defendant Congregation Kolel Vyashkem Avrhom Inc. identifies itself as a religious organization. Landau is an authorized signatory on Congregation Kolel Vyashkem Avrhom Inc.'s bank accounts. Congregation Kolel Vyashkem Avrhom Inc.'s last known address is 199 Lee Street, Suite 730, Brooklyn, NY 11211.

30.    Defendant Yampola 2022 Charitable Lead Annuity Trust is nominally a charitable lead annuity trust. Landau is the grantor of the trust, and his children are the beneficiaries. It has used the address 13 Walton Street, Floor 4, Brooklyn, New York, 11206.

31.    Defendant Carebot ABA LLC is a New York limited liability corporation. Carebot ABA LLC's last known address is 4615 11th Avenue, Brooklyn, New York, 11219, and it also has a registered office at 100 International Drive, Budd Lake, New Jersey, 07828.

32.    Defendant OvaLab LLC is a New York corporation owned, at least in part, by Landau. OvaLab's last known address is 4510 16th Ave Ste 300, Brooklyn, NY 11204.

33.    Defendant Care Bio Clinical Corp. is a California corporation owned by Landau. Care Bio Clinical Corp.'s last known address is 16311 Ventura Blvd Ste 888, Encino, CA 91436.

## BACKGROUND

### I.    The Uninsured Program

34.    In response to the public health emergency caused by the global COVID-19 pandemic, Congress enacted various legislation to ensure that persons in the United States could receive COVID-19 testing[1] at no cost to themselves. Congress carefully delineated who would cover the cost of this testing. For individuals with private health insurance coverage, Congress mandated that private health insurers cover these persons' medically necessary COVID-19 testing. *See* Families First Coronavirus Response Act (the "FFCRA"), Pub. L. No. 116-127, 134 Stat. 178, 201 (2020) *as amended by the* Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281, 366-367 (2020). Congress similarly required that government health care programs, such as Medicare or Medicaid, cover medically necessary COVID-19 testing for persons enrolled in such programs. *See* FFCRA, Pub. L. No. 116-127, 134 Stat. 178, 202-208 (2020).

35.    For the remaining individuals who did not have health insurance coverage (approximately 8.6% of persons in the United States), Congress appropriated finite sums of funds that permitted HHS to reimburse health care providers that provided COVID-19 testing to persons who did not have any health care coverage on the relevant date of service ("Uninsured

---

[1] As used in this Complaint, the term "COVID-19 testing" refers to diagnostic laboratory testing for severe acute respiratory syndrome coronavirus 2 (also known as SARS-CoV-2), including through infectious agent detection by nucleic acid.

Individuals"). *See* FFCRA, Pub. L. No. 116-127, 134 Stat. 178, 182, 206 (2020); Paycheck

Protection Program and Health Care Enhancement Act (the "Paycheck Protection Act"), Pub. L.

No. 116-139, 134 Stat. 620, 626 (2020); CARES Act, Pub. L. No. 116-136, 134 Stat. 281, 563

(2020); American Rescue Plan Act, Pub. L. No. 117-2, 135 Stat. 4, 236 (2021).

36.    HRSA, an agency within HHS, established and administered the Uninsured Program,

formally titled the *COVID-19 Claims Reimbursement to Health Care Providers and Facilities for

Testing, Treatment, and Vaccine Administration for the Uninsured*. In order to protect the integrity

of the program, HRSA mandated that any providers seeking reimbursement from the Uninsured

Program agree to specific Terms and Conditions, and make attestations regarding their compliance

with specific program requirements. HRSA also contracted with UnitedHealthGroup

("UnitedHealth") to help administer the Uninsured Program with Optum, a division of

UnitedHealthGroup.[2]

37.    The submission of claims to the Uninsured Program involved several steps, and

providers were required to use two systems. First, though an online portal known as the "UIP

Portal," health care providers had to enroll in the Uninsured Program and submit a "patient roster."

The patient roster contained identifying information regarding the providers' uninsured patients.

In order to upload any patient roster, however, the provider had to make attestations to HRSA

regarding these patients (the "Patient Roster Attestations").

38.    The Patient Roster Attestations included a representation from the provider that they

had "checked for health care coverage eligibility and confirmed that the patient is uninsured, and

does not have employer-sponsored or individual coverage, Medicare or Medicaid and that no other

---

[2] Since 2022, HRSA's contract has been with OptumServe Technology Services, Inc., which is a division of UnitedHealth.

payer will reimburse for COVID-19 testing or care for the patient."[3] *See* Ex. A (Patient Roster Attestations).

39.     Further, in the Patient Roster Attestations, the providers had to attest that they had read and agreed to the Uninsured Program's Terms and Conditions. Those Terms and Conditions (which were linked and available on the Uninsured Program's website) specifically prohibited providers from seeking reimbursement for COVID-19 testing that: (1) had been provided to patients who had any health care coverage at the time the services were provided; or (2) would be (or had been) reimbursed by another payor.

40.     Specifically, until on or about May 31, 2021, the Terms and Conditions provided in relevant part that: "[the provider] . . . certifies that to the best of its knowledge, the patients identified on the claim form were FFCRA Uninsured Individuals at the time the services were provided . . ." *See* First Uninsured Program Terms and Conditions, *available at* https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/terms-conditions-ffcra-relief-fund.pdf (last accessed Feb. 20, 2024). "FFCRA Uninsured Individuals" were defined as individuals who, as of the date they received the service for which the Provider sought payment, were not enrolled in a private health insurance plan or a federal health care program. *See id.* In addition, these Terms and Conditions provided that the "[the provider] certifies that it will not use the [Uninsured Program payment] to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse. If the [provider] subsequently receives reimbursement for any items or services for which the [provider] requested Payment from

---

[3] HRSA updated the Patient Roster Attestations on June 18, 2021, and December 17, 2021, but did not modify the attestations relating to checking for health care coverage eligibility or relating to the Uninsured Program's Terms and Conditions.

the [Uninsured Program], the [provider] will return to HHS that portion of the Payment which duplicates payment or reimbursement from another source."[4] *Id.*

41.    Through their agreement to the Terms and Conditions, providers also acknowledged that their obligations were ongoing, as well as the materiality of their compliance. *See id.* ("The Recipient acknowledges that each time the Recipient submits such claims for reimbursement, each claim must be in full compliance with these Terms and Conditions, and submission of those claims confirms the Recipient's ongoing compliance with these Terms and Conditions. The Recipient acknowledges that the Recipient's full compliance with all Terms and Conditions is material to the Secretary's decision to disburse funds to the Recipient. Non-compliance with any Term or Condition is grounds for the Secretary to recoup some or all of the payments made.")

42.    After a provider attested to compliance with these program requirements and submitted its patient roster, Optum (on behalf of HRSA) performed patient insurance eligibility checks for patients whose Social Security Numbers had been included in patient rosters submitted by providers to attempt to identify individuals with health insurance coverage. HRSA established the following policies regarding these patient insurance eligibility checks for Optum to follow. If Optum's eligibility check did not identify health insurance for an individual on a patient roster, Optum would assign the patient a Temporary Patient ID.  Conversely, if Optum found that a patient included in a roster had insurance, they would not issue a Temporary Patient ID. Claims for COVID-19 testing submitted to the Uninsured Program that were not accompanied by a valid

---

[4] On about May 31, 2021, HRSA updated the language used in the Terms and Conditions, but did not change any of these requirements.  The updated Terms and Conditions provided that: "The [Provider] . . . certifies that to the best of its knowledge, the patients identified on the claim form were Uninsured Individuals at the time the services were provided." "Uninsured Individuals" were defined as "individuals who do not have any health care coverage at the time the services were provided." *See Updated Uninsured Program Terms and Conditions*, *available at* https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/terms-conditions-uninsured-relief-fund.pdf    (last accessed February 20, 2024). Further, the updated Terms and Conditions' language regarding payments from other sources remained the same as in the original Terms and Conditions. *See id.*

Temporary Patient ID would be rejected. Providers could then submit claims for reimbursement to the Uninsured Program by using the Temporary Patient IDs issued by Optum in claims submissions made through the Medicare Electronic Data Interchange, a system widely used by health care providers.

43.    The Uninsured Program generally reimbursed providers at rates published by the Centers for Medicare and Medicaid Services ("CMS"), which published Healthcare Common Procedure Coding System ("HCPCS") codes that were used in providers' electronic claims submissions to the Uninsured Program. Through these HCPCS codes, the providers identified the specific services rendered. The Uninsured Program reimbursed providers as much as $100 for providing a COVID-19 test, and an additional $23.46 for the collection of specimens.

44.    HRSA also provided ongoing guidance to providers. For example, HRSA published "Frequently Asked Questions" ("FAQs") and corresponding answers on the Uninsured Program's website, such as the following FAQ about Uninsured Individuals:

> ***Who is considered to be an "uninsured individual" for purposes of providers requesting reimbursement for testing, treatment, or vaccine administration?***
>
> For claims for COVID-19 testing and testing-related items and services, treatment of positive cases of COVID-19, and vaccine administration claims, a patient is considered uninsured if the patient did not have any health care coverage at the time services were rendered
>
> . . .
>
> ***What if a provider submitted a claim to the HRSA COVID-19 Uninsured Program and the patient is actually underinsured?***

> If a claim was submitted to the HRSA
> COVID-19 Uninsured Program for a patient
> who was actually insured, the provider
> should receive a notice that the claim was not
> eligible for reimbursement.[5]

HRSA, *FAQs for COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment and Vaccine Administration FAQs* (published May 2021).

45.    Further, the Uninsured Program's website informed providers, that if they make direct contact with the patients, the provider should make their own "best efforts to confirm that the patient was uninsured."



HRSA, Uninsured Program Patient Roster Attestation Webpage, archived version *available at* https://coviduninsuredclaim-stage.linkhealth.com/patient-details.html.

46.    The Uninsured Program could only reimburse providers using the funds that had been appropriated by Congress. On March 16, 2022, HRSA informed providers (including LabQ and Dart Medical) that, on March 22, 2022, the Uninsured Program would stop accepting new claims

---

[5] Prior FAQs and corresponding answers (published by HRSA in December 2020) provided similar guidance. One of those FAQs, for example, stated the following: "***Who is considered to be an "uninsured individual" for purposes of providers requesting reimbursement for testing, treatment, or vaccine administration?*** For claims for COVID-19 testing and Testing-Related Items and Services, a patient is considered uninsured if the patient does not have coverage through an individual, or employer-sponsored plan, a federal health care program, or the Federal Employees Health Benefits Program at the time the services were rendered." HRSA, FAQs for COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment and Vaccine Administration FAQs (published December 2020).

for COVID-19 testing and treatment due to a lack of sufficient funds.  That same day, a LabQ employee emailed a copy of this notification to Landau.

## II.    **The False Claims Act**

47.    The FCA establishes civil penalties and treble damages liability to the United States for an individual who, or entity that, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1).

48.    "Knowingly" is defined to include actual knowledge, reckless disregard, and deliberate ignorance. 31 U.S.C. § 3729(b)(1). No proof of specific intent to defraud is required. *Id.*

49.    In addition to treble damages, the FCA also provides for assessment of a civil penalty for each violation or false claim. *Id.* § 3729(a).

## FACTUAL ALLEGATIONS

## I.    **Defendants' Fraudulent Billing Practices**

50.    From at least September 2020 through March 2022, Defendants knowingly submitted, or caused to be submitted, ineligible and fraudulent claims to the Uninsured Program for COVID-19 testing in instances: (a) when the cost of the COVID-19 testing had been (or would be) reimbursed by another source; and/or (b) the COVID-19 testing had been provided to persons who had health care coverage on the relevant date of the service. Defendants also repeatedly learned of instances where other payors and the Uninsured Program paid Defendants for the same claims. However, Defendants failed to return these payments to the Uninsured Program and, instead, knowingly concealed and evaded their obligation to reimburse the Uninsured Program for double payments to which they were not lawfully entitled.

51.     More specifically, during the Relevant Time Period: (1) LabQ, Dart Medical, and Landau double-billed the Uninsured Program and other health care programs and private institutions for the same exact COVID-19 testing; (2) LabQ and CMT employees frequently told patients and customers, in sum and substance, that LabQ did not need insurance information and, in instances when LabQ possessed patient insurance information, LabQ, Dart Medical, and Landau nonetheless often submitted claims (or caused claims to be submitted) to the Uninsured Program for those patients; and (3) finally, in clear violation of the Uninsured Program's Terms and Conditions, LabQ, Landau, and Dart Medical, as a matter of policy, sought reimbursement (or caused others to seek reimbursement) from the Uninsured Program for COVID-19 tests provided to people with health care coverage in instances where LabQ, Landau, and Dart Medical believed that the patients' insurer might deny LabQ or Dart Medical's claim for reimbursement.

52.     As a result of Defendants' fraudulent conduct, the Uninsured Program paid tens of millions of dollars to LabQ and Dart Medical to which they were not entitled. Further, at Landau's direction, the LabQ Corporate Defendants transferred a significant portion of these funds to Landau's personal bank accounts, to other entities owned or controlled by him, and to David Landau.

## A.  Defendants' Laboratory Business Operations

53.     Together with other investors, Landau founded LabQ in 2019. Prior to that, Landau had no prior professional experience or educational background relating to laboratories or health care. In 2019, Landau and his other investors also acquired Dart Medical. Prior to the COVID-19 pandemic, LabQ and Dart Medical's principal business consisted of providing blood testing diagnostic laboratory services to nursing home residents pursuant to agreements between LabQ and the nursing homes (which were owned in part by Landau's brother). In 2019, LabQ and Dart

Medical generated less than $5 million in total revenue. By January 2020, LabQ and Dart Medical faced financial pressure and LabQ employees started to complain that their paychecks were bouncing due to insufficient funds in LabQ's bank account.

54.    Shortly after the start of the COVID-19 pandemic, Landau expanded LabQ and Dart Medical's operations into COVID-19 testing. During the Relevant Time Period, Landau formed and operated three separate business lines related to COVID-19 testing. First, LabQ entered into agreements with institutional customers—such as New York-area nursing homes, schools, and television production companies (the "Private Clients")—whereby LabQ agreed to provide COVID-19 testing to the Private Clients' employees (or other beneficiaries such as the client-schools' students) in exchange for a fixed price that was paid on a per-test basis by the Private Clients to LabQ. From 2020 to 2021, the Private Clients paid LabQ millions of dollars for tests administered pursuant to these agreements.

55.    Second, LabQ entered into agreements with individuals and companies that, in turn, secured relationships with institutions (the "Referral Clients") whereby LabQ provided COVID-19 testing, at no cost, for the Referral Clients. The Referral Clients included hundreds of institutions across the nation, including a jail facility in Alabama and school districts in California. LabQ monetized this business by seeking and receiving reimbursement from the Uninsured Program and private insurers for the COVID-19 testing provided for the benefit of the Referral Clients.

56.    Third, LabQ provided COVID-19 testing to "walk-up" patients at numerous LabQ-branded vans and tents located on public streets in New York City, known as LabQ Mobile Testing Sites. Those sites, operated by Community Mobile Testing employees or other LabQ representatives, collected specimens from patients. LabQ would then perform COVID-19 testing

on these specimens and return the results to the patients. LabQ and Dart Medical, using Dart Medical's NPI, sought and received reimbursement from the Uninsured Program for numerous tests performed pursuant to this business line.

57.    During the entirety of the Relevant Time Period, Defendants failed to have anything close to an adequate compliance program concerning their billing of federal health care programs. In fact, during the Relevant Time Period, Defendants never employed in-house attorneys or formed an internal compliance department with responsibilities relating to billing issues.

58.    After expanding into COVID-19 testing, the LabQ Corporate Defendants' revenue grew exponentially. The LabQ Corporate Defendants generated over $10 million in revenue in 2020, and over $100 million in revenue in 2021. LabQ employees believed that the Uninsured Program would pay claims that private insurers may deny, and LabQ and Dart Medical submitted over one million claims for reimbursement to the Uninsured Program.

59.    Payments from the Uninsured Program to Dart Medical fueled revenue growth; by March 2022, the Uninsured Program had paid approximately $130 million to Dart Medical. Using funds paid by the Uninsured Program, Dart Medical transferred at least tens of millions of dollars to each of LabQ, CMT, and Landau (both directly, and to other Transferee Defendants that Landau solely owned and controlled). For example, from February 11, 2022, to February 17, 2022, the Uninsured Program made approximately $2.04 million dollars in payments to Dart Medical. On February 17, 2022, Dart Medical transferred $2 million dollars to Har Hazayis'm Realty LLC. LabQ, CMT, and Landau each received amounts paid by the Uninsured Program for claims submitted by LabQ and Dart Medical that were, in fact, ineligible for reimbursement.

60.    When the Uninsured Program ended, so did the Defendants' financial success. In June 2022, Landau emailed LabQ executives to inform them that the LabQ Corporate Defendants

"need[ed] to cut dramatically all payrolls and immediately, in order to survive," noting that "we just cannot continue like this when we don't have HRSA anymore."

**B. Landau Personally Controlled and Operated the LabQ Corporate Defendants**

61.    For the entirety of the Relevant Time Period, Landau controlled the Corporate LabQ Defendants' operations. Landau oversaw all aspects of the LabQ Corporate Defendants' operations, including the LabQ Corporate Defendants' procedures and policies relating to billing, patient interactions, and institutional customer interactions. All of the LabQ Corporate Defendants' senior executives—such as LabQ's Chief Operating Officer and Community Mobile Testing's Director of Mobile Sites—reported directly to Landau.

62.    Moreover, Landau routinely made decisions for the LabQ Corporate Defendants relating to COVID-19 testing, including, but not limited to, setting company policies relating to COVID-19 testing and billing. For example, as set forth below, Landau was personally involved in drafting LabQ policy documents relating to billing practices.

63.    Landau also closely monitored the claims that Dart Medical and LabQ submitted to the Uninsured Program and other health care payors. Landau regularly received reports from LabQ employees on topics such as LabQ's submission of claims to the Uninsured Program, HRSA's payment decisions relating to Dart Medical, and the total number of claims billed and paid by the Uninsured Program and other payors.

64.    The COVID-19 pandemic was profitable for Landau. While other LabQ Corporate Defendants' executives and employees were paid fixed salaries, Landau distributed a substantial portion of the revenue generated from the LabQ Corporate Defendants to himself. By 2023, Landau transferred over $100 million from the LabQ Corporate Defendants' accounts to himself and to other companies that he controlled.

### C. LabQ, Dart Medical, and Landau Submitted Claims to the Uninsured Program (Or Caused Claims to Be Submitted) for COVID-19 Testing and Billed Other Payors for That Same COVID-19 Testing

65.     Landau, Dart Medical, and LabQ engaged in a double-billing scheme whereby they submitted (or caused to be submitted) thousands of claims for reimbursement to the Uninsured Program for COVID-19 tests for which they also sought and received payments from Private Clients, other federal health care programs, and private insurance companies. As a result, Landau, Dart Medical, and LabQ caused the Uninsured Program to pay millions of dollars to LabQ and Dart Medical for COVID-19 testing that should never have been reimbursed because it was already paid for (or would be paid for) by other sources.

66.     As noted above, LabQ entered into agreements with Private Clients whereby LabQ agreed to provide COVID-19 testing to these institutions' staff and the people they served (such as nursing home patients and school students) in exchange for a fixed price to be paid by these institutions to LabQ. LabQ frequently charged the Private Clients between $100 and $150 for each COVID-19 test performed by LabQ. During the Relevant Time Period, the LabQ Corporate Defendants received millions of dollars in payments from Private Clients for the provision of COVID-19 testing.

67.     Despite being paid by these Private Clients for COVID-19 testing, LabQ, Dart Medical, and Landau nonetheless frequently sought payment from the Uninsured Program for those same COVID-19 tests. In fact, Landau admitted during Civil Investigative Demand ("CID") Testimony that LabQ double-billed HRSA and Private Clients. For example, Landau testified as follows:

Q. But am I correct in understanding that LabQ also submitted claims to HRSA for the same Covid-19 test that [Skilled Nursing Facility 1][6] paid for?

A. Yes.

68.    Indeed, LabQ sought and received payments from *both* the Uninsured Program and at least four skilled nursing facilities in New York City, which were each managed by a company founded by Landau's brother ("Management Company A"). Further, LabQ and Dart Medical repeatedly falsely attested (in Patient Roster Attestations) to HRSA that no other payer would reimburse the cost of the COVID-19 testing. As illustrative examples, LabQ sought and received reimbursement from both the Uninsured Program and Private Clients for the following COVID-19 testing provided to skilled nursing facility beneficiaries:

a)    On April 20, 2021, LabQ and Dart Medical submitted claims for reimbursement to the Uninsured Program for COVID-19 testing provided to Patient 1[7] and Patient 2, Skilled Nursing Facility 2 beneficiaries, on November 30, 2020. The Uninsured Program paid Dart Medical $125.46 for the COVID-19 testing provided to Patient 1, and $125.46 for the COVID-19 testing provided to Patient 2. However, months earlier, on or about December 24, 2020, LabQ issued an invoice to Management Company A for the cost of this same COVID-19 testing, as well as the cost of COVID-19 testing provided to other Skilled Nursing Facility 2 beneficiaries. Further, on March 24, 2021, LabQ and Dart Medical falsely attested to HRSA (in a Patient Roster Attestation) that no other payer would reimburse the cost of the COVID-19 testing provided to Patient 1 and Patient 2. In February and March 2021, Management Company A paid over $89,000 to LabQ in a series of payments that, upon information and belief, covered the cost of the COVID-19 testing provided to Patient 1,  Patient 2, and other Skilled Nursing Facility 2 beneficiaries for which LabQ and Dart Medical also sought reimbursement from the Uninsured Program.

---

[6] This Amended Complaint anonymizes the names of certain third-party entities that are not named as defendants. The Government has disclosed the names of these entities to Defendants.

[7] In order to protect the confidentiality of patients' personal health information, this Amended Complaint does not include the names of specific patients. The Government has already disclosed to Defendants the names of the patients identified in the original complaint, and will disclose the names of additional patients and additional entity identified in the Amended Complaint to Defendants.

b) On December 3, 2021, LabQ and Dart Medical submitted claims for reimbursement to the Uninsured Program for COVID-19 testing provided to Patient 3 and Patient 4, Skilled Nursing Facility 3 beneficiaries, on March 23, 2021. The Uninsured Program paid Dart Medical $125.46 for the COVID-19 testing provided to Patient 3, and $125.46 for the COVID-19 testing provided to Patient 4. On April 21, 2021, LabQ issued an invoice to Management Company A for, among other things, the cost of this COVID-19 testing. On or about September 20, 2021, Skilled Nursing Facility 3 paid LabQ approximately $248,352, which, upon information and belief, covered the cost of the COVID-19 testing provided to Patient 3, Patient 4, and other Skilled Nursing Facility 3 beneficiaries for which LabQ and Dart Medical also sought reimbursement from the Uninsured Program. On November 19, 2021, however, LabQ and Dart Medical had attested to HRSA (in a Patient Roster Attestation) that no other payer would reimburse the cost of the COVID-19 testing provided to Patient 3 and Patient 4.

69.    Similarly, LabQ and Dart Medical submitted claims to the Uninsured Program for COVID-19 testing that was also paid for by a Private Client that was a foreign country's mission to the United Nations (the "U.N. Mission"). In approximately October 2020, LabQ had entered into an agreement with the U.N. Mission, whereby LabQ agreed to provide COVID-19 testing to U.N. Mission employees for the fixed cost of $150 per test. LabQ performed those COVID-19 Tests and issued invoices to the U.N. Mission. LabQ and Dart Medical also submitted claims to the Uninsured Program for the vast majority of the COVID-19 testing paid for by the U.N. Mission.

70.    For example, on December 1, 2020, LabQ administered COVID-19 tests to the following U.N. Mission employees: Patient 5, Patient 6, Patient 7, Patient 8, and Patient 9. In December 2020 (and prior to seeking reimbursement from the Uninsured Program), LabQ invoiced the U.N. Mission for this same exact COVID-19 testing and, from January 21, 2021, to February 16, 2021, the U.N. Mission made a series of payments to LabQ that, upon information and belief, covered the cost of this COVID-19 testing. Nevertheless, on February 1, 2021, LabQ and Dart Medical falsely attested to HRSA (in a Patient Roster Attestation) that no other payer would reimburse the cost of the COVID-19 testing provided to Patient 5, Patient 6, Patient 7, Patient 8,

and Patient 9. In addition, on February 8, 2021, Dart Medical submitted claims for reimbursement to the Uninsured Program for this same COVID-19 testing.

71.    This double-billing scheme extended beyond Private Clients. LabQ and Dart Medical also sought and received reimbursement from the Uninsured Program for COVID-19 testing for which LabQ also sought and received reimbursement from other federal health care programs. Moreover, Dart Medical and LabQ billed the Uninsured Program *twice* for the same test, sometimes submitting a second claim for a test after receiving payment from the Uninsured Program for that very same test. These schemes are reflected by the following specific examples:

a) On or about April 1, 2021, Dart Medical and LabQ submitted claims to the Uninsured Program seeking reimbursement for COVID-19 testing provided to Patient 10—a Medicare beneficiary—on January 14, 2021. The Uninsured Program subsequently paid Dart Medical $120.06. On or about June 18, 2021, however, Dart Medical also submitted a claim to Medicare for the COVID-19 testing provided to Patient 10 on January 14, 2021, and Medicare subsequently paid $98.46 to Dart Medical for this claim. LabQ and Dart Medical never refunded the Uninsured Program for the cost of this COVID-19 testing.

b) On January 6, 2021, LabQ provided COVID-19 testing to Patient 11, a Medicaid beneficiary. On or about November 24, 2021, LabQ submitted a claim for reimbursement from the Uninsured Program for this COVID-19 testing, and the Uninsured Program subsequently paid LabQ $123.46 for this claim. However, LabQ also submitted a claim to Patient 11's Medicaid plan for this testing, and the Medicaid plan subsequently paid LabQ $123.46. LabQ and Dart Medical never refunded the Uninsured Program for the cost of this COVID-19 testing.

c) On January 18, 2021, LabQ provided COVID-19 testing to Patient 12. On August 2, 2021, LabQ submitted a claim for reimbursement from the Uninsured Program for this COVID-19 testing and the Uninsured Program subsequently paid $123.46 for this claim. LabQ then *again* submitted the same claim for the same patient and the same date of service on November 24, 2021, and the Uninsured Program paid an additional $123.46. Patient 12 did not receive two COVID-19 tests from LabQ on January 18, 2021. LabQ and Dart Medical never refunded the Uninsured Program for the cost of this COVID-19 testing.

72.     The double-billing scheme also extended to private insurance plans, with LabQ and Dart Medical submitting claims to both the Uninsured Program and private insurance plans for the same tests. As an example, on January 6, 2022, and March 9, 2022, LabQ and Dart Medical falsely attested to HRSA (in Patient Roster Attestations) that no other payer would reimburse the cost of the COVID-19 testing provided to Patient 13, who possessed health coverage through a private insurance plan. Further, on or about March 10, 2022, and January 11, 2022, Dart Medical submitted claims for reimbursement to the Uninsured Program for two COVID-19 tests provided to Patient 13 on September 10, 2021, and October 13, 2021, respectively. In total, the Uninsured Program paid Dart Medical $246.92 for these claims. However, Patient 13 also had private health insurance coverage and in November and December 2021, Dart Medical also requested reimbursement from Patient 13's insurer for the same exact COVID-19 testing provided to Patient 13 on September 10, 2021, and October 13, 2021. The private insurer paid Dart Medical for these claims. Defendants never refunded the Uninsured Program for the cost of this COVID-19 testing.

73.     In another example, on November 4, 2021, Dart Medical submitted a claim for reimbursement to Private Insurer A for COVID-19 testing provided on January 31, 2021, to Patient 14. Private Insurer A paid $625.30 to Dart Medical for this COVID-19 testing. However, a few months earlier, on August 2, 2021, Dart Medical sought reimbursement from the Uninsured Program for this same COVID-19 testing. The Uninsured Program paid $123.46 for this claim. Defendants never refunded the Uninsured Program for the cost of this COVID-19 testing.

74.     LabQ, Landau, and Dart Medical were well aware that they could not seek reimbursement from the Uninsured Program for COVID-19 testing paid for by other sources. During his CID testimony, Landau acknowledged that, prior to getting paid by the Uninsured Program, LabQ and Dart Medical had to attest, among other things, that no other payer would

reimburse the provider for COVID-19 testing. And on over three thousand occasions between July 22, 2020, and March 29, 2022, LabQ and Dart Medical certified to HRSA in Patient Roster Attestations that "no other payer will reimburse for COVID-19 testing or care of the patient," and agreed (through its agreement to the Uninsured Program's Terms and Conditions) to return payments from other sources that duplicated payments from the Uninsured Program. But for each of the categories of claims discussed above, LabQ and Dart Medical billed the claims to HRSA, and failed to refund payments to HRSA, in direct contravention of that certification.

75.    Similarly, during the Government's investigation, Landau testified that it could have been an "error" or "mistake" to submit claims for reimbursement to the Uninsured Program for COVID-19 testing provided to the U.N. Mission. LabQ's former billing specialist likewise testified that LabQ should "definitely not" have submitted any claims to the Uninsured Program for testing paid for by a U.N. Consulate, and that LabQ "obviously" could not bill the Uninsured Program for claims already paid by private payors.

76.    But instead of fulfilling this basic obligation, Landau, LabQ, and Dart Medical, repeatedly failed to take appropriate actions after learning that they had billed claims to both the Uninsured Program and another source. For example, in November 2021, a LabQ billing department employee informed Landau by email that the costs of a COVID-19 test had been "paid by [private] insurance" but then also "flipped to HRSA [*i.e.*, also subsequently billed to the Uninsured Program] systematically." Defendants, however, never conducted a comprehensive analysis of the scope of the claims to the Uninsured Program affected by this issue, and correspondingly never reimbursed HRSA for claims that had been paid by both the Uninsured Program and private insurers.

77.     Similarly, also in November 2021, a LabQ employee informed Landau and the LabQ billing department of an issue where LabQ employees had "sent private bills [to certain Private Clients], but they didn't notify [LabQ's] billing [department]." In other words, the LabQ employees responsible for invoicing Private Clients had not informed LabQ's billing department of the contractual relationships with the Private Clients. This resulted in the billing department seeking reimbursement from the Uninsured Program and private insurers for the cost of testing also paid for by Private Clients. But once again, Landau, Dart Medical, and LabQ never took any steps to refund the Uninsured Program for the affected claims.

78.     Defendants were more focused on getting paid than on whether their claims to the Uninsured Program were accurate. In fact, Landau testified under oath that when there were rumors that the Uninsured Program was going to stop issuing payments to providers, LabQ made an effort to "get things, like, out of the door." Landau further testified that, as a result, "mistakes could have happened."

79.     But these were not honest mistakes or mere negligence. In early March 2022, for example, LabQ and Dart Medical, at Landau's instruction, explicitly adopted a policy to submit claims for reimbursement to both the Uninsured Program and private insurance, in instances where they had received private insurance information for patients. As stated by Landau in a March 2022 email, "We need a way to sometimes bill for both HRSA and insurance and if we [sic] paid from insurance we will pay back HRSA[.]" LabQ and Dart Medical subsequently billed both HRSA and other insurers for the same COVID-19 tests.

80.     In total, the Uninsured Program paid millions of dollars to LabQ and Dart Medical for COVID-19 testing also paid for by another source. LabQ and Dart Medical, however, hardly ever reimbursed the Uninsured Program for the COVID-19 testing for which they were paid twice. In

total, LabQ and Dart Medical returned less than $1 million to the Uninsured Program for claims

paid by the Uninsured Program. That is less than 1% of the total amount paid by the Uninsured

Program to LabQ and Dart Medical.

**D. Defendants Knowingly Sought and Received Payment from the Uninsured Program for COVID-19 Testing Provided to Persons with Health Coverage, or Caused the Submission of Such Claims**

81.     Defendants also knew that in order to submit claims to the Uninsured Program, LabQ

and Dart Medical had to attest that they: (1) had checked their patients' health care coverage and

confirmed that the patient was uninsured; and (2) verified that the patient does not have coverage

through an individual, or employer-sponsored plan, a federal health care program, or the Federal

Employees Health Benefits Program at the time services were rendered. During his CID testimony,

Landau acknowledged that LabQ and Dart Medical had to make this attestation prior to getting

paid by HRSA.

82.     As a LabQ billing employee similarly stated to a patient in a March 14, 2022, email:

"While there is a government program that covers anyone who is uninsured, (federally funded),

(and requires us to test anyone regardless of insurance status), it also mandates that we verify, to

the extent possible, that the patient is uninsured. In a case where we find insurance we have to bill

their insurance carrier, not the government. (Even in cases where we find out after we were already

paid by the government program we will bill insurance and void the original claim)." Defendants,

however, repeatedly failed to do just that.

      ***i.    Defendants Frequently Disregarded Their Obligation to Collect Insurance Information***

83.     The best way to determine whether an individual has private health insurance is to ask

them. Defendants understood this fact. During his CID Testimony, Landau agreed that the direct

collection of insurance information from patients was a higher quality method to determine whether a patient had insurance than using an insurance discovery service.

84.    Moreover, as set forth above, the Uninsured Program's website informed providers, that if they make direct contact with the patients, the provider should make their own "best efforts to confirm that the patient was uninsured." *See* HRSA, Uninsured Program Patient Roster Attestation Webpage, archived version *available at* https://coviduninsuredclaim-stage.linkhealth.com/patient-details.html.

85.    Defendants frequently did not do so. As a result, Defendants often did not collect insurance information, and even on many occasions told patients that they did not need to provide the information. LabQ and Dart Medical then submitted claims for reimbursement to the Uninsured Program for these patients, many of whom had health care coverage on the date of service.

86.    Defendants' deficient procedures are illustrated by the fact that LabQ failed to collect insurance information from its own insured employees and contractors for whom it provided COVID-19 testing. LabQ and Dart Medical then billed the Uninsured Program for these tests and also falsely attested to HRSA that they had confirmed that these patients were uninsured.

87.    For example, on sixteen occasions between July and October 2021, LabQ provided COVID-19 testing to one of its directors, Patient 15. LabQ never asked Patient 15 for his insurance information. Patient 15, in fact, had health care coverage on each date of service. Nevertheless, on eight occasions between September 2021 and February 2022, LabQ and Dart Medical falsely attested to HRSA (in Patient Roster Attestations) that they had checked for Patient 15's health care coverage eligibility and confirmed that the patient was uninsured, and did not have employer-sponsored or individual coverage, Medicare or Medicaid. LabQ and Dart Medical subsequently

submitted claims for reimbursement to the Uninsured Program for this COVID-19 testing, and the Uninsured Program paid Dart Medical over $2,000 for these claims.

88.     Similarly, on October 17, 2021, and November 6, 2021, LabQ provided COVID-19 testing to a senior executive at LabQ (Patient 16). Patient 16 had health coverage on those dates of service. Nonetheless, on December 3, 2021, LabQ and Dart Medical falsely attested to HRSA (in a Patient Roster Attestation) that they had checked for health care coverage eligibility and confirmed that LabQ's own senior executive was uninsured, and did not have employer-sponsored or individual coverage, Medicare or Medicaid. Dart Medical and LabQ submitted claims for reimbursement to the Uninsured Program for these tests, and were paid $289.05 for such claims.

89.     LabQ and Community Mobile Testing generally provided patients at LabQ Mobile Testing Site with intake forms (often in digital form, which patients could access through QR codes on their mobile phones) that contained fields where patients could input their insurance information. However, LabQ patients often did not input their insurance information into the form because of deficient instructions from LabQ and Community Mobile Testing employees. These employees—known internally as "technicians"—received training from LabQ and Community Mobile Testing managers concerning how they were supposed to handle patients that appeared at LabQ Mobile Testing Sites. LabQ and Community Mobile Testing often failed to meaningfully train these technicians on the collection of insurance. For example, during an orientation conducted in 2021, a LabQ manager stated, in sum and substance, that patient insurance information did not matter.

90.     It was approximately two years into the COVID-19 pandemic when LabQ's billing manager suggested to LabQ leaders that LabQ should start asking for insurance information from patients. On March 8, 2022, LabQ's billing manager emailed LabQ executives and stated, "[n]ow

that our Covid testing volume has dropped off, I feel now that our mobile sites and Labq locations *can start asking for insurance information* if not given in advance for every patient that comes to be tested." (emphasis added).

91.    As a result of these deficient procedures, LabQ and Community Mobile Testing frequently failed to collect patients' health insurance information. This failure by LabQ and Community Mobile Testing resulted in LabQ and Dart Medical submitting claims for reimbursement to the Uninsured Program for such persons, even though they were insured. For example:

    a) In September 2021, LabQ provided COVID-19 testing to Patient 18[8] at a mobile van location. On at least one occasion, a LabQ Technician told Patient 18, in sum and substance, that she did not need to worry about filling the health insurance section of the form. Patient 18, in fact, had health insurance. LabQ subsequently billed the Uninsured Program for the test it provided to Patient 18, and the Uninsured Program reimbursed Dart Medical $123.46 for that test.

    b) Throughout 2020 and 2021, LabQ provided COVID-19 testing to Patient 19, a nursing home employee, at the nursing home where she worked in Brooklyn. The LabQ technicians did not ask Patient 19 for her insurance information—indeed Patient 19 believed that the difference between LabQ and other testing companies was that LabQ did not ask for insurance. Patient 19, in fact, had health insurance. LabQ billed the Uninsured Program for 28 tests provided to her in 2020 and 2021, and the Uninsured Program reimbursed Dart Medical $3,382.76 for those tests. For example, on June 23, 2021, Dart Medical submitted a claim to the Uninsured Program for a COVID-19 test provided to Patient 19 on December 30, 2020. The Uninsured Program paid Dart Medical $123.46 for that claim. In another example, on or about January 16, 2022, Dart Medical submitted a claim to the Uninsured Program for a COVID-19 test provided to Patient 19 on October 22, 2021. The Uninsured Program paid $123.46 for the claim.  Patient 19 had health insurance at the time both of these COVID-19 tests were provided and billed to the Uninsured Program.

---

[8] Given that the relevant mobile testing sites used the "LabQ" branding but were operated by Community Mobile Testing representatives, the LabQ technicians referenced in this paragraph were also CMT agents.

92.     As with its Mobile Testing Sites, LabQ often did not collect insurance information for Private Clients' and Referral Clients' patients, and then submitted claims to the Uninsured Program for COVID-19 testing provided to individuals with health coverage. LabQ and Landau did not institute any procedures specific to the collection of insurance information from Private Clients' and Referral Clients' patients. Indeed, LabQ employees and contractors frequently told Referral Clients that they did not need to provide LabQ with insurance information for their patients.

93.     For example, in an email dated October 18, 2021, a LabQ sales representative told an independent contractor responsible for a Referral Client ("New Jersey Town Board of Education 1") that information such as a patient's name, date of birth and phone number was "required" but insurance information was only "preferred." In response, the independent contractor provided LabQ with a spreadsheet that contained the "required" information, but not insurance information for the relevant school district employees. Defendants subsequently billed the Uninsured Program—and was paid thousands of dollars—for COVID-19 testing provided to this school district's employees, many of whom, upon information and belief, had health insurance coverage.

94.     On other occasions, LabQ representatives directly told Private and Referral Clients' patients that LabQ did not require their health insurance information. For example, in November 2021, LabQ provided a school district in New Jersey with COVID-19 surveillance testing to the school district's staff, at no cost to the school district. However, LabQ technicians told certain of this school district's staff, in sum and substance, not to worry about providing their insurance information. Upon information and belief, LabQ subsequently billed the Uninsured Program for COVID-19 testing provided to this school district's employees.

95.     Similarly, on two occasions in July 2021, LabQ provided COVID-19 testing to Patient 20 at a camp located in New Jersey. The LabQ technicians did not ask her for their insurance information. Patient 20, in fact, had health insurance. LabQ subsequently billed the Uninsured Program for the two tests provided to her in July 2021, and the Uninsured Program reimbursed Dart Medical $246.92 for those tests.

96.     These examples would come as no surprise to Landau. During his CID testimony, Landau testified that it "was very possible" that there were instances where a LabQ employee had suggested to a customer that insurance information was not required to get a test. Further, in July 2022, Landau received an email from LabQ's third-party billing company, discussing claims submitted by LabQ and Dart Medical to the Uninsured Program where "LabQ didn't check for insurance first before they billed to HRSA due to the push of the cutoff date [i.e., the March 2022 claims submission deadline]."

97.     In addition to their failure to attempt to collect insurance information, Defendants also failed to collect other pertinent information from their patients.  For example, Uninsured Program guidance published by HRSA informed providers that they should submit a patient's "SSN and state of residence" with their claims or, "if not available," the patient's state identification or driver's license. *See* HRSA, *FAQs for COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment and Vaccine Administration FAQs* (published May 2021). The guidance explained that this information was "needed only for the purpose of verifying insurance status." *Id.*  If a provider could not obtain that information, they were required "to attest that [they] attempted to capture this information before submitting a claim." *Id.*

98.     Despite this clear guidance, the patient intake forms used by Defendants did not have a field in which patients could input their SSNs. As a result, in their patient rosters submitted to

HRSA, LabQ and Dart Medical submitted SSNs for less than 3% of their patients. Defendants' failure to collect SSNs hampered the Uninsured Program's ability to verify that Defendants' patients were, in fact, uninsured. As the guidance stated, SSNs are "needed . . . for the purpose of verifying insurance status."

99.    LabQ and Dart Medical, at certain points during the Relevant Time Period, did engage an insurance discovery service to try to locate insurance information for Defendants' patients. But LabQ, Dart Medical, and Landau knew that they did not always use this service prior to submitting claims to the Uninsured Program. For example, in a December 17, 2021, email sent to Landau and others by LabQ's third-party billing company, the third-party billing company employee noted that, on behalf of LabQ and Dart Medical, the company's method was to "bill HRSA" and, if the Uninsured Program denied the claim because the patient had health insurance coverage, only "then bill the insurance company after we receive the insurance information from you based on insurance discovery." In other words, Landau was directly informed by the third-party billing company that it was submitting claims to the Uninsured Program (on behalf of LabQ and Dart Medical) prior to receiving insurance information from LabQ based on insurance discovery, and that LabQ and Dart Medical had been submitting claims to the Uninsured Program for COVID-19 testing provided to persons with insurance (for which, in these instances, the Uninsured Program denied payment). Landau, however, did not implement any changes to LabQ and Dart Medical's billing protocols after receiving this email, and did not conduct any comprehensive analysis to determine whether LabQ or Dart Medical had submitted any other such claims that had been paid by the Uninsured Program.

100.   In addition, Landau himself determined—as he testified during his CID testimony—that this insurance discovery service had "many errors." The success of insurance discovery was

even worse when a patient's SSN was unknown, as that is a key identifier used by insurance discovery services. As noted, Defendants systematically failed to collect the SSNs of their patients, rendering their insurance discovery efforts even less fruitful. Even more, LabQ and Dart Medical submitted numerous claims to the Uninsured Program for COVID-19 testing provided to patients where the insurance discovery service had identified that those same patients had health coverage.

101.  Indeed, LabQ received direct warnings that it was illegally billing the Government for COVID-19 testing. On October 25, 2021, a LabQ employee received an email sent by a pharmacy owner based in California. In the email, the pharmacy owner noted that LabQ's independent contractor was marketing COVID-19 testing to schools (potential Referral Clients) as "government-funded through the Cares Act" and at "no charge." The pharmacy owner further stated that "I am concerned whomever is handling your billing through your lab is doing something that is illegitimate to bill the federal government for COVID testing." Despite this warning, Defendants did not implement any changes to their practices.

102.  Defendants' own internal data likewise showed that the percentage of its patient population that was uninsured (and, accordingly, its billings to the Uninsured Program) was impossibly high. One internal LabQ analysis received by Landau in April 2022 showed that for 184,327 COVID-19 tests performed on behalf of 373 of its Referral Clients, 75% of the tests were purportedly performed for uninsured patients. Moreover, for approximately 77 of these 373 Referral Clients, LabQ identified that 100% of testing was performed on supposedly uninsured patients. Upon information and belief, many of those patients were in fact insured. Similarly, an April 2022 internal LabQ report identified over twenty-five Mobile Testing Sites where over 50% of the patients served by that site were purportedly uninsured.

103.   These "uninsured rates" were virtually impossible. As reflected in census data that is publicly available, during the Relevant Time Period, approximately 5% of New Yorkers were uninsured, and less than 10% of the U.S. population was uninsured. *See, e.g., Health Insurance Coverage in New York State*, New York State Comptroller (August 2023) *available at* https://www.osc.ny.gov/files/reports/pdf/health-insurance-coverage-in-new-york-state.pdf (uninsured rate of New York State residents is approximately 5% from 2019-2021); *Income, Poverty and Health Insurance Coverage in the United States: 2022*, U.S. Census Bureau (Sept. 12, 2023), *available at* https://www.census.gov/newsroom/press-releases/2023/income-poverty-health-insurance-coverage.html (8.3% of U.S. population did not have health insurance at any point in 2021); *see also QuickFacts, New York City, New York* U.S. Census Bureau, *available at* https://www.census.gov/quickfacts/fact/table/newyorkcitynewyork/PST045223     (approximately 7% of New York City residents under the age of 65 are uninsured). During his CID testimony, Landau himself estimated that a third or less of LabQ's patients were actually uninsured – well below the actual percentage of patients that LabQ billed to the Uninsured Program.

104.   So long as the Uninsured Program was paying Defendants' claims for reimbursement, however, Defendants ignored the data that revealed the failures of their insurance collection procedures. But after the Uninsured Program expired and Defendants needed to rely on other sources of revenue, they changed their approach, recognizing (in Landau's words to other LabQ employees in a June 2022 email) that they "just cannot continue like this when we don't have HRSA anymore."

105.   In March 2022, Defendants learned that, as of March 22, 2022, the Uninsured Program would stop accepting claims from providers like LabQ. Only then did Defendants begin conducting meaningful reviews of the percentage of their purportedly "uninsured" patients. As

noted above, in April 2022 (the month *after* the Uninsured Program's claims submission deadline), Landau began receiving reports by email that showed "uninsured rate[s]" for patients of numerous Referral Clients. Further, in the coming weeks and months, Defendants radically improved their policies, demonstrating that they could collect and identify insurance information if they had wanted to do so. For example, in April 2022, LabQ's Director of Client Services emailed administrators at schools that were LabQ Referral Clients, stating that LabQ would only continue to provide COVID-19 testing "for groups in which the large majority of individuals provide insurance information" and "encourage your group to re-register with insurance information if they have insurance and have yet to provide it." Further, it was not until July 2022 that LabQ and Dart Medical finally implemented a system to look back at insurance information collected from patients during prior tests of those patients.

### ii.    LabQ, Dart Medical, and Landau Submitted (Or Caused to Be Submitted) Claims to the Uninsured Program for Patients When Defendants' Own Records Showed That Those Patients Had Private Insurance

106.    LabQ, Dart Medical, and Landau also submitted (or caused to be submitted) numerous reimbursement claims to the Uninsured Program for COVID-19 tests provided to patients for whom LabQ and Dart Medical had health insurance information in their own records. Nonetheless, LabQ, Dart Medical, and Landau falsely claimed to HRSA (or caused others to falsely claim to HRSA) that they had confirmed that these patients were uninsured. In fact, LabQ and Dart Medical frequently failed to check their own relevant records relating to patients' insurance information before submitting claims for reimbursement to the Uninsured Program.

107.    As explained above, LabQ generally provided patients with an intake form that permitted patients to input their personal information, including, their name, date of birth, and insurance information. For Mobile Testing Site patients, LabQ and CMT employees frequently

provided such patients with a QR code so that they could fill out such intake forms digitally using their mobile phones (a "Digital Intake Form"). But even when Mobile Testing Site patients submitted a completed Digital Intake Form stating that they had private health insurance, LabQ's billing department frequently ignored this information and billed the Uninsured Program instead.

108.    For example, in a declaration submitted to the Court, a LabQ executive has admitted that on October 31, 2021, Patient 21 received COVID-19 testing from LabQ and submitted to LabQ a Digital Intake Form in which she provided the name of her private health insurance company and corresponding policy number. Nonetheless, on December 30, 2021, LabQ and Dart Medical falsely attested to HRSA (in a Patient Roster Attestation) that they had confirmed that Patient 21 was uninsured, and did not have employer-sponsored or individual coverage, Medicare, or Medicaid. Further, LabQ and Dart Medical submitted claims to the Uninsured Program for COVID-19 testing provided to Patient 21, and the Uninsured Program paid over $1,600 to LabQ for these COVID-19 tests, including: (a) a COVID-19 test provided to Patient 21 on January 13, 2022, for which Dart Medical submitted a claim to the Uninsured Program on March 21, 2022; (b) a COVID-19 test provided to Patient 21 on January 7, 2022, for which Dart Medical submitted a claim to the Uninsured Program on March 20, 2022; and (c) a COVID-19 test provided to Patient 21 on November 8, 2021, for which Dart Medical submitted a claim to the Uninsured Program on February 21, 2022.

109.    In another example, in November 2021, LabQ provided COVID-19 testing to Patient 17 at a mobile site in New York City. Even though a LabQ technician may have suggested that Patient 17 did not need health insurance, Patient 17's digital intake form identified her health insurance and policy number. Nonetheless, LabQ subsequently billed the Uninsured Program for the test provided to her and the Uninsured Program reimbursed Dart Medical $123.46 for that test.

110.  LabQ and Dart Medical also ignored insurance information directly sent to them by Referral Clients. For example, in September 2021, LabQ agreed to provide COVID-19 testing to staff and students at two schools located in Manhattan ("School A" and "School B"). The schools provided LabQ with insurance information (including the name of the insurer, group number, and policy number) for numerous staff and students. Nevertheless, LabQ and Dart Medical submitted numerous claims to the Uninsured Program for COVID-19 testing provided to staff and students for whom they had insurance information. For example, School A provided LabQ with insurance information for school staff member Patient 22, identifying their insurer, group number, and policy number. On December 30, 2021, however LabQ and Dart Medical falsely attested to HRSA that they had confirmed that Patient 22 was uninsured, and did not have employer-sponsored or individual coverage, Medicare or Medicaid. LabQ and Dart Medical also submitted claims to the Uninsured Program for three tests provided to Patient 22 in September 2021, and the Uninsured Program paid LabQ over $370.00 for those claims.

111.  Defendants knew that they were systematically ignoring the information in their own files. On June 29, 2021, a LabQ billing employee emailed LabQ's Chief Operating Officer and other LabQ employees, noting that information provided on two patients' intake forms was not located in the database used by LabQ's billing department to pull the insurance information for billing purposes. In his email, the billing employee stated, "I don't know who's entering these or why the insurance is still not being entered." LabQ and Dart Medical did not, however, take the necessary steps to resolve this technical issue until after the Uninsured Program stopped paying claims in March 2022.

112.  Landau likewise knew that LabQ and Dart Medical had submitted claims to the Uninsured Program despite also having insurance information on file for the patients. As noted

above, in November 2021, Landau was informed of claims that had been "paid by [private] insurance" but then also "flipped to HRSA [*i.e.*, also subsequently billed to the Uninsured Program] systematically." As also stated above, in March 2022, Landau wrote to LabQ employees that "[w]e need a way to sometimes bill for both HRSA and insurance and if we [sic] paid from insurance we will pay back HRSA." In addition, in an email sent to Landau in July 2022, LabQ's third-party billing company noted that it "was told [by LabQ] that during the HRSA cutoff, if there are any issues with billing insurance, to bill HRSA as not to miss the deadline." In other words, Landau knew that LabQ representatives had instructed its third-party billing company to bill the Uninsured Program in instances where LabQ had insurance information on file for a patient, so as not to miss the Uninsured Program's claims submission deadline. Furthermore, in connection with submitting claims to the Uninsured Program, LabQ and Dart Medical frequently did not examine patient information already in its possession from a prior test performed by LabQ for that patient. Meaning, if a patient provided their insurance information to the LabQ Corporate Defendants during one COVID-19 test, but provided inaccurate information for a later test (or provided no insurance information at all), LabQ and Dart Medical often did not look back to the prior test to confirm insurance coverage prior to submitting a claim to the Uninsured Program.

113. Landau, LabQ, and Dart Medical, only began preparing a formal policy document setting forth their purported billing practices in February 2022—almost two years into the pandemic (and approximately one month before the Uninsured Program expired). Even that document, which was drafted by Landau and other LabQ employees, did not state that LabQ and Dart Medical would examine their own insurance information on file for a patient before submitting a claim to the Uninsured Program.

114.   Defendants knew, however, that they could not seek reimbursement from the Uninsured Program when their own files showed that a patient had private insurance. During his CID testimony, Landau admitted that LabQ should not have billed the Uninsured Program for a patient's COVID-19 test where LabQ's own records showed that, four months earlier, LabQ and Dart Medical previously sought reimbursement from the patient's private insurer for a COVID-19 test. As set forth above, it was not until July 2022—after the Uninsured Program had concluded and Defendants became dependent on accurate insurance information to generate revenue—that LabQ and Dart Medical finally implemented a system to look back to information collected during prior tests.

115.   In addition, Defendants ignored their own billing data, which showed—as with their "uninsured rate" data—that they had submitted most of their claims for reimbursement to the Uninsured Program, despite their own estimate that only approximately one third of their patient population was uninsured. Landau regularly requested and received internal LabQ reports that showed the total number of COVID-19 tests performed by LabQ in a given month or year, as well as the number of paid claims from private insurers and the Uninsured Program. These reports showed that, during some time periods, LabQ and Dart Medical had sought reimbursement from the Uninsured Program at three times the frequency they sought reimbursement from all private insurance companies combined.

116.   For example, on July 5, 2021, Landau received an internal report showing that, for the month of September 2020, LabQ performed 15,632 COVID-19 tests and 8,950 of these tests were billed to and paid by the Uninsured Program while only 2,841 of these tests were billed to and paid by private insurers. In other words, the report showed that, for September 2020, LabQ had been paid by the Uninsured Program for three times as many claims as by private insurers.

42

117.    One of LabQ's own billing department employees believed that if a disparity of this magnitude was known, it would cause concerns so significant that he would not personally want to make any attestations to HRSA regarding the insured status of patients. During the Government's investigation, that employee testified that if he had ascertained that HRSA had paid LabQ for three times as many tests as private insurers for a certain time period, he "wouldn't want to attest to anything."

118.    Landau received many similar reports. On January 6, 2022, for example, Landau received a report showing that, for the time period from January 2021 to September 2021, LabQ and Dart Medical had been paid by/billed to the Uninsured Program for more claims than LabQ and Dart Medical had been paid by/billed to private insurers. As set forth above, Landau testified that he believed that only a third or less of the LabQ patient population was uninsured, and publicly available data showed that both the nation and New York's uninsured rate was less than 10%.

### iii.    *LabQ, Dart Medical, and Landau Knowingly Adopted a Policy to Submit Claims for Insured Persons to the Uninsured Program if Private Insurers Refused to Pay for the Cost of the Services*

119.    As early as fall 2020, LabQ, Dart Medical, and Landau instituted a policy whereby they billed the Uninsured Program for the cost of COVID-19 tests provided to patients whom LabQ and Dart Medical knew had private insurance but believed that such private insurance would not reimburse LabQ for cost of the test. This policy was summed up in a December 15, 2020, email sent by a LabQ employee: "if insurance denies we charge the hrsa that's get [sic] covered by the government."

120.    However, COVID-19 tests provided to insured patients were ineligible for reimbursement from the Uninsured Program, irrespective of whether the patient's insurer denied LabQ's claim for reimbursement. The Uninsured Program's Terms and Conditions defined

"Uninsured Individuals" as "individuals who did not have **any** health care coverage at the time the services were provided." (emphasis added).[9] *See Updated Uninsured Program Terms and Conditions*, *available at* https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/terms-conditions-uninsured-relief-fund.pdf (last accessed February 20, 2024). In an FAQ published by HRSA in 2021, HRSA also provided the following question and answer:

> **Q. What if a provider submitted a claim to the HRSA COVID-19 Uninsured Program and the patient is actually underinsured?**
>
> A. If a claim was submitted to the HRSA COVID-19 Uninsured Program for a patient who was actually insured, the provider should receive a notice that the claim was not eligible for reimbursement.

121.    Landau was notified by a LabQ employee that the Uninsured Program would not pay for claims that were denied by insurance companies for lack of coverage. In May 2020, Union A's Benefit and Pension Fund ("the Union A Health Plan") announced that it would not cover the cost of surveillance testing for nursing home employees mandated by the then-Governor of New York. Following this announcement, in 2020, LabQ and Dart Medical submitted numerous claims for reimbursement to the Uninsured Program for COVID-19 testing provided to nursing home staff members who had private health coverage through the Union A Health Plan.

122.    Soon thereafter, however, LabQ, Dart Medical, and Landau learned that HRSA would not cover the cost of these tests. On December 24, 2020, a LabQ billing employee emailed Landau,

---

[9] The same was true under the prior version of the Uninsured Program's Terms and Conditions, which defined uninsured individuals as persons who, as of the date of service, were ***not enrolled*** in a federal health care program or an insurance plan offered by a private insurer. *See* First Uninsured Program Terms and Conditions, *available at* https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/terms-conditions-ffcra-relief-fund.pdf (last accessed Feb. 20, 2024). This general rule was subject only to narrow exceptions not relevant to this case, including Medicaid plans with limited benefits, *see* Gov. Reply Brief, Dkt. 230, at 15 n. 14, and, prior to on or about June 2021, short-term limited duration insurance plans, which are not a type of "individual health insurance coverage" as that term is defined under the Public Health Service Act. *See* 42 U.S.C. § 300gg-91(b)(5); Dkt No. 249. The term "health care coverage" as used in this amended complaint, does not include these narrow exceptions.

stating that he "spoke to HRSA to determine why they are reversing some payments . . . They were all found to be covered by [Union A Health Plan] after we received payment. They claim that we can't get paid for these at all but it seems like we are getting paid for others once they are appealed with the denial letter."

123.    These "appeals" referenced by the LabQ employee were, in fact, requests for reconsideration made by Dart Medical and LabQ to HRSA (through its contractor, Optum) in instances where Optum had denied Dart Medical and LabQ's request for a Temporary Patient ID after submitting the patient's information to Optum in a patient roster. Further, the requests for reconsideration were only granted because LabQ and Dart Medical had made further false attestations to the Uninsured Program. In submitting requests for reconsideration, providers were informed that they could "provide evidence that the patient is uninsured, such as a Claim Denial Letter." Providers had to attest that any submitted documentation "meets the criteria established for eligibility reconsideration." LabQ and Dart Medical falsely attested that their patients were eligible for the Uninsured Program despite the fact that the documentation they provided did not meet the eligibility criteria because it did not state the patient was uninsured.

124.    As set forth above, a cursory examination of the Uninsured Program's Terms and Conditions shows that patients who had insurance were ineligible for COVID-19 testing coverage through the Uninsured Program. Nevertheless, Landau, LabQ, and Dart Medical deliberately ignored the Uninsured Program's eligibility requirements and, on at least thousands of occasions during the Relevant Time Period, submitted claims for reimbursement (or caused claims to be submitted) to the Uninsured Program for patients whom LabQ, Landau, and Dart Medical knew had private insurance.

125.    Indeed, LabQ managers understood the Uninsured Program's eligibility to be limited to individuals with no insurance at all. For example, in an email sent in January 2022, a LabQ Regional Service Manager wrote to another LabQ employee, copying another LabQ manager, that "The CARES ACT covers only for patients who don't have insurance at all."

### E.    LabQ, Dart Medical, and Landau Knowingly and Improperly Concealed or Avoided Their Obligation to Pay or Transmit Money to the Government

126.    LabQ, Dart Medical, and Landau also knew that LabQ and Dart Medical received payments from both the Uninsured Program and health insurers (or other entities providing health care coverage) for the exact same COVID-19 tests and that they had an obligation to return these overpayments by the Uninsured Program. However, LabQ, Dart Medical, and Landau failed to do so and, instead, improperly retained these funds.

127.    For example, as set forth above, near the end of the Uninsured Program, LabQ and Dart Medical had a policy whereby they simultaneously billed the Uninsured Program and commercial insurers for the same COVID-19 testing. And email communications between LabQ and one of their third-party billing companies show that LabQ carried out this policy.

128.    For instance, on May 13, 2022, a third-party billing company employee ("3P Employee A") emailed a LabQ employee ("LabQ Employee A") with billing responsibilities to memorialize a prior telephone call between them in which they discussed claims previously submitted to the Uninsured Program. More specifically, in this email, the 3P Employee A wrote that during their call, LabQ Employee A confirmed that "some of them [*i.e.*, some of LabQ's claims for reimbursement] are claims that were paid by HRSA, that now will be billed by Insurance and if paid, you will reverse the HRSA claim back." LabQ Employee A replied that 3P Employee A's description of the process was "correct." Similarly, in July 2022, LabQ Employee A again

46

wrote an email to the same billing company, copying Landau, and discussing "[c]laims that were paid" by both "HRSA" and "insurance."

129.   LabQ, Dart Medical, and Landau knew that they had an obligation to return payments to the Uninsured Program when they had been paid by other sources. For example, in a declaration submitted to the Court on October 2, 2024, a LabQ executive with billing responsibilities acknowledged that Defendants had previously "learned of an obligation to pay back HRSA" when commercial insurers had paid LabQ and Dart Medical. Similarly, during his CID testimony, Landau testified that "[i]f we do find that they do have insurance, we're gonna void the claims or whatever."

130.   But Defendants often did not void such claims.  In particular, LabQ and Dart Medical never returned any funds to HRSA on or after March 1, 2022, despite knowing, at the latest, in July 2022 that they had been paid by HRSA and commercial insurers for the same exact COVID-19 testing.

131.   This fraudulent scheme to retain overpayments continued through at least 2024. For example, on June 20, 2024, the BlueCross BlueShield Federal Employee Program paid Dart Medical $375 for a COVID-19 test provided to Patient 23 on March 17, 2021. The Uninsured Program, however, had already paid Dart Medical $100 for the same COVID-19 test provided to Patient 23 on March 17, 2021. LabQ and Dart Medical never returned to the Uninsured Program the payment it received from the Uninsured Program for the COVID-19 test provided Patient 23 on March 17, 2021.

132.   In another example, on June 18, 2024, the BlueCross BlueShield Federal Employee Program paid Dart Medical $375 for a COVID-19 test provided to Patient 24 for a COVID-19 test provided on October 19, 2021. The Uninsured Program, however, had already paid Dart Medical

$100 for a COVID-19 test provided to Patient 24 for the same COVID-19 test to Patient 24 on October 19, 2021. LabQ and Dart Medical never returned the payment from the Uninsured Program for the COVID-19 test provided to Patient 24 on October 19, 2021.

## II.    Defendants' Fraudulent Conduct Was Material to HRSA's Payment Decisions

133.    HRSA's payment decisions turned on, among other things, whether a provider complied with its obligations to submit claims for reimbursement only when: (1) no other payor would reimburse (or had reimbursed) the COVID-19 testing; and (2) the provider had confirmed that the patient was an Uninsured Individual. If HRSA had known that a provider had submitted claims for COVID-19 testing where either another payor would reimburse (or had reimbursed) the provider for the COVID-19 testing or the patient had any health care coverage on the relevant date of service, HRSA would have not paid the claims.

134.    Indeed, as discussed above, Optum (on behalf of HRSA) performed patient insurance eligibility checks for patients whose Social Security Numbers had been included in patient rosters submitted by providers, to attempt to identify individuals with health insurance coverage. HRSA established the following policies for Optum to follow regarding these insurance checks. If Optum's eligibility check did not identify health insurance for an individual on a patient roster, Optum would issue a Temporary Patient ID to the provider for each Uninsured Individual. Conversely, if Optum found that a patient had insurance, they would not issue a Temporary Patient ID. Optum would reject claims for COVID-19 testing submitted to the Uninsured Program that were not accompanied by a valid Temporary Patient ID.

135.    In addition, at HRSA's direction, Optum conducted post-payment retrospective eligibility checks of patients with Social Security Numbers. These retrospective checks were conducted 30, 60, and 90 days post-payment to identify whether the patient had health insurance

coverage on the date that the patient received the COVID-19 testing. If such a post-payment eligibility check indicated that the patient had health coverage on the relevant date of service, HRSA's policy was to offset future claims submitted by this provider.

136. On hundreds of occasions, HRSA offset future claims for reimbursement submitted by Dart Medical and LabQ pursuant to an Optum post-payment retrospective eligibility review because that review identified health insurance coverage for the patients on the relevant dates of service.

## III.    Defendants Are Alter Egos of Landau

137. During the entirety of the Relevant Time Period and through the present, each LabQ Corporate Defendant has been an alter ego of Landau.

138. Landau exerted dominion and control over each of the LabQ Corporate Defendants, which have overlapping personnel and locations. The LabQ Corporate Defendants and Landau have also intermingled funds and not followed corporate formalities. These abuses of the corporate form have resulted in fraud or wrong against the United States which resulted in the Government's injury.

139. ***Overlap in Decision-Making, Ownership, Officers, Directors, and Personnel***. For the entirety of the Relevant Time Period and through the present, there has been substantial overlap between the LabQ Corporate Defendants with respect to ownership, personnel, and reporting structure.  In particular, Landau is the CEO of Dart Medical, LabQ, and CMT. He is the majority owner of CMT.  And,  although Landau putatively owns only 30% of both LabQ and Dart Medical, he is the only owner that has actually taken distributions from LabQ and Dart Medical. Further, during the Relevant Time Period, Dart Medical did not have its own employees—instead, Landau operated Dart Medical with LabQ employees. With respect to CMT, Landau operates it as a

division of LabQ and not as a separate entity.  In fact, in a LabQ organizational chart, CMT is listed merely as an "office" under Landau and LabQ Clinical Diagnostics. Moreover, LabQ, Dart Medical, and CMT employees all reported to Landau. Further, during his CID testimony, Landau testified that the employees who worked at the mobile testing sites were "LabQ employees under Community [Mobile Testing]."

140.   Landau exerted control over LabQ, Dart, and CMT's operations. He oversaw all aspects of their operations, including their procedures and policies relating to billing and patient and client interactions, and had decision making authority.  LabQ and CMT's senior executives reported directly to Landau. And Landau routinely made decisions for LabQ, Dart Medical, and CMT relating to COVID-19 testing, including setting the companies' policies relating to COVID-19 testing and billing.

141.   ***Intermingling of Funds***. At Landau's direction, the LabQ Corporate Defendants repeatedly intermingled funds with each other and the Transferee Defendants. Moreover, as set forth below, the LabQ Corporate Defendants sent moneys back and forth between them as though they were one company. For example:

   a.   From 2021 through February of 2025, Dart Medical transferred more than $170 million to a bank account belonging to LabQ.

   b.   From 2021 through 2024, Dart Medical transferred more than $24 million to a different account of LabQ.

   c.   From 2021 through 2024, Dart Medical transferred more than $15 million to yet another account of LabQ.

   d.   From 2021 to 2024, Dart Medical transferred more than $72 million to CMT.

    e.   Between 2021 and 2024, CMT sent more than $198,000 to a bank account of LabQ. Correspondingly, between 2021 and 2024, LabQ sent more than $1 million from this bank account to CMT.

    f.   From 2021 to 2023, LabQ also sent CMT $710,000 from a different account. CMT in turn sent more than $440,000 to this LabQ account from August 2022 to May 2024.

142.   ***Common Office Space, Address, And Telephone Numbers of Corporate Entities***: Throughout the Relevant Time Period, the LabQ Corporate Defendants used the same address on their respective bank accounts. Further, LabQ and Dart Medical shared a single phone number.

143.   ***Financial Control***:  Throughout the Relevant Time Period and through the present, Landau exerted financial control over all of the LabQ Corporate Defendants. In particular, Landau had signature authority over the financial accounts of LabQ, Dart Medical, and CMT.

144.   ***Lack of Arms-Length Dealings and Use of Corporate Funds for Personal Reasons***: Throughout the Relevant Time Period and as recently as 2025, the LabQ Corporate Defendants repeatedly engaged in non-arms-length transactions with entities that Landau owned or controlled. In particular, the LabQ Corporate Defendants, for Landau's benefit, made the following transfers to other entities owned or controlled by Landau:

    a.   In August 2022, CMT transferred more than $24 million to MLK Blvd. Upscale LLC. During his CID testimony, Landau admitted that MLK Blvd. Upscale LLC was his company and that he created it as a real estate holding company.

    b.   From 2022 to 2024, LabQ transferred more than $14 million to Unitec Laboratories Inc., an entity purportedly owned by Landau's wife. However, during his CID testimony, Landau admitted that he personally acquired Unitec Laboratories Inc. In

2024, Unitec Laboratories Inc. sent more than $700,000 back to LabQ. As Unitec Laboratories provides laboratory services to patients, it would not have been in a position to provide services to LabQ, which is another laboratory.

c.  Between March 2022 and December 2024, Dart Medical likewise transferred $17,550,000 million to Unitec Laboratories Inc.

d.  Between July and August of 2022, LabQ sent $2,000,000 to an IOLTA account held by Landau's real estate attorney (the "Real Estate Attorney A") on Landau's behalf. Those funds were then used to acquire properties on behalf of Transferee Defendants owned or controlled by Landau. None of these properties, are (or ever were) actually owned or used by LabQ. In 2021, Dart Medical also sent $1,000,000 to the IOLTA account held by Real Estate Attorney A on Landau's behalf.

e.  Between 2022 and 2024, LabQ sent over $800,000 to Transferee Defendant Har Hazayis'm Realty LLC, an entity solely owned by Landau and used by Landau to acquire real property. Har Hazayis'm Realty LLC in turn sent more than $400,000 to LabQ from 2022 through 2024.

f.  Dart Medical also transferred more than $24 million to Har Hazayis'm Realty LLC from 2021 to 2024. Har Hazayis'm Realty LLC in turn transferred more than $542,000 to Dart Medical's account from 2023 to 2025.

g.  Between February and August of 2024, another limited liability company used to hold and/or manage real estate that is owned by Landau and his son (and which is another alter ego of Landau) ("LLC A"), transferred more than $1.6 million to LabQ. LabQ in turn transferred more than $590,000 to LLC A in 2024. LLC A

would not be in a position to provide *bona fide* services to the LabQ Corporate Defendants.

h.   Dart Medical also transferred $15,000 to LLC A in June of 2024.

i.   From 2022 through 2025, LabQ sent more than $900,000 to Care Bio Clinical Corp. ("Care Bio"), which is owned by Landau and is a laboratory that, according to Landau's CID testimony, operates solely in California. Dart Medical also sent more than $226,000 to Care Bio in 2024 and 2025.

j.   CMT transferred $5.3 million to Ovalab LLC in September 2022, which is a company that provides laboratory services and is owned by Landau and his wife.

145.   These transfers do not appear to be payment for services or otherwise mutually beneficial, arms-length transactions between companies. Instead, upon information and belief, these transactions are all directed by Landau, between companies (some of which are mere real estate holding companies) controlled by Landau, and without any consideration.

146.   Landau's domination of his companies has resulted in fraud or wrong against the United States which resulted in the Government's injury. Specifically, through these self-dealing transactions, Landau has dissipated almost all of his companies' assets, leaving virtually nothing for the Government to collect when it prevails in this lawsuit.

**IV.   Defendants Fraudulently Transferred Their Assets to the Transferee Defendants**

147.   After Defendants learned of the Government's investigation, Defendants divested and concealed their assets by fraudulently transferring tens of millions of dollars to entities owned or controlled by Landau, and to Landau's son. As a result of these fraudulent transfers, Defendants have only minimal amounts remaining in their bank accounts and, accordingly, would be unable to satisfy the judgment sought by the Government in this case, which could exceed $200 million.

148.    Specifically, in April 2022, the Government issued Civil Investigative Demands ("CIDs") to LabQ, CMT, and Dart Medical. Those CIDs stated that the Government's investigation concerned whether LabQ, CMT, Dart Medical, or Landau submitted or caused to be submitted false claims for payment to the Uninsured Program in connection with the provision and billing of services relating to COVID-19 testing. On April 13, 2022, the Government emailed copies of those CIDs to Landau.

149.    After receiving the CIDs in April 2022, Defendants transferred vast sums to the Transferee Defendants and appear to have attempted to disguise or obscure the nature of many of these transfers through the use of limited liability companies and putative charitable organizations. However, despite Defendants' numerous transfers and their use of numerous entities, Landau or his son continue to control much of the funds, or assets subsequently purchased with the funds.

150.    The paragraphs below set forth examples of Defendants' fraudulent transfers to the Transferee Defendants.

A.   **MLK Blvd Upscale LLC and 175 Park Avenue LLC**

151.    Landau owns and controls MLK Blvd Upscale LLC, which he has used as a holding company to acquire real estate located in New Jersey. Between July 8, 2022, and August 29, 2022—after becoming aware of the Government's investigation—LabQ and Dart Medical transferred $46.16 million to MLK Blvd Upscale LLC, for no consideration. Because MLK Blvd Upscale LLC is simply a holding company used to acquire real estate, it could not have provided any relevant services to LabQ or Dart Medical in exchange for the $46.16 million it received.

152.    Instead, after receiving these funds, MLK Blvd Upscale LLC acquired a hotel in New Jersey, known as the Malon Resort. MLK Blvd Upscale LLC then assigned its entire interest in this hotel for no consideration to 175 Park Avenue LLC.

54

**B.    The Malon Resort NJ LLC**

153.    Between May 8, 2024, and September 24, 2024, LabQ transferred $106,000 to The Malon Resort NJ LLC, an entity affiliated with the Malon Resort, for no consideration. An entity affiliated with the Malon Resort would not have been in a position to provide services to LabQ. David Landau and Moshe Landau have signature authority for the Malon Resort NJ LLC's bank account that received the transfers. The bank account is associated with a bank's branch office located in Brooklyn, New York.

154.    During that same time period, the Malon Resort NJ LLC also received additional transfers from Har Hazayis'm Realty LLC, using funds that had been previously transferred by LabQ and Dart Medical to those entities. For example, on July 23, 2024, Dart Medical transferred $260,000 to Har Hazayis'm Realty LLC. And between July 23 and July 29, 2024, Har Hazayis'm Realty LLC transferred $158,000 to The Malon Resort NJ LLC. In another example, on October 11, 2024, LabQ transferred $2,500 to Har Hazayis'm Realty LLC. Four days later, Har Hazayis'm Realty LLC transferred the exact same amount to The Malon Resort NJ LLC.

**C.    Thomas G. Rosano PhD LLC d/b/a National Toxicology Center ("National Toxicology Center")**

155.    The National Toxicology Center is a toxicology laboratory owned by Landau and located in New York. Between June 2022 and March 2024, LabQ transferred over $650,000 to the National Toxicology Center, for no consideration.

156.    Funds transferred from LabQ to National Toxicology Center were used to pay National Toxicology Center's expenses—not LabQ's expenses. For example, on about July 16, 2022, an individual issued an invoice to National Toxicology Center for $64,365.40 for independent contractor services provided by that individual to National Toxicology Center and other National

Toxicology Center expenses. On July 22, 2022, LabQ transferred $64,365.40 to the National Toxicology Center.

### D. David Landau

157. After Moshe Landau became aware that the Government would be seeking writs of attachment on his property, he took steps to frustrate the Government's ability to collect property owned, at least nominally, by LLC A, a company that was formed in 2022, by transferring ownership in that company to his son. Specifically, on July 23, 2024, the Government informed Defendants (through counsel) that it planned to file an application under the Federal Debt Collection Practices Act, seeking writs of attachment and garnishment.

158. An operating agreement dated only two days later—July 25, 2024—reflects that David Landau supposedly has a 90% membership interest in LLC A and that Moshe Landau has only a 10% membership interest. Upon information and belief, the operating agreement also incorrectly states that David Landau contributed 90% of the capital amounts to LLC A. In reality, Har Hazayis'm Realty LLC had sent over $2.7 million to LLC A's bank account, and bank records obtained by the Government reflect $0 in contributions from David Landau to LLC A. Despite David Landau's supposed 90% interest, however, Moshe Landau has continued to use LLC A for his own purposes. For example, on January 2, 2025, LLC A transferred $21,806.03 to Transferee Defendant Care Bio Clinical Corp., a company that Moshe Landau owns.

### E. Har Hazayis'm Realty LLC

159. Har Hazayis'm Realty LLC is a company that owns various real estate properties in New Jersey. During discovery in this matter, Defendants admitted that they are the actual 100% owners of property held in the name of Har Hazayis'm Realty LLC. Between May 2, 2022, and

June 11, 2024, Dart Medical transferred over $18,750,000 to Har Hazayis'm Realty LLC, for no consideration.

160.  Har Hazayis'm Realty LLC used these funds to acquire residential real estate located in New Jersey. As Har Hazayis'm Realty LLC owns and operate residential real estate in New Jersey, it would not have been in a position to provide services to LabQ.

**F. Realty at HH LLC**

161.  Mere weeks after receiving the Government's CIDs, Landau created and incorporated Realty at HH LLC, a company that owns residential real estate properties in New Jersey. Like Har Hazayis'm Realty LLC, Realty at HH LLC is owned and controlled by Moshe Landau and Defendants have admitted that they are the 100% owners of property that is held in the name of Realty at HH LLC. Beginning, in May 2022, after Landau created Realty at HH LLC, LabQ transferred millions of dollars, for no consideration, to the IOLTA account used by Real Estate Attorney A, where those funds were used to acquire property placed in the name of Realty at HH LLC.

162.  More specifically, between May 2022 and June 27, 2022, LabQ transferred $2.5 million to the IOLTA account held Real Estate Attorney A used by Defendants to acquire real estate. Records reflect that, between June 1, 2022, and June 29, 2022, $1.42 million of these funds were wired from the IOLTA account for Realty at HH, LLC's benefit. Through these transactions, LabQ provided funds to Realty at HH LLC for no consideration.

163.  In another example, on August 11, 2022, LabQ transferred $1 million to the attorney IOLTA account, for no consideration. On that same day, some of those funds were used to acquire a property located at 257 Winding Hill Drive, to be held in the name of Realty at HH LLC.

164.    Similarly, on November 28, 2022, LabQ transferred $4.5 million to the attorney IOLTA account, for no consideration. Some of those funds were used to acquire a property located at 260 Winding Hill Drive, again to be placed in the name of Realty at HH LLC.

**I. NJJ Institutions**

165.    Between June 2023, and September 2024, Landau sent NJJ Institutions at least $3,349,200, and LabQ sent NJJ Institutions at least $307,100, all for no consideration. In addition, in 2023, three other entities controlled by Landau that received post-CID transfers from Defendants—Congregation Kolel Vyashkem Avrhom Inc., LLC A, and Har Hazayis'm Realty LLC—transferred over $11 million to NJJ Institutions, for no consideration.

166.    NJJ Institutions is putatively a 501(c)(3) non-profit organization, but Landau has exerted control over it. Landau has previously served as NJJ's President, as well as a board member and trustee. Landau only resigned from these positions on or about May 7, 2024.

167.    Nevertheless, through at least on or about May 7, 2024, Landau controlled NJJ Institutions.  In fact, during his CID testimony, Landau testified that NJJ Institutions was *his* institution. Specifically, while discussing purported charitable contributions that he made, Landau testified: "So it went to many, many, many different organizations also. Many different private charity. Many -- I have an institution with kids and schools. So it went there. NJJ institutions within New Jersey."

168.    Moreover, the address for NJJ Institutions is a property owned by Defendants. Specifically, the Certificate of Incorporation of NJJ Institutions lists its address as 102 Drakestown Road and Defendants have admitted a 100% ownership interest in this property.

169.    Further, between July 2023 and September 2023, NJJ Institutions transferred over $3 million to an IOLTA account held by Real Estate Attorney A. At least some of these funds were

then used to purchase real property that was placed in the name of separate limited liability companies—between August 8 and August 10, 2023, NJJ Institutions transferred $600,000 to the IOLTA account held by Real Estate Attorney A for Landau. On August 17, 2023, these funds were used to acquire 22 Winding Hill Drive, a residential real estate property in New Jersey. 22 Winding Hill Drive, however, was deeded to 22 Winding Hill, LLC—not NJJ Institutions—an IRS document reflects that Moshe Landau is the sole member of 22 Winding Hill LLC. However, a certification of formation filed with the New Jersey Department of the Treasury reflects that LLC A is the "member/manager" of 22 Winding Hill LLC.

### G. Congregation Kolel Vyashkem Avrhom Inc.

170.   In December 2022, Landau transferred $36 million to Congregation Kolel Vyashkem Avrhom Inc. ("Kolel Vyashkem Avrhom"), for no consideration. Landau is an authorized signatory on Kolel Vyashkem Avrhom's bank account.

171.   Further, while Kolel Vyashkem Avrhom identifies itself as a religious organization, where Landau serves as a rabbi, after receiving the above-referenced transfer, Kolel Vyashkem Avrhom transferred over $11 million to NJJ Institutions in 2023.

172.   Additionally, Kolel Vyashkem Avrhom bank records reflect that its address is 199 Lee Street, Suite 730 in Brooklyn. As reflected below, however, this address is a storefront for another company and not a synagogue.



173.   In addition, on April 27, 2023, Kolel Vyashkem Avrhom transferred $6.2 million to an IOLTA account of the attorney used by Landau to make real estate purchases. In May 2023, funds from this transfer were then used to acquire residential real estate properties, including the following located in Budd Lake, New Jersey: 23 Peckwell Street, 25 Peckwell Street, 27 Peckwell Street, and 29 Peckwell Street. However, in a disclosure made by Defendants on August 23, 2024, pursuant to a Court-ordered stipulation (the "August 23 Disclosure"), Defendants admitted that *Defendants*—not Kolel Vyashkem Avrhom—were the "100[%]" owners of the properties located at 23, 25, 27, and 29 Peckwell Street.

### H.   Yampola 2022 Charitable Lead Annuity Trust

174.   In December 2022, Landau transferred $13 million to Yampola 2022 Charitable Lead Annuity Trust ("Yampola CLAT"), for no consideration. Landau is the grantor of the trust, and his children are the beneficiaries. A *bona fide* Charitable Lead Annuity Trust is supposed to make contributions to charitable organizations before the trust expires and the remaining assets are then passed on to the beneficiaries. Upon information and belief, Yampola CLAT, however, has not made regular contributions to *bona fide* charitable organizations.

175.    Instead, Yampola CLAT has used funds to acquire residential real estate for Defendants. For example, between June 21, 2023, and June 26, 2023, Yampola CLAT transferred $3.5 million to the IOLTA account used by Landau's attorney to acquire real estate. These funds were then used to acquire residential real estate, including 1 Peckwell Street and 3 Peckwell Street in New Jersey. These properties are nominally held in the names of 1 Peckwell LLC and 3 Peckwell LLC. In the August 23 Disclosure, however, Defendants admitted that Defendants—not Yampola CLAT—are the 100% owners of the properties located at 1 Peckwell Street and 3 Peckwell Street.

### I. Carebot ABA LLC

176.    Between February 2023 and September 2024, Landau transferred over $915,000 to Carebot ABA LLC ("Carebot"), for no consideration. In addition, from February 2024 to August 1, 2024, LabQ transferred $176,176 to Carebot, also for no consideration. Landau is a signatory on a Carebot bank account. Moreover, Landau made business decisions for Carebot. In addition, Carebot operates from the same business address as LabQ's New Jersey location, and LabQ employees performed work for Carebot.

### J. OvaLab LLC

177.    On September 15, 2022, LabQ transferred $5.3 million to OvaLab LLC ("OvaLab"), for no consideration. During his CID testimony, Landau claimed that OvaLab is a lab related to women's health owned by Landau and his wife. However, within months of learning about the Government's investigation (and well before his CID testimony which occurred on May 11, 2023), Landau had instructed his managers to move LabQ's COVID-19 testing business to OvaLab. Indeed, on June 9, 2022, a LabQ senior manager emailed Landau, to confirm that "Covid operations are to be moved to Ovalab . . . following dictation of your instructions."

178.    Further, Landau testified that OvaLab sometimes takes "help from LabQ," and LabQ correspondingly "takes sometimes help from OvaLab employees."

### K.    Care Bio Clinical

179.    Between June 15, 2022, and January 13, 2025, LabQ transferred $907,551 to Care Bio Clinical Corp ("Care Bio"). Further, between February 21, 2024, and January 23, 2025, Dart Medical transferred $226,748 to Care Bio. These transfers were made without consideration.

180.    During his CID testimony, Landau testified that he was the sole owner of Care Bio, which is a laboratory located in California.

181.    Funds transferred by LabQ were used by Care Bio to pay Care Bio expenses—not LabQ expenses. For example, on July 5, 2022, a LabQ employee, copying Landau, sent a list of Care Bio expenses to LabQ's accountant, totaling $28,517.21. On July 6, 2022, LabQ wired that exact amount—$28,517.21—to Care Bio. Landau was copied on the email from LabQ's accountant that confirmed the transfer.

## FIRST CLAIM

### *Violations of the False Claims Act: Presentation of False or Fraudulent Claims*
### *31 U.S.C. § 3729(a)(1)(A)*

182.    The Government incorporates by reference paragraphs 1 through 181 above as if fully set forth in this paragraph.

183.    The Government seeks relief against the Defendants under 31 U.S.C. § 3729(a)(1)(A).

184.    Through the acts set forth above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment to the Uninsured Program for COVID-19 testing. These claims were false or fraudulent and not eligible for reimbursement because (a) the cost of the COVID-19 testing had been (or would be) reimbursed by another source, and/or (b) the

COVID-19 testing was provided to persons who had health care coverage on the relevant date of the service.

185.    If HRSA had known that the claims presented for payment were for (a) the cost of the COVID-19 testing that had been (or would be) reimbursed by another source, and/or (b) the COVID-19 testing was provided to persons that had any health care coverage on the relevant date of service, HRSA would not have paid the claims.

186.    Defendants presented or caused to be presented these claims with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard of whether or not they were false.

187.    By reason of these false or fraudulent claims, the Government has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

### SECOND CLAIM

*Violation of the False Claims Act: Use of False Statements*
*31 U.S.C. § 3729(a)(1)(B)*

188.    The Government incorporates by reference paragraphs 1 through 181 above as if fully set forth in this paragraph.

189.    The Government seeks relief against the Defendants under 31 U.S.C. § 3729(a)(1)(B).

190.    Through the acts set forth above, Defendants knowingly made, used, or caused to be made and used, false records and statements material to the payment of false or fraudulent claims for payment to the Uninsured Program for COVID-19 testing. These false records and statements included false attestations and certifications that LabQ and/or Dart Medical had checked for health care coverage eligibility and confirmed that their patients were uninsured, that, to the best of LabQ and Dart Medical's knowledge, the patients identified on their claims were Uninsured Individuals (as defined in the Uninsured Program's Terms and Conditions) at the time the services were

provided, that no other payer would reimburse LabQ and/or Dart Medical for the COVID-19 testing provided to the patient, that LabQ and/or Dart Medical would not use any payments from the Uninsured Program to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse, and that if LabQ and/or Dart Medical subsequently received reimbursement for any items or services for which they requested payment from the Uninsured Program, LabQ and/or Dart Medical would return to HHS that portion of the HRSA payments which duplicates payment or reimbursement from another source.

191.   These false records and statements were material to the false or fraudulent claims because, among other things, HRSA would not have paid the claims absent the records and statements.

192.   Defendants made, used, or caused to be made and used, these false records and statements with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard of whether or not they were false.

193.   By reason of these false records and statements, the Government has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

## **THIRD CLAIM**

### *Knowingly and Improperly Avoiding an Obligation to Repay the Government*
### *31 U.S.C. § 3729(a)(1)(G)*

194.   The Government incorporates by reference paragraphs 1 through 181 above as if fully set forth in this paragraph.

195.   The Government seeks relief against Landau, LabQ, and Dart Medical under 31 U.S.C. § 3729(a)(1)(G).

196.   Despite knowing that they had submitted or caused to be submitted claims for reimbursement to the Uninsured Program where the cost of the COVID-19 testing had been reimbursed by another source. LabQ, Landau, and Dart Medical knowingly concealed and/or knowingly improperly avoided their obligation to reimburse the Uninsured Program for these payments to which these Defendants were not lawfully entitled.

197.   By reason of these defendants' knowing concealment and/or avoidance, the Government has been damaged in a substantial amount to be determined at trial and is entitled to recover treble damages plus a civil monetary penalty for each false record or statement.

## FOURTH CLAIM

### *Unjust Enrichment*

198.   The Government incorporates by reference paragraphs 1 through 181 above as if fully set forth in this paragraph.

199.   Through the acts set forth above, Defendants have received money from the Government to which they were not entitled, which unjustly enriched them, and for which they must make restitution. The circumstances of these payments are such that, in equity and good conscience, Defendants should not retain those payments, the amount of which is to be determined at trial.

## FIFTH CLAIM

### *Payment by Mistake*

200.   The Government incorporates by reference paragraphs 1 through 181 above as if fully set forth in this paragraph.

201.   The Government paid money to Dart Medical and LabQ as a result of a mistaken understanding. Specifically, the Government paid claims submitted by LabQ and Dart Medical to the Uninsured Program under the mistaken understanding that such claims were eligible for

reimbursement under that program. Had the Government known the truth, it would not have paid such claims. Those payments were therefore by mistake. Further, Defendants each received funds that the Government paid by mistake.

202.  As result of such mistaken payments, the Government has sustained damages for which the Defendants are liable in an amount to be determined at trial.

## SIXTH CLAIM

### *Fraudulent Transfers under the Federal*
### *Debt Collection Procedures Act, 28 U.S.C. § 3304(a)(1)*

203.  The Government incorporates by reference paragraphs 1 through 181 above as if fully set forth in this paragraph.

204.  No later than March 2022, Defendants owed, jointly and severally, a debt to the United States that may exceed $200,000,000 constituting damages and penalties for violations of the False Claims Act. This debt constituted a "debt" under 28 U.S.C. §§ 3002(3)(B) & 3304(a)(1).

205.  As set forth above, after Defendants received a CID in April 2022, Defendants transferred assets, including cash, to the Transferee Defendants. Defendants made these transfers without receiving a reasonably equivalent value in exchange.

206.  As a result of these transfers, Defendants were rendered insolvent, in violation of 28 U.S.C. § 3304(a)(1), in that Defendants are unable to satisfy the debt Defendants owed to the United States.

207.  The transfers described above should be adjudged fraudulent and void to the extent necessary to satisfy any judgment for the United States. Alternatively, damages in the value of the fraudulent transfers should be assessed against Transferee Defendants who received the fraudulent transfers from Defendants or anyone acting on their behalf.

## SEVENTH CLAIM

### *Fraudulent Transfers under the Federal*
### *Debt Collection Procedures Act, 28 U.S.C. § 3304(b)(1)(A)*

208.   The Government incorporates by reference paragraphs 1 through 181 above as if fully set forth in this paragraph.

209.   No later than March 2022, Defendants owed, jointly and severally, a debt to the United States that may exceed $200,000,000 constituting damages and penalties for violations of the False Claims Act. This debt constituted a "debt" under 28 U.S.C. §§ 3002(3)(B) & 3304(a)(1).

210.   As set forth above, after Defendants received a CID in April 2022, Defendants transferred assets, including cash, to the Transferee Defendants. Defendants acted with actual intent to hinder, delay or defraud their creditor, the United States.

211.   The actual intent to hinder, delay, and/or defraud the United States by Defendants is demonstrated by the following:

   a.  At the time of the transfers, Defendants had already received CIDs from the Government;

   b.  The transfers were made to the Transferee Defendants, all of whom were insiders of Defendants pursuant to the FDCPA. Specifically, the United States alleges as follows:

   i.  Transferee Defendant David Landau is a relative of Moshe Landau within the meaning of 28 U.S.C. § 3301(5)(A)(i) & (5), being Landau's son;

   ii.  Transferee Defendants MLK Blvd Upscale LLC, Har Hazayis'm Realty LLC, Realty at HH LLC, National Toxicology Center, OvaLab LLC, and Care Bio Clinical are corporations that Landau owns, is an officer of, or

controls within the meaning of 28 U.S.C. §§ 3301(1)(A), (1)(B), (5)(A)(iv) & (5)(D);

iii. Transferee Defendant The Malon Resort NJ LLC is a corporation nominally owned at least in part by Transferee Defendant David Landau, the son of Landau and thus an insider of Landau, and thus an affiliate of Landau within the meaning of 28 U.S.C. §§ 3301(5)(A)(i), (5)(B)(vi) & (5)(D);

iv. Transferee Defendant 175 Park Avenue LLC is a corporation owned by MLK Blvd Upscale LLC, which is owned and controlled by Landau, and thus a corporation that Landau owns and controls as an affiliate within the meaning of 28 U.S.C. §§ 3301(1)(B), (5)(A)(iv) & (5)(D).

v. Transferee Defendant NJJ Institutions is a corporation of which Landau was, at least until May 2024, a Board Member, Trustee, and President, and thus a director, officer, or person in control within the meaning of 28 U.S.C. §§ 3301(5)(A)(iv).

c. All of the transfers went to Defendants' family members or corporations or entities controlled by Defendants and/or their affiliates, allowing Defendants to retain possession or control of the property and other assets after transfer;

d. All of the transfers were made without the receipt of reasonably equivalent value in exchange;

e. The transfers included substantially all of the assets of Defendants;

f. At the time of the transfers, Defendants were insolvent or rendered insolvent in that they would be unable to pay their debt to the United States; and

g.   Other indicia of fraud were present, including multiple transfers of funds between and among entities controlled by Landau and the concealment of assets.

212.   The transfers described above should be adjudged fraudulent and void to the extent necessary to satisfy any judgment for the United States. Alternatively, damages in the value of the fraudulent transfers should be assessed against Transferee Defendants who received the fraudulent transfers from Defendants or anyone acting on their behalf.

## EIGHTH CLAIM

### *Fraudulent Transfers under the Federal*
### *Debt Collection Procedures Act, 28 U.S.C. § 3304(b)(1)(B)*

213.   The Government incorporates by reference paragraphs 1 through 181 above as if fully set forth in this paragraph.

214.   No later than March 2022, Defendants owed, jointly and severally, a debt to the United States that may exceed $200,000,000 constituting damages and penalties for violations of the False Claims Act. This debt constituted a "debt" under 28 U.S.C. §§ 3002(3)(B) & 3304(a)(1).

215.   As set forth above, after Defendants received CIDs in April 2022, Defendants transferred assets, including cash, to the Transferee Defendants. Defendants made these transfers without receiving a reasonably equivalent value in exchange.

216.   At the time of the transfers, Defendants reasonably should have believed that they would incur debts beyond their ability to pay them, namely, their debt to the United States, in violation of 28 U.S.C. §§ 3304(b)(1)(B)(ii).

217.   The transfers described above should be adjudged fraudulent and void to the extent necessary to satisfy any judgment for the United States. Alternatively, damages in the value of the fraudulent transfers should be assessed against Transferee Defendants who received the fraudulent transfers from Defendants or anyone acting on their behalf.

* * *

WHEREFORE, the Government respectfully requests that judgment be entered in its favor and against Landau, Dart Medical, and LabQ as follows:

1.   On Counts One, Two and Three (FCA violations), a sum equal to treble the Government's damages in an amount to be determined at trial, civil penalties to the maximum amount allowed by law, and an award of costs pursuant to 31 U.S.C. § 3729(a); and

2.   On Counts Four and Five (unjust enrichment and payment by mistake), a sum equal to the damages as allowed by law; and

3.   Such further relief as the Court may deem proper.

WHEREFORE, the Government respectfully requests that judgment be entered in its favor and against Community Mobile Testing as follows:

1.   On Counts One and Two (FCA violations), a sum equal to treble the Government's damages in an amount to be determined at trial, civil penalties to the maximum amount allowed by law, and an award of costs pursuant to 31 U.S.C. § 3729(a); and

2.   On Counts Four and Five (unjust enrichment and payment by mistake), a sum equal to the damages as allowed by law; and

3.   Such further relief as the Court may deem proper.

WHEREFORE, the Government respectfully requests that judgment be entered in its favor and against the Transferee Defendants as follows:

1.   The transfers described in this Amended Complaint to the Transferee Defendants be adjudged fraudulent and void to the extent necessary to satisfy any judgment in the United States' favor in this case;

2.  Alternatively, damages in the amount of the value of the real and/or personal property should be assessed against Transferee Defendants who received the real and personal property, plus interest from the date of transfer; and

3.  Such further relief as the Court may deem proper.

Dated:    May 19, 2025

Respectfully submitted,

JAY CLAYTON
United States Attorney for the
Southern District of New York
*Attorney for the United States of America*

By:    /s/ Charles S. Jacob
ZACHARY BANNON
RACHAEL DOUD
LAWRENCE H. FOGELMAN
CHARLES S. JACOB
MOLLIE KORNREICH
DANIELLE J. MARRYSHOW
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Tel.: (212) 637-2800
zachary.bannon@usdoj.gov
rachael.doud@usdoj.gov
lawrence.fogelman@usdoj.gov
charles.jacob@usdoj.gov
mollie.kornreich@usdoj.gov
danielle.marryshow@usdoj.gov