UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/10/2025
```

-----------------------------------------------------------------------X
                                                    :
UNITED STATES OF AMERICA et al.,                    :
                                                    :
                              Plaintiffs,           :
                                                    :                22-cv-10313 (LJL)
              -v-                                   :                22-cv-00751 (LJL)
                                                    :
LABQ CLINICAL DIAGNOSTICS, LLC et al.,              :                OPINION AND ORDER
                                                    :
                              Defendants.           :
                                                    :
-----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Defendants LabQ Clinical Diagnostics, LLC ("LabQ"), Community Mobile Testing, Inc.

("CMT"), Dart Medical Laboratory, Inc. ("Dart" and with LabQ and CMT, the "LabQ Corporate

Defendants"), Rabbi Moshe Landau ("Landau"), and the Transferee Defendants (collectively,

"Defendants")[1] move for an Order transferring venue of this action to the United States District

Court for the District of New Jersey or, in the alternative, for the undersigned to recuse himself

from adjudicating this case pursuant to 28 U.S.C. § 455.  Dkt. No. 708.  For the reasons that

follow, the motion is denied.

## BACKGROUND AND PROCEDURAL HISTORY

**I.    The Allegations of the Amended Complaint**

This case involves claims under the False Claims Act ("FCA") arising out of the alleged

submission by the LabQ Corporate Defendants and Landau of false claims to the Government for

---

[1] The Transferee Defendants are MLK Blvd Upscale LLC, 175 Park Avenue LLC, The Malon
Resort NJ LLC, the Thomas G. Rosano PhD LLC d/b/a National Toxicology Center, David
Landau, Har Hazayis'm Realty LLC, Realty at HH LLC, NJJ Institutions, Congregation Kolel
Vyashkem Avrhom Inc, Yampola 2022 Charitable Lead Annuity Trust, Carebot ABA LLC,
OvaLab LLC, and Care Bio Clinical Corp.  Dkt. No. 493 ¶¶ 21–33.

reimbursement of COVID-19 testing services in the period from September 2020 through March 2022 (the "Relevant Period"). Dkt. No. 493 ("Am. Compl.") ¶ 1. LabQ is a New York limited liability company which, during the Relevant Period, performed COVID-19 testing for patients, including tens of thousands of patients who lived in Manhattan. *Id.* ¶ 18. It operated laboratories in Budd Lake, New Jersey, and Brooklyn, New York. *Id.* Dart is a New York corporation that possessed a National Provider Identifier ("NPI") that permitted it to bill federal health care programs; it previously owned the laboratory now operated by LabQ in Brooklyn, New York. *Id.* ¶ 19. CMT is a New York corporation which, during the Relevant Period, operated over one hundred "LabQ Mobile Testing Sites" in New York City, including at least forty such sites in Manhattan and the Bronx, where walk-up patients could obtain COVID-19 tests; the specimens collected by CMT were provided to LabQ for testing. *Id.* ¶ 20. Landau is the Chief Executive Officer of LabQ, Dart, and CMT, is the majority owner of CMT, and owns 30% of both LabQ and Dart. *Id.* ¶ 17.

During the Relevant Period, the federal Health Resources and Services Administration ("HRSA"), an agency under the Department of Health and Human Services ("HHS"), administered a program to reimburse health care providers who tested individuals who did not have any health care coverage on the relevant date of service for the costs of their COVID tests ("the "Uninsured Program"). *Id.* ¶¶ 2, 35–36. The objective of the program was to ensure widespread testing by assuring providers that, if they provided tests to persons who had no health care coverage, they would still be reimbursed for the cost of the test through federal funds. In order to protect the integrity of the program, HRSA mandated that any providers seeking reimbursement from the Uninsured Program agree to specific Terms and Conditions and make attestations regarding their compliance with specific program requirements. *Id.* ¶ 36; Dkt. No.

40 ("Huttinger Decl.") ¶¶ 2, 12.  The attestation stated, in part, "I have checked for health care coverage eligibility and confirmed that the patient is uninsured, and does not have employer-sponsored or individual coverage, Medicare or Medicaid and that no other payer will reimburse for COVID-19 testing or care for the patient."  Am. Compl. ¶ 38; Dkt. No. 40-1 at ECF p. 2. The Terms and Conditions to which providers were required to subscribe before they were reimbursed required the provider to certify that "to the best of its knowledge," the patients for whom it was seeking reimbursement were "Uninsured Individuals at the time the services were provided."  Am. Compl. ¶ 40; Huttinger Decl. ¶ 18.  Uninsured Individuals were defined as individuals who did not have health care insurance or coverage.  Am. Compl. ¶ 40; Huttinger Decl. ¶¶ 18–19.  In addition, the Terms and Conditions provided that "[the provider] certifies that it will not use the [Uninsured Program payment] to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse.  If the [provider] subsequently receives reimbursement for any items or services for which the [provider] requested Payment from the [Uninsured Program], the [provider] will return to HHS that portion of the Payment which duplicates payment or reimbursement from another source." Am. Compl. ¶ 40.

 On March 16, 2022, HRS provided notice to providers that the Uninsured Program would stop accepting new claims for COVID-19 testing and treatment on March 22, 2022, due to a lack of sufficient appropriated funds.  Huttinger Decl. ¶ 28; Am. Compl. ¶¶ 46, 105.

The Government alleges that during the Relevant Period, while the Uninsured Program was accepting claims for COVID-19 testing and treatment, the LabQ Corporate Defendants engaged in a multi-faceted scheme to make false claims to the federal government and to defraud HRSA by submitting claims while knowing that the individual for whom it was submitting a

claim was insured or without confirming that the individual was uninsured.  Am. Compl. ¶ 50.

The alleged fraud took several different forms.  First, LabQ entered into agreements with

institutional customers—such as New York-area nursing homes, schools, and television

production companies (the "Private Clients")—pursuant to which LabQ agreed to provide

COVID-19 testing to the Private Clients' employees (or other beneficiaries such as the

client-schools' students) in exchange for a fixed price that was to be paid on a per-test basis by

the Private Clients to LabQ.  *Id.* ¶ 54.  The Government alleges that LabQ double-billed for these

tests, billing the Private Clients a fixed price for each COVID-19 test performed by LabQ while

at the same time frequently seeking payments from the Uninsured Program for those same

COVID-19 tests.  *Id.* ¶¶ 66–67.  The Government alleges that this happened with at least four

skilled nursing facilities in New York City and with a Private Client that was a foreign country's

mission to the United Nations.  *Id.* ¶¶ 68–70.

Second, LabQ entered into agreements with individuals and companies that, in turn,

secured relationships with institutions (the "Referral Clients") whereby LabQ provided

COVID-19 testing, at no cost, for the Referral Clients and then sought reimbursement from

either the Uninsured Program or from private insurers; the Referral Clients included hundreds of

institutions across the country, including a jail facility in Alabama and school districts in

California.  *Id.* ¶¶ 55, 101.  The Government alleges that LabQ submitted claims to the

Uninsured Program for COVID-19 testing provided to individuals with health coverage and did

not institute any procedures specific to the collection of insurance information from Private

Clients' and Referral Clients' patients, frequently telling Referral Clients that they did not need

to provide LabQ with insurance information for their patients.  *Id.* ¶ 92.  This happened with at

least a New Jersey Town Board of Education and a school district in New Jersey.  *Id.* ¶¶ 93–94.

In other instances, a LabQ employee sent a bill to certain Private Clients but did not inform LabQ's billing department of the contractual relationship with the Private Clients. *Id.* ¶ 77. Defendants' own internal data showed that the percentage of the Referral Clients who were uninsured was impossibly high. *Id.* ¶ 102. One internal LabQ analysis showed that for 184,327 COVID-19 tests performed on behalf of 373 of its Referral Clients, 75% of the tests were purportedly performed for uninsured patients; for approximately 77 of these 373 Referral Clients, LabQ identified that 100% of the testing was performed on supposedly uninsured patients. *Id.* ¶ 102.

Third, LabQ provided COVID-19 testing to "walk-up" patients at LabQ branded vans and tents in New York City, operated by CMT, and then, using Dart's NPI, billed the costs of numerous of those tests to the Uninsured Program. Am. Compl. ¶ 56. LabQ and CMT generally provided patients at mobile sites with intake forms (often in digital form, which patients could access through QR codes on their mobile phones) that contained fields for the input of insurance information. *Id.* ¶ 89. But, the Government alleges that LabQ and CMT did not meaningfully train technicians on the collection of insurance with the result that LabQ patients often did not input their insurance information into the form because of deficient instructions from LabQ and CMT employees. *Id.* An April 2022 internal LabQ report identified over 25 mobile testing sites where over 50% of the patients served by that site were purportedly uninsured. *Id.* ¶ 102. Indeed, the Government alleges that LabQ failed to collect insurance information from its own insured employees and contractors for whom it provided COVID-19 testing. *Id.* ¶ 86. It was not until March 2022, two years into the COVID-19 pandemic and at the end of the Relevant Period when the Uninsured Program was ending, that LabQ's billing manager suggested to LabQ leaders that LabQ should start asking for insurance information from patients. *Id.* ¶ 90.

In addition, the Government alleges that (i) LabQ's intake forms failed to ask for other pertinent information from their patients, such as social security numbers, *id.* ¶¶ 97–98; (ii) while LabQ and Dart engaged an insurance discovery service to try to locate insurance information for the patients, they did not always use that service prior to submitting claims to the Uninsured Program, *id.* ¶ 99; (iii) LabQ, Dart and Landau submitted numerous reimbursement claims to the Uninsured Program for patients as to whom they had health insurance information in their own records, including information submitted on digital intake forms or information sent to them directly by Referral Clients, *id.* ¶¶ 106–10; and (iv) the LabQ Corporate Defendants improperly billed the Uninsured Program for the costs of COVID-19 tests given to patients who had private insurance but whose private insurance would not reimburse LabQ for the cost of the tests, *id.* ¶¶ 119–25.  Further, the Government alleges that the LabQ Corporate Defendants failed to reimburse the Uninsured Program when they were paid by both the Uninsured Program and by private insurance for the exact same COVID-19 tests.  *Id.* ¶¶ 126–32.

After the Uninsured Program expired in March 2022, the LabQ Corporate Defendants changed their approach.  *Id.* ¶ 104.  In the weeks and months after learning in March 2022 that the Uninsured Program would stop accepting claims from providers such as LabQ, the LabQ Corporate Defendants radically improved their policies demonstrating that they could collect and identify insurance information if they wanted to do so.[2]  *Id.* ¶ 105.

## II.    Procedural History

This case arises out of two qui tam actions filed by relators in 2022.  On January 28, 2022, Relator Resolute 3 LLC filed a qui tam complaint in this District on behalf of the United

---

[2] The Government also alleges that the LabQ Corporate Defendants fraudulently transferred their assets to other Defendants (the "Transferee Defendants") after learning in April 2022 of the Government investigation.  *Id.* ¶¶ 147–181.

States against the LabQ, CMT, Landau and others. *United States et al. v. LabQ Clinical Diagnostics, LLC*, No. 22-cv-00751 (S.D.N.Y. filed Jan. 28, 2022). The case was assigned to the undersigned. On May 27, 2022, a different private relator, NJ Challenger LLC, filed a qui tam complaint against Defendants in the United States District Court for the Eastern District of New York. Dkt. No. 1. The case was ordered transferred to this District on November 16, 2022. Nov. 16, 2022 Minute Entry. The case was assigned to the undersigned on April 11, 2023. The Government filed its complaint in intervention on June 13, 2024 in both cases and the case was unsealed. Dkt. Nos. 10–11, 20. The Government brings claims for presentation of false or fraudulent claims in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A), use of false statements in violation of the FCA, 31 U.S.C. § 3729(a)(1)(B), knowingly and improperly avoiding an obligation to repay the government in violation of the FCA, 31 U.S.C. § 3729(a)(1)(G), unjust enrichment, payment by mistake by the Government, and fraudulent transfers in violation of the Federal Debt Collection Procedures Act ("FDCPA"), 28 U.S.C. § 3304(a)(1), (b)(1)(A), and (b)(1)(B). Am. Compl. ¶¶ 182–217.

The Court has devoted substantial time and attention to this case. On July 24, 2024, the Government filed an initial application for writs of garnishment and writs of attachment pursuant to the FDCPA's provision for prejudgment remedies. Dkt. No. 31; 28 U.S.C. §§ 3102, 3104. The Court entertained argument on that application at the initial case management conference on July 31, 2024. Dkt. No. 107. The Court pushed the parties to agree on a stipulation that would permit the payment of reasonable business expenses of the restrained entities, reasonable legal expenses, and reasonable personal expenses for Landau. *Id.* at 35. On August 2, 2024, the Court signed a Stipulation and Order, in which the parties agreed that the Court would grant the writs of garnishment and writs of attachment requested in the Government's application. Dkt. No. 60

("August 2024 order").  The August 2024 Order permitted Defendants to grant liens on the properties subject to the writs to pay reasonable business expenses of the LabQ Corporate Defendants and of Landau and the reasonable attorney's fees of any of the Defendants.  *Id.* ¶ 2. Among other things, the parties also agreed and the Court ordered that Defendants would disclose in writing each and every real property in which each Defendant had an interest.  *Id.* ¶ 9. The Court then issued the writs.  Dkt. Nos. 61–95, 176, 241–98.  The Court set a schedule for the Defendants to make an application to have the writs lifted and for the Government to reply to that application.  Dkt. No. 60 ¶ 1.

On September 19, 2024, the Government filed a supplemental application for writs of attachment supported by a memorandum of law, Dkt. No. 172, and the supplemental declaration of Lu Tszyan, Dkt. Nos. 173–174.  The Court granted that application on September 20, 2024, Dkt. No. 176, and issued the writs on December 13, 2024, *see* Dkt. Nos. 241–298.

On October 2, 2024, the LabQ Corporate Defendants and Landau filed a joint memorandum of law in opposition to the Writs.  Dkt. No. 182.  The parties filed reply memoranda and accompanying declarations.  Dkt. Nos. 230–233, 239, 239-1.

On March 13, 2025, the Court issued a 97-page opinion and order extensively analyzing the evidence, finding that the Government had established the probable validity of its claims, and denying Defendants' motion to quash the Government's writs.  Dkt. No. 357.  At the same time, the Court did not grant the Government the full relief it was requesting.  The Government estimated that its claim was worth an estimated $248 million under the False Claims Act and $82 million on its common law theories.  *Id.* at 47, 87.  The Court found that the Government had established the probable validity of $36.6 million in overpayments.  *Id.* at 89.  The Court also

found that the LabQ Corporate Defendants had taken action which would have the effect of

hindering, delaying or defrauding the Government in its effort to recover a debt.  *Id.* at 90–95.

> "By transferring funds to LLCs and thereafter into real property, Defendants have
> rendered the chain of ownership more obscure, forcing the Government to attempt
> to locate numerous real properties and continue to monitor ongoing real estate
> transactions and transfers to other limited liability companies, sort through a web
> of limited liability companies and their nominal and actual ownership structures,
> and potentially foreclose on and sell dozens of properties to collect a judgment."

*Id.* at 94.  The Court concluded that the case was a close one and that "[t]he Government's

evidence is not overwhelming."  *Id.* at 97.

On May 19, 2025, the Government filed an Amended Complaint.  Dkt. No. 493.  The

Court denied Defendants' previously filed motion to dismiss as moot, in light of the Amended

Complaint, on July 2, 2025.  Dkt. No. 568.  On August 18, 2025, Defendants filed a motion to

dismiss the Amended Complaint for failure to state a claim under Federal Rule of Civil

Procedure 12(b)(6) and failure to plead with the required particularity under Federal Rule of

Civil Procedure 9(b).[3]  Dkt. No. 693.

On May 20, 2025, the LabQ Corporate Defendants and Landau moved by letter motion

for modification of the August 2024 Order to permit what they characterized as payment of past

due and future reasonable business expenses of certain of Landau's businesses.  Dkt. No. 495.

And, on May 23, 2025, the Government filed a motion for an order to show cause why

Defendants should not be held in contempt for violating the terms of the August 2024 Order by

making millions of dollars of payments from the accounts subject to the writs for purposes other

than reasonable business expenses.  Dkt. Nos. 534, 535.  On July 8, 2025, the Court granted the

Government's motion, finding clear and convincing evidence that Defendants violated the clear

---

[3] The Court established a briefing schedule requiring the Government to file opposition to
Defendants' motion to dismiss by November 5, 2025 and Defendants to file a reply brief in
support of their motion to dismiss by December 3, 2025.  Dkt. No. 742.

and unambiguous terms of the August 2024 order and instructing the Government to file a motion for contempt sanctions.  Dkt. No. 574.  The Court denied Defendants' motion for modification.  *Id.*  The Government subsequently filed a motion for sanctions on July 14, 2025, Dkt. No. 584, and a motion for order to show cause why Defendants should not be held in civil contempt for violating the August 2024 order and the April 14, 2025 Stipulation and Order, Dkt. No. 377, which addressed the subordination of the Government's writs of attachment in order to pay attorney's fees.  Dkt. No. 677.  On July 21, 2025, Defendants filed a cross motion for reconsideration of the July 8, 2025 order.  Dkt. No. 591.  The Government's subsequent motions and Defendants' cross motion remain undecided.

On September 5, 2025, Defendants filed this motion to change venue and, in the alternative, for judicial disqualification pursuant to 28 U.S.C. § 455.  Dkt. No. 708.  Defendants filed a supporting memorandum of law, declaration, and exhibits.  Dkt. Nos. 709, 711, 711-1– 711-8.  The Government filed a memorandum of law in opposition, with a supporting declaration and exhibits.  Dkt. Nos. 736, 737, 737-1–737-8.  On October 10, 2025, Defendants filed a reply memorandum of law in support of their motion, with supporting exhibits.  Dkt. Nos. 744, 744-1– 744-2.  The Court adjourned the hearing scheduled for September 19, 2025 on the Government's motion for an order to show cause why Defendants should not be held in contempt, Dkt. No. 713, and, at Defendants' request, ceased making any substantive decisions prior to the resolution of Defendants' motion for recusal.

## DISCUSSION

Defendants move to transfer venue of this case pursuant to 28 U.S.C. § 1404 and for recusal under 28 U.S.C. § 455.  The Court will address Defendants' motions in the order in which they are presented by Defendants—transfer of venue and then the alternative motion for judicial disqualification.

## I.    Transfer of Venue

Defendants move for transfer of venue to the District of New Jersey pursuant to 28

U.S.C. § 1404(a).  Defendants argue that "[t]he majority of the events giving rise to the

government's claims . . . occurred in or are more closely tied to the District of New Jersey," Dkt.

No. 709 at 1, that "the locus of the operative facts all occurred in New Jersey," *id.* at 2, and that

while the Corporate Defendants "operated testing sites in New York City, the core of the

allegations is more closely tied to the laboratory billing operations and asset transfers in New

Jersey," *id.* at 9.

Defendants also argue broadly that the undersigned and at least seven other judges in this

District received COVID-19 testing from the LabQ Defendants, and therefore transfer of venue

"is an indispensable measure to preserve the integrity of the judiciary itself." *Id.* at 15.  The

Government contests each proposed basis for transfer of venue and further asserts that transfer

would be inefficient at this stage in the litigation.  Dkt. No. 736 at 8–20.

Under Section 1404(a) of the United States Code, "[f]or the convenience of parties and

witnesses, in the interest of justice, a district court may transfer any civil action to any other

district or division where it might have been brought or to any district or division to which all

parties have consented."  28 U.S.C. § 1404(a).  The statute codifies the doctrine of forum non

conveniens for the federal system and provides for "transfer, rather than dismissal, when a sister

federal court is the more convenient place for trial of the action."  *Sinochem Int'l Co. v. Malaysia

Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007).

To determine whether transfer is appropriate, the Court engages in a two-step inquiry.

First, the Court asks "whether the action sought to be transferred is one that 'might have been

brought' in the transferee court."  *In re Collins & Aikman Corp. Sec. Litig.*, 438 F. Supp. 2d 392,

394 (S.D.N.Y. 2006).  Second, if the action could have been filed in the proposed transferee

district, the Court evaluates "whether transfer is warranted using several factors relating to the convenience of transfer and the interests of justice." *Id.*; *Freeplay Music, LLC v. Gibson Brands, Inc.*, 195 F. Supp. 3d 613, 616 (S.D.N.Y. 2016). These factors include: "(1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means of the parties." *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 112 (2d Cir. 2010) (quoting *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 106–07 (2d Cir. 2006). Courts also consider trial efficiency, noting that "the further along a case is in the litigation process, the less efficient a transfer would be." *Guardian Life Insurance Company of America v. Coe*, 724 F. Supp. 3d 206, 216 (S.D.N.Y. 2024) (citing *Royal & Sun All. Ins., PLC v. Nippon Express USA, Inc.*, 202 F. Supp. 3d 399, 411 (S.D.N.Y. 2016).

"[T]he party requesting transfer carries the 'burden of making out a strong case for transfer.'" *N.Y. Marine*, 599 F.3d at 114 (quoting *Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.*, 865 F.2d 513, 521 (2d Cir. 1989)). Accordingly, "district courts in our Circuit have consistently applied the clear and convincing evidence standard in determining whether to exercise discretion to grant a transfer motion," *id.* (collecting cases), and operate with considerable discretion, *see Forjone v. California*, 425 F. App'x 73, 74 (2d Cir. 2011) (summary order) ("The determination whether to grant a change of venue requires a balancing of conveniences, which is left to the sound discretion of the district court.") (quoting *Filmline*, 865 F.2d at 520).

The Government does not dispute that this case could have been filed in the District of New Jersey pursuant to 31 U.S.C. § 3732(a), which authorizes suit under the FCA "in any

judicial district in which . . . any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." Accordingly, the Court turns to whether the balance of relevant factors support transferring venue.

### A.    Plaintiff's Choice of Forum

"[A] plaintiff's choice of forum is presumptively entitled to substantial deference," for "our legal system has traditionally deferred to the plaintiff's choice of forum." *Gross v. British Broadcasting Corp.*, 386 F.3d 224, 230 (2d Cir. 2004) (citing *Iragorri v. United Techs Corp.*, 274 F.3d 65, 70–71 (2d Cir. 2001) (en banc)). Thus, "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Id.* (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)); *see In re Warrick*, 70 F.3d 736, 741 (2d Cir. 1995) (plaintiff's choice of forum is "entitled to substantial consideration") (citation omitted).

This deference remains where the United States as plaintiff selected the forum. *United States v. New York*, 2025 WL 2208941, at *4 (S.D.N.Y. Aug. 4, 2025) ("The United States has selected this forum and on these facts [which demonstrate a substantial nexus to the forum] its choice is entitled to great deference"); *United States v. Nature's Farm Products, Inc.*, 2004 WL 1077968, at *6 (S.D.N.Y. 2004) (United States government's choice of forum is "properly granted significant weight," but does not receive the added level of deference accorded to a plaintiff who chooses her home forum) (internal quotations omitted).

The first of the two complaints giving rise to this action was filed by a private relator in this Court, *United States et al. v. LabQ Clinical Diagnostics, LLC*, No. 22-cv-00751 (S.D.N.Y. filed Jan. 28, 2022); the second was filed in the Eastern District of New York. The Government filed an unopposed motion to transfer venue in the second case because of this case's significant ties to Manhattan and the investigative work already completed by the United States Attorney's

Office for the Southern District of New York, Dkt. No. 5 at 5 (United States motion to transfer venue to this District).

As discussed below, this is not a case where "the operative facts have few meaningful connections to the plaintiff's chosen forum." *New York*, 2005 WL 2208941, at *3 (quoting *Kreinberg v. Dow Chem. Co.,* 496 F. Supp. 2d 329, 330 (S.D.N.Y. 2007)).  The Government's choice of forum is accorded deference and this factor weighs against transfer of venue.

### B.    Convenience of Witnesses and Parties

The convenience of witnesses is "typically the most important factor" on a motion to transfer.  *Eres N.V. v. Citgo Asphalt Refining Co.*, 605 F. Supp. 2d 473, 480 (S.D.N.Y. 2009). "Because of the importance of this factor, the party seeking transfer must clearly specify the key witnesses to be called and make a general statement of what their testimony will cover." *Excelsior Designs, Inc. v. Sheres*, 291 F. Supp. 2d 181, 185–86 (E.D.N.Y. 2003) (internal quotation marks omitted) (quoting *Royal & Sunalliance. v. British Airways*, 167 F. Supp. 2d 573, 577 (S.D.N.Y. 2001)); *see also Factors Etc., Inc. v. Pro Arts Inc.*, 579 F.2d 215, 218 (2d Cir. 1978) ("When a party seeks the transfer on account of the convenience of witnesses under § 1404(a), he must clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover."), *overruled on other grounds by Pirone v. MacMillan, Inc.*, 894 F.2d 579 (2d Cir. 1990); *IKB Int'l S.A. v. Wilmington Trust Co.*, 2017 WL 4084052, at *4 (S.D.N.Y. Sept. 14, 2017) (same); *YLD Ltd. v. Node Firm, LLC*, 2016 WL 183564, at *2 (S.D.N.Y. Jan. 14, 2016) ("[T]he movant must identify material witnesses and supply a general description of what their testimony will cover."); *Larew v. Larew*, 2012 WL 87616, at *4 (S.D.N.Y. Jan. 10, 2012) (same).  "Vague generalizations and failure to clearly specify the key witnesses to be called . . . are an insufficient basis upon which to grant a change

of venue under § 1404(a)." *In re Collins & Aikman Corp. Sec. Litig.*, 438 F. Supp. 2d 392, 395 (S.D.N.Y. 2006) (quoting *Orb Factory, Ltd. v. Design Science Toys, Ltd.*, 6 F. Supp. 2d 203, 208–09 (S.D.N.Y. 1998)). Furthermore, although the convenience of party witnesses is "not wholly insignificant," *Pilevesky v. Suntrust Bank*, 2010 WL 4879006, at *3 (E.D.N.Y. Nov. 22, 2010), it does not weigh as heavily as inconvenience to non-party witnesses, *id.*; *see also Payless Shoesource, Inc. v. Avalon Funding Corp.*, 666 F. Supp. 2d 356, 364 (E.D.N.Y. 2009). "[F]ormer employees are not entitled to the same deference shown to other non-party witnesses because . . . [they] are more likely willing to attend trial than other non-party witnesses." *Pilevesky*, 2010 WL 4879006, at *3 (internal quotation marks and citation omitted). Further, "the physical proximity of New York and New Jersey and the ease of transportation into New York City from Northern New Jersey . . . weigh against transfer." *In re Bystolic Antitrust Litig.*, 2021 WL 148747, at *4 (S.D.N.Y. Jan. 15, 2021).

Defendants make at most a half-hearted attempt to show that transfer to New Jersey would further the convenience of witnesses. Defendants point to three witnesses (Frank Carlo, Steve Kamalic, and Marlena Rodriguez-Chmielewski) and argue that these three witnesses were "deeply embedded in LabQ's New Jersey operations." Dkt. No. 709 at 10. Defendants' showing is facially deficient. Defendants do not provide a summary of the testimony that those witnesses will provide. Moreover, according to Defendants, only one of the three is alleged to reside in New Jersey. *Id.*; Dkt. No. 709-1 ¶ 4–6. Defendants do not identify the residence of either of the other two or explain why it would be inconvenient for them to testify in a trial in New York. Defendants do not make a pretense of showing all the key witnesses and what their testimony will cover. There are over thirty witnesses on Defendants' Rule 26(a)(1) disclosures, in addition to ten categories of witnesses, and thirty-seven witnesses on the Government's Rule 26(a)(i)

initial disclosures.  Dkt. No. 737-8.  Only two, out of almost seventy witnesses, are listed with an address in New Jersey.  *Id.*  Neither of the witnesses who reside in New Jersey are listed by Defendants.  *Id.*  The convenience of the witnesses weighs against transfer.

Defendants also assert that transfer to New Jersey would be to the convenience of the parties.  The convenience of the parties is accorded little weight.  *See Chan v. iSpot, Inc.*, 2021 WL 2480881, at *3 (S.D.N.Y. June 17, 2021) (noting that convenience of party witnesses, including those within the control of the party such as employees, weighs less heavily).  In this case, the factor favors New York.  Though Defendants argue that "Rabbi Moshe Landau, a key defendant, controls multiple New Jersey-based entities," Dkt. No. 709 at 12, Landau lives in New York, Dkt. No. 736 at 2–3.  And three other key LabQ employees—Daniel Adar, Moshe Engel, and Esther Wurzberger—all either live in New York, at least as of their testimony in the Government's investigation, or worked for LabQ at its New York location.  Dkt. No. 736 at 3.

Defendants identify four Transferee Defendants who allegedly "have clear ties to New Jersey."  Dkt. No. 709 at 12.  It is not clear that the state of incorporation or registration of these entities, as opposed to the residence of the individuals who would testify with respect to them, should be accorded any weight.  *See In re Bystolic Antitrust Litig.*, 2021 WL 148747, at *4 (holding that "more relevant question" is not state of incorporation of defendants but "the location of the witnesses and the relative convenience to the witnesses of a New Jersey forum versus a New York forum").  In any event, more than half of the Transferee Defendants are New York-based entities.  Dkt. No. 736 at 16.

The convenience of the parties weighs against transfer.

### C.    Locus of Operative Facts

"The location of the operative events is a primary factor in determining a § 1404(a) motion to transfer."  *SBAV LP v. Porter Bancorp, Inc.*, 2013 WL 3467030, at *4

(S.D.N.Y. July 10, 2013) (quoting *Smart v. Goord,* 21 F.Supp.2d 309, 316 (S.D.N.Y. 1998)).

"The determination of the locus of operative facts for purposes of choice of venue is not a

mechanical exercise divorced from the substance of a dispute." *Wistron Neweb Corp. v. Genesis*

*Networks Telecom Servs., LLC*, 2022 WL 17067984, at *8 (S.D.N.Y. Nov. 17, 2022). "The

factor is addressed to determining the venue which has the greatest interest in the resolution of

the dispute and where evidence relevant to its resolution may be located." *Id.* Put simply, "to

determine where the locus of operative facts lies, courts look to the site of events from which the

claims arises." *Flood v. Carlson Restaurants Inc.*, 94 F. Supp. 3d 572, 578 (S.D.N.Y. 2015).

There is a "local interest in having localized controversies decided at home." *Atl. Marine Const.*

*Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 62 n.6 (2013).

Defendants argue that the locus of operative fact lies in New Jersey because LabQ

maintained a laboratory in Budd Lake, New Jersey where "COVID-19 testing was performed,"

Dkt. No. 709 at 8, and "[e]ighty percent of the Defendants' U.S. billing operations" occurred,

Dkt. No. 709-1 ¶ 3. However, Defendants fail to explain how the location where "COVID-19

testing was performed," Dkt. No. 709 at 8, on specimens LabQ collected elsewhere, is relevant to

the claims at issue in this case. On reply, Defendants claim that "the billing, insurance

verification, and submission of claims were directed from" the Budd Lake laboratory, but

provide no support for the claim. Dkt. No. 744 at 4. The declaration in support of their motion

states that LabQ's billing supervisor worked at Budd Lake, but does not allege that the

supervisor directed LabQ's billing process or established policies for billing. Dkt. No. 709-1 ¶ 7.

The locus of operative facts in a case pertaining to claims under the FCA is determined,

at least in part, "by the location of the decisionmakers." *United States v. Anthem, Inc.*, 2022 WL

4815978, at *3 (S.D.N.Y. Sept. 30, 2022). Landau, who resides in Brooklyn, New York,

"oversaw all aspects" of the LabQ Corporate Defendants operations, Am. Comp. ¶ 61–64, and had "a controlling leadership role in LabQ and Dart Medical's decision-making on billing issues," Dkt. No. 357 at 48.  Other key decisionmakers also either resided in New York or operated out of LabQ's New York offices.  Esther Wurzberger, LabQ's Chief Technology Officer who attested to her work in LabQ's billing operations, worked at LabQ's New York location, as did Daniel Adar, LabQ's Chief Operating Officer, and Moshe Engel, LabQ's billing manager.  Dkt. No. 736 at 3, 14.

Few Districts could have a stronger interest in the resolution of this dispute than the Southern District of New York.  LabQ operated forty of its mobile testing sites in this District. Am. Compl. ¶ 20.  It performed COVID-19 testing for tens of thousands of patients in Manhattan.  Am. Compl. ¶¶ 18.  It also had contracts with private clients in Manhattan, and New York City broadly, that the Government alleges led to false claims to the Uninsured Program. Am. Compl. ¶ 110 (noting two schools located in Manhattan); *see also* Am. Compl. ¶¶ 66–69 (noting four nursing facilities located in New York City).  The central decisionmakers for LabQ's billing and insurance verification processes and much of the COVID-19 testing that led to the Government's claims are located in New York.

The locus of operative facts therefore weighs against transfer.

### D.     Trial Efficiency

"When a case is in its earliest stages, it is generally not inefficient to transfer the case." *Royal & Sun All.*, 202 F. Supp. 3d at 411.  However, as a case gets further along in the litigation process, transfer becomes less efficient.  *See id.* (declining motion for transfer where "the parties are only two months away from the close of discovery); *see also Haber v. ASN 50th St., LLC*, 2011 WL 1226282, at *2 (S.D.N.Y. Mar. 30, 2011) (judicial economy favors transfer "[g]iven this Court's familiarity with the action" and where "[d]iscovery is nearly complete"); *Mattel, Inc.*

*v. Robarb's, Inc.*, 139 F. Supp. 2d 487, 491 (S.D.N.Y. 2001), *on reconsideration in part*, 2001 WL 797478 (S.D.N.Y. 2001) (denying transfer where parties completed discovery and where transfer "would unnecessarily require another court to become familiar with this action").

This case was first initiated over three years ago and, as outlined in the procedural history above, the Court has devoted substantial time and attention to it. Though discovery is not yet complete, the Court has become familiar with the central issues in this case, *see* Dkt. No. 357 (Court's 97-page March 13, 2025 opinion and order analyzing the evidence), and has adjudicated substantive issues regarding prejudgment writs of attachment and discovery. *See, e.g.,* Dkt. Nos. 107 (holding argument regarding initial application for prejudgment writs), 176 (granting supplemental application for writs of attachment), 357 (opinion and order denying Defendants' motion to quash the Government's writs), 574 (order finding Defendants in contempt and denying motion to modify the August 2024 Order), 683 (granting the Government's motion to compel discovery); *cf. Guardian Life Ins. Co.*, 724 F. Supp. 3d at 217 (finding efficiency a neutral factor where the court has not "adjudicated any substantive motions or even any discovery disputes . . . [and] has acquired no knowledge of the substance of the dispute in this case"). Transfer at this stage in the litigation would require a new judge to become familiar with the complexities of this litigation and hinder the efficient and prompt resolution of this case. *See Albright v. Terraform Labs, Pte. Ltd.*, 641 F. Supp. 3d 48, 57 (S.D.N.Y. 2022) (efficiency weighs against transfer where transfer would "delay the prompt resolution of [the] matter").

Defendants' sole argument for efficiency depends on the convenience of witnesses and parties, Dkt. No. 709 at 14. All of the arguments regarding the convenience of the witnesses and the parties and the locus of operative facts that Defendants make now could have been made at the outset of the case. In any event, they are all unavailing. *See Richardson v. National Railroad*

*Passenger Corp.*, 2022 WL 3701492, at *6 (S.D.N.Y. Aug. 26, 2022) (noting that although the "case has not developed past the pleading stage, Defendant has failed to carry its burden of demonstrating that trial efficiency would be improved by transfer").

Judicial efficiency thus weighs against transfer.

### E.    Remaining factors

Defendants do not argue that the remaining factors—the location of relevant documents, relative means of the parties, or the availability of process—weigh in favor of transfer.  Relevant documents may be available in New Jersey or New York, and neither location affects the appropriateness of transfer.  *See Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. Lafarge N. Am., Inc.*, 474 F. Supp. 2d 474, 484 (S.D.N.Y. 2007), *aff'd sub nom*, *N.Y. Marine & Gen. Ins. Co.*, 599 F.3d at 114 ("The location of relevant documents is largely a neutral factor in today's world of faxing, scanning, and emailing documents.").  Defendants further have not identified any witness who is not within the jurisdiction of this Court but is within the jurisdiction of the District of New Jersey.  *See* Fed. R. Civ. P. 45(c)(1) ("A subpoena may command a person to attend a trial, hearing, or deposition ... within 100 miles of where the person resides, is employed, or regularly transacts business in person.").  The parties have provided no basis to find that relative means favors transfer.

### F.    Judicial Conflict

Finally, Defendants argue that this case should not be managed and tried in New York because the undersigned and "at least" seven of his Southern District of New York colleagues obtained COVID-19 tests from Defendants at some point in time.  Defendants state that "the LabQ Defendants provided COVID-19 testing to at least seven other SDNY Judges on 23 separate occasions" and that "one of these seven SDNY judges stated 7 out of 11 times that this judge did not have health insurance when registering on the LabQ Defendants' on-line digital

GoMeyra portal." Dkt. No. 709 at 14–15. They further argue that transfer to one of the 37 judges who have not received testing from LabQ would not "cure[] the problem" as "the appearance of impropriety extends across the bench." Dkt. No. 744 at 9. Other than conclusory, overblown statements claiming that twenty-three tests infect the entire bench with an appearance of impropriety, Defendants provide no support for this assertion.

The argument is an attempt at naked forum-shopping. This case does not involve the quality of the COVID-19 tests administered by the LabQ Corporate Defendants, the care with which they administered those tests, or the costs to the patients. It involves claims that the highest levels of corporate management at LabQ submitted hundreds of thousands of claims to HRSA for patients who were insured while claiming that they were not insured. Dkt. Nos. 33 ¶ 24, 37 ¶ 5 (the Government estimates that 62% of the 1,114,245 claims paid by HRSA to Defendants were premised on false claims). The central issues in this case are whether Defendants knowingly submitted ineligible claims to the Uninsured Program and whether Defendants made best efforts to confirm a patient was uninsured. Evaluating these issues will primarily concern the Uninsured Program's guidance and policies, Defendants' billing practices, and Defendants' insurance discovery and verification systems—not isolated individual patient interactions with LabQ technicians. It is undisputed that Defendants' digital registration process requested insurance information and that LabQ patients often provided insurance information. Am. Compl. ¶ 107; Dkt. No. 693 at 44. Defendants provided hundreds of thousands of tests to patients in New York City, New Jersey, California, and Alabama. Am. Compl. ¶¶ 55, 93–94. Whether or not on a particular occasion an individual technician collected insurance information from a patient is a matter of insignificance and immaterial to the momentous questions in this case. No reasonable observer could believe that a judge who at one point received a COVID-19

test administered by Defendants would be unable to judge a case regarding whether Defendants engaged in a massive scheme to fraudulently bill the Government.  Indeed, while Defendants assert without foundation in this motion that the intake process is the "factual issue at the heart of this litigation," Dkt. No. 744 at 8, in their motion to dismiss the amended complaint, Defendants admit "the collection of insurance information from the patient at the site of the test" as immaterial to the Government's claims, Dkt. No. 693 at 38.

Defendants have presented no viable theory for their accusation of impropriety. Therefore, judicial conflict is not a relevant factor here.

As each factor weighs against transfer of venue, Defendants' motion for transfer of venue to the District of New Jersey is denied.

## II.    Recusal

Having argued strenuously that the "locus of the operative facts all occurred in New Jersey," Dkt. No. 709 at 2, and that no events of significance occurred in New York, Defendants reverse course in the back half of their memorandum of law and argue that the Court should recuse itself because of COVID-19 testing that occurred in New York.

The Court has been assisted by counsel in evaluating this request.  *See* Dkt. No. 762 (ordering Defendants to create an Excel chart with the relevant information).  It also has honored Defendants request that it not rule on any "enforcement, contempt and sanctions proceedings pending disposition of this motion."  Dkt. No. 709 at 27.  It has carefully considered the request.

 The relevant facts are as follows.  After the case was assigned to the undersigned and after the Relevant Period at issue, but before the Government filed its complaint in intervention, I—like several of my other colleagues—received COVID-19 tests from Defendants.  I did so on two occasions at a location in Manhattan far from the courthouse.  Dkt. No. 711-2 (noting tests on April 15, 2022 and January 29, 2023).  On both occasions insurance information was recorded

for me.  *Id.*  In addition, my wife and an adult daughter received COVID-19 tests from

Defendants both during the Relevant Period and after.  *Id.*  Defendants argue that I should recuse

myself because my COVID-19 tests gave me personal knowledge of disputed evidentiary facts in

this case and because my family members' personal experiences with Defendants make them

material fact witnesses.

Section 455(a) of Title 28 provides that "[a]ny justice, judge, or magistrate judge of the

United States shall disqualify himself in any proceeding in which his impartiality might

reasonably be questioned," and subsection (b)(1) of that same statute provides that the judge

"shall also disqualify himself . . . [w]here he has a personal bias or prejudice concerning a party,

or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. §

455(a), (b)(1).  Subsection (b)(5)(iv) of that statute further provides that the judge shall

disqualify himself where "[h]e or his spouse, or a person within the third degree of relationship

to either of them . . . (iv) [i]s to the judge's knowledge likely to be a material witness in the

proceeding."  28 U.S.C. § 455(b)(5)(iv).

The standards for recusal under subsection (a) and subsection (b) are distinct.  While

Section 455(b) "addresses the problem of actual bias," *United States v. Bayless*, 201 F.3d 116,

126 (2d Cir. 2000), Section 455(a) seeks "to avoid even the appearance of partiality," *In re

Aguida*, 241 F.3d 194, 200 (2d Cir. 2001) (quoting *Liljeberg v. Health Servs. Acquisition Corp.*,

486 U.S. 847, 860 (1988)).  The Second Circuit has interpreted Section 455(a) to require recusal

if "an objective, disinterested observer fully informed of the underlying facts, [would] entertain

significant doubt that justice would be done absent recusal," *Bayless*, 201 at 126, or alternatively,

if "a reasonable person, knowing all the facts, [would] conclude that the trial judge's impartiality

could reasonably be questioned," *Omega Eng'g. Inc. v. Omega, S.A.,* 432 F.3d 437, 447 (2d Cir.

2005) (internal quotations omitted).  The judge who is being asked to disqualify herself must consider both claims of actual bias and the objective appearance of impartiality, and her decision not to disqualify herself is reviewed by the Second Circuit for abuse of discretion.  *LoCascio v. United States,* 473 F.3d 493, 495 (2d Cir. 2007).

A recusal motion requires the judge to "carefully weigh the policy of promoting public confidence in the judiciary against the possibility that those questioning his impartiality might be seeking to avoid the adverse consequences of his presiding over their case."  *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1312 (2d Cir. 1987).  "Litigants are entitled to an unbiased judge; not to a judge of their choosing."  *Id.*  Therefore, "the grounds asserted in a recusal motion must be scrutinized with care."  *In re Aguinda*, 241 F.3d at 201.  "[W]here the standards governing disqualification have not been met, disqualification is not optional; rather, it is prohibited."  *Id*; *see also Thorpe v. Zimmer, Inc.,* 590 F. Supp. 2d 492, 494 (S.D.N.Y. 2008) ("The Court has an affirmative duty not to disqualify itself unnecessarily").

### A.    Defendants' Recusal Motion is Untimely

The Government argues that Defendants' motion for recusal is untimely, as the information underlying the motion was within Defendants' claims data, and thus available for over a year prior to filing this motion, and Defendants emailed a draft motion for recusal to the Government on May 6, 2025 but did not file this motion until September 5, 2025.  Dkt. No. 736 at 22–24.  The Government argues that the timing of the motion reflects pure gamesmanship—it was filed following the Court's adverse decision on contempt and was accompanied by a request that the Court not rule on sanctions in connection with that decision.  *Id.* at 24–25.

The Second Circuit has read a timeliness requirement into Section 455, requiring the moving party "to seek recusal when it should first have been sought, that is, as soon as the facts on which it is premised are known to the parties."  *Bayless*, 201 F.3d at 127; *see also LoCascio*,

473 F.3d at 497 ("As we have made clear, 'recusal motions are to be made 'at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim'") (quoting *Gil Enters., Inc. v. Delvy*, 79 F.3d 241, 247 (2d Cir. 1996)); *United States v. Burke*, 756 F. App'x 93, 94 (2d Cir. 2019) (summary order) ("This Court has interpreted § 455 to incorporate a timeliness requirement"). This timeliness requirement serves two important purposes: (1) it "affords the district judge an opportunity to assess the merits of the application before taking any further steps that may be inappropriate for the judge to take" and (2) "prompt application avoids the risk that a party is holding back a recusal application as a fall-back position in the event of adverse rulings on pending matters." *LoCascio*, 473 F.3d at 497 (internal quotations omitted).

Where information is a matter of public record, the Second Circuit has charged the party moving for recusal with facts it could have known. *See United States v. Daley*, 564 F.2d 645, 651 (2d Cir. 1977) (motion for recusal untimely because, inter alia, the facts upon which it was based "as a matter of public record, were at all times ascertainable by counsel"); *Nat'l Auto Brokers Corp. v. Gen. Motors Corp.*, 572 F.2d 953, 959 (2d Cir. 1978) (finding motion untimely where motion was based on judge's former membership at a law firm, which had been a matter of public knowledge for years). Thus, courts in this Circuit have charged parties with "knowledge of all facts known or knowable, if true, with due diligence from the public record or otherwise." *Universal City Studios, Inc. v. Reimerdes*, 104 F. Supp. 2d 334, 349 (S.D.N.Y. 2000), *on reconsideration*, 2000 WL 1016649 (S.D.N.Y. July 19, 2000) (internal quotations omitted); *see also*, *HC2, Inc. v. Messer*, 2022 WL 61370, at *3 n.4 (S.D.N.Y. Jan. 6, 2022) (finding motion for recusal untimely where it was based on judge's former affiliation with a law firm, which had been matter of public knowledge for two decades); *Da Silva Moore v. Publicis*

25

*Groupe*, 868 F. Supp. 2d 137, 155 (S.D.N.Y. 2012) (evaluating timeliness from point at which information was first available to plaintiffs).

There is substantial reason to believe that the motion reflects gamesmanship. *See LoCascio*, 473 F.3d at 497 ("a prompt application avoids the risk that a party is holding back a recusal application as a fall-back position in the event of adverse rulings on pending matters"); *Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.2d 326, 334 (2d Cir. 1987) ("a movant may not hold back and wait, hedging its bets against the eventual outcome"). From the beginning of this case, Defendants had access to the information underlying this motion. If Defendants were concerned that a judge who had taken a LabQ COVID-19 test, or whose family member had taken a test, could not preside over the case without creating an impermissible bias, Defendants could have raised or investigated the issue. It could hardly have come as a surprise to Defendants that members of the bench, who as a matter of statute are required to live near the courthouse, 28 U.S.C. § 134(b), and who during the times at issue and thereafter were in public settings where they would have had to be concerned about exposing others, may have taken a COVID-19 test at one of Defendants' sites. Defendants had over 100 mobile-testing sites throughout New York City, Am. Compl. ¶ 20, and administered tests to tens of thousands of patients throughout Manhattan alone during the Relevant Period, *id.* ¶ 18. Defendants had the ability to determine if any—or all or most—of the members of the bench had taken a COVID-19 test from Defendants or if members of their family had. The identities of the patients to whom Defendants administered tests were within Defendants' knowledge from the beginning of this case. Transcript of Oral Argument, October 22, 2025 ("Tr.") at 26:13–15 (Defendants' counsel stating "I can't disagree with you on that" when Court noted that there "was nothing preventing your

26

client from looking at the very beginning of this case, correct?").  The Court can only infer that Defendants did not ask because they did not care.

Defendants circulated a copy of their draft recusal motion to the Government on May 6, 2025.  Dkt. No. 737-6; 744 at 20.  Defendants claim that they first learned of the basis for their recusal motion a few weeks prior to circulating the motion.  Tr. at 26:2–5.  That was shortly after the Court rendered its decision denying Defendants' motion to vacate the pre-judgment restraints.  Dkt. No. 357.  Defendants sat on that motion, while waiting for the Court to decide several significant issues.[4]  On May 16, 2025, the Government raised with the Court Defendants' failure to produce any documents responsive to the Government's merits discovery, failure to take any other steps to progress merits discovery, and failure to sufficiently respond to the Government's financial discovery requests.  Dkt. No. 492.  On May 20, 2025, the LabQ Corporate Defendants and Landau requested that the Court modify the August 2024 Order  to permit them to pay what they claimed was reasonable business expenses incurred by other Landau entities relating to the restrained properties.  Dkt. No. 495.  Three days later, the Government moved for contempt, alleging that the LabQ Corporate Defendants and Landau violated the August 2024 Order by transferring hundreds of thousands of dollars to other companies owned by Landau or his wife for no consideration.  Dkt. Nos. 534–35.  Those were significant motions, involving large sums of money.  On July 7, 2025, the Court denied Defendants' motion for modification and granted the Government's first motion for contempt, finding clear and convincing evidence that Defendants violated the Court's August 2024 order. Dkt. No. 574.

---

[4] In addition to the motions recounted here, the Government filed its Amended Complaint on May 19, 2025, Dkt. No. 493, and Defendants filed a motion to dismiss the Amended Complaint on August 18, 2025, Dkt. No. 692.

The Court's finding of contempt was followed by additional motions by the Government for contempt and to compel the production of long overdue documents, Dkt. Nos. 673, 677, as well as subsequent motions for sanctions following the Court's rulings, Dkt. Nos. 584, 700.  On August 13, 2025, the Court granted the Government's second motion to compel[5] and set a briefing schedule for the Government's second motion for contempt, scheduling a hearing on the motion for September 19, 2025.  Dkt. No. 683.  It was then, on September 5, 2025, while the question of contempt sanctions and whether to compel production of documents was sub judice and before the Court had an opportunity to consider those motions, that Defendants filed the instant motion for change of venue and alternatively recusal, and requested that the Court immediately pause proceedings regarding the pending enforcement, contempt, and sanctions motions to avoid "irreparable taint to the judicial process."  Dkt. No. 708.

That timing is suspicious.  It suggests that Defendants were waiting to see "which way the wind appears to be blowing," *Universal City Studios*, 104 F. Supp. at 349–50, and how the Court would come out on contested motions to compel and motions for contempt and decided only after the Court ruled adversely for them and only on the eve of the Court imposing sanctions that they should make a motion for change of venue or recusal as a means to forestall a further negative result.  Such a delay "suggests a misuse of the recusal statute for strategic purposes."  *Lyman v. City of Albany*, 597 F. Supp. 2d 301, 308 (N.D.N.Y. 2009) (finding that motion for recusal was untimely where Plaintiff moved twenty months after information was available and shortly after court dismissed parts of the complaint); *see also Weisshaus v. Fagan*, 456 Fed. App'x 32, 34 (2d Cir. 2012) (summary order) ("the district court aptly noted that the

---

[5] The Court granted Defendants' first motion to compel on July 30, 2025.  Dkt. No. 664.

motion came on the heels of its direction that [plaintiff] submit to a deposition, thus strongly suggesting that the motion was a mere fall-back position in response to an adverse ruling.").

Defendants do not provide any good cause for their later filing. They assert that they could not have made the recusal motion earlier because they first retained new counsel at the end of May, Dkt. No. 744 at 21, and that their new counsel had to familiarize themselves with the case, but Defendants were well-represented in advance of May 2025 and from the beginning of the case; the retention of new counsel does not establish good cause for delay. *See Cheng v. Via Quadronno LLC*, 2022 WL 1210839, at *4 (S.D.N.Y. Apr. 25, 2022). In any event, the argument does not explain why Defendants waited for a full four months after drafting their motion to bring it to the attention of the Court. Defendants also argue that the four month delay "demonstrates diligence, not delay." Dkt. No. 744 at 20. But Defendants do not identify anything that they did or needed to do during the four-month time period. The notion that they were concerned about judicial bias is belied by the fact that they asked for judicial action. Defendants asked for recusal only after the Court denied their motion to modify the August 2024 Order.

Defendants failed to move for recusal "at the earliest possible moment after obtaining knowledge of [the relevant] facts," *Burke*, 756 F. App'x at 94. The motion was made only after Defendants had participated in pretrial proceedings in a substantial way, granting it would represent a waste of judicial resources, and Defendants have demonstrated no good cause for delay. *See Apple*, 829 F.2d at 334. Their motion thus is untimely. *See Da Silva Moore*, 868 F. Supp. 2d at 154 (finding three-month delay to render motion for recusal untimely where "[i]t appears that plaintiffs are improperly using the recusal motion as a 'fall-back position' to an unfavorable ruling"); *see also Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, 2003

WL 282187, at *3 (S.D.N.Y. Feb. 7, 2003), *aff'd sub nom.*, *Six W. Retail Acquisition, Inc. v. Sony Pictures Entm't Corp.*, 124 F. App'x 73 (2d Cir. 2005) (finding motion untimely where plaintiff waited two months after alleged knowledge of the basis of recusal motion, and two years after the information was available, to file the motion).

### B.    Defendants' Recusal Motion is Meritless

Notwithstanding the failure to make a timely motion, the Court is prepared to consider the motion on its merits. Their motion should not be, and is not, denied on timeliness grounds alone.

Defendants argue that the following facts require recusal:

On two occasions, I registered with the Defendants' GoMeyra portal and underwent COVID-19 testing with the LabQ Defendants. The first occasion was on April 15, 2022 and the second occasion was on January 29, 2023. Dkt. No. 711-2. Both occasions were after the Relevant Period and before the complaint in intervention. On both occasions, I gave my insurance information. When the Government filed its intervenor complaint in June 2024 and when the case was unsealed, I had forgotten about the visits. Although I do recall visiting COVID-19 testing sites on multiple occasions after the COVID-19 vaccine became available, I received most of those tests near the courthouse apparently from a vendor different from LabQ. I do not have a recollection of receiving a test from Lab-Q and do not recall the names of any of the several mobile testing sites where I did receive COVID-19 tests. I do not recall a negative experience at any testing site.[6]

My wife (identified as Family Member 1) visited Defendants' sites for COVID-19 testing on one occasion during the Relevant Period (on September 14, 2021) and on 26 occasions

---

[6] The Court has an affirmative obligation to advise the parties of the relevant facts that could give rise to recusal. *See Thorpe*, 590 F. Supp. 2d at 494.

thereafter (during the period from April 5, 2022 to February 1, 2023). Dkt. No. 711-2. Insurance information is not recorded for Family Member 1 on the September 2021 visit. Dkt. Nos. 711-2, 764. For 19 of the remaining visits, insurance information is reported while there is no insurance information for the remaining seven. Dkt. No. 764. An adult daughter of mine (identified as Family Member-2) received a COVID-19 test on five occasions during the Relevant Period (in the period from October 2021 to January 2022). *Id.* Insurance information is reported for the first visit but not for the remaining four visits. *Id.* Family Member 2 received a COVID-19 test from Defendants on three occasions after the Relevant Period (from November 2022 to January 2023). Insurance information is reported for her on all three of those occasions, however the insurance information provided was incorrect on the January 29, 2023 visit.[7] *Id.*

At the request of Defendants' counsel, Tr. 14:23–15:4, I have not spoken to my family members about their visits to Defendants' testing sites but I can report that I do not recall any discussions of their experiences receiving COVID-19 tests other than that they were receiving them and (occasionally) the results of those tests. There were no discussions regarding the collection of insurance information.

### 1.    Section 455(b)(1)

Defendants argue that due to the two COVID-19 tests I received from Defendants, I must recuse myself under Section 455(b)(1). However, I do not have "personal knowledge of any disputed evidentiary facts concerning the proceeding" so as to require recusal under Section

---

[7] In response to the Court's request for a chart organizing the relevant information, Defendants also submitted records pertaining to COVID-19 tests taken by my brother. Dkt. No. 764. Defendants state that my brother took one COVID-19 test during the Relevant Period and three tests after the Relevant Period. These tests were not raised in the motion for recusal and Defendants offered no argument regarding them. *Id.* Defendants do not argue that he is a material witness. For the same reasons outlined in this section, these tests do not require recusal.

455(b)(1).  28 U.S.C. § 455(b)(1).[8]  Defendants do not identify any "disputed evidentiary facts

concerning the proceeding" of which I would have knowledge.  Defendants assert that I would

have relevant knowledge of Defendants "digital registration process," Dkt. No. 709 at 25, and of

"what transpired at the patient-provider interface: when LabQ tested individuals for COVID-19,

what questions were asked, what information was requested and collected, and whether

Defendants exercised best efforts to determine patients' insurance status," Dkt. No. 744 at 9.  As

the Government has asserted, however, and as Defendants admit, there is no disputed evidentiary

fact regarding Defendants' digital process.  Dkt. No. 736 at 27; *see also* Dkt. No. 182 at 8

(Defendants' memorandum of law in opposition to the Government's motion for Preliminary

Prejudgment Remedies, arguing "the government admits that LabQ collected patient insurance

information: LabQ's patient-intake form contained field for patients to provide their insurance

details—and they often did so"); Dkt. No. 11 ¶ 74.  There also is no dispute regarding whether

Defendants collected insurance information after the Relevant Period.  Neither party disputes

that in April 2022 and thereafter, when the I received my COVID tests, Defendants were

insisting upon insurance information.  Tr. 8:11–16, 31:10–12.  The parties do dispute whether the

collection of insurance information from March 2022 on was a change in practice, with the

Government alleging that prior to the Relevant Period, the LabQ Corporate Defendants did not

routinely collect insurance information.  However, I have no knowledge, either from personal

---

[8] Defendants do not assert that I have "a personal bias or prejudice concerning a party," 28
U.S.C. § 455(b)(1), that would require recusal.  Although I do not remember any of the visits at
issue, I can attest that during the period of the COVID-19 pandemic and after the vaccine was
available, I received COVID-19 testing on virtually a weekly basis and mostly next to the
Courthouse.  I do not recall any negative experiences with respect to any of my COVID-19 tests.
Defendants also do not assert that I have any personal knowledge of disputed evidentiary facts
from the visits of my family members.  I was not present when they visited Lab-Q sites prior to
March 22, 2022 and the registration process at Lab-Q was never a topic of conversation.

experience or conversations with family, regarding LabQ's practices prior to April 2022 or whether what I experienced at the LabQ mobile site was a change in practice. Thus, recusal is not required under Section 455(b)(1). *See Thorpe*, 590 F. Supp. 2d at 495–96 (moving party did not demonstrate that judge had knowledge of any disputed fact); *In re Certain Underwriter*, 294 F.3d 297, 302–03, 305 (2d Cir. 2002) (same); *see also Easley v. University of Michigan Board of Regents*, 906 F.2d 1143, 1147 (6th Cir. 1990); *In re Hatcher*, 150 F.3d 631, 635 (7th Cir. 1998).

### 2.    Section 455(b)(5)(iv)

There also is no basis for recusal under Subsection (b)(5)(iv) which requires recusal where the judge's "spouse, or a person within the third degree of relationship to either of them . . . (iv) [i]s to the judge's knowledge likely to be a material witness in the proceeding." 28 U.S.C. § 455(b)(5)(iv). "Under this provision, recusal is mandatory." *United States v. Robinson*, 439 F.3d 777, 779 (8th Cir. 2006). However, a person is not a "material" witness when the events she witnessed are not disputed, *United States v. Vargas*, 279 F. App'x 56, 61 (2d Cir. 2008) (summary order) (finding defense witness immaterial where testimony would not contradict government's evidence), nor is recusal required where "'the district judge's relatives could not possibly have anything to add as witnesses in this case, and . . . 'when other witnesses are available to provide the same testimony,'" *Hall v. City of Williamsburg*, 768 F. App'x 366, 373 (6th Cir. 2019) (quoting *United States v. Lanier*, 2018 WL 296725, at *3 (E.D. Tenn. Jan. 3, 2018)). *See also United States v. Rosemond*, 595 F. App'x 26, 29 (2d Cir. 2014) (summary order) (Second Circuit determined that defense counsel was not conflicted because "another witness was available to provide the same testimony that [defense counsel] could have provided" and for the one proffer session that the witness was not present for, there were no disputed recollections); *c.f. United States v. Fargesen*, 2022 WL 4110303, at *4 (S.D.N.Y. Sept. 8, 2022)

(holding witnesses to be material where "testimony offered appears to be uniquely held by the three witnesses").

There is no reason to believe that either of my family members is a material witness to any event of significance in this case. The Government alleges a wide-ranging conspiracy lasting from September 2020 to March 2022 to submit false claims to the Government on behalf of thousands of patients to whom Defendants administered COVID-19 tests. That scheme took many different forms ranging from mobile sites providing testing in New York City, contracts with private institutions, and referral contracts with third party institutions that provided LabQ COVID-19 testing to their clients. Am. Compl. ¶¶ 54–56. The LabQ Corporate Defendants are alleged to have submitted claims for hundreds of thousands of patients who were insured. Dkt. Nos. 33 ¶ 24, 37 ¶ 5. Liability and damages in this case will not turn upon whether on a handful of occasions a patient at one of the mobile sites was asked or was not asked for insurance information or whether such information was correctly input. As Defendants elsewhere admit, "the collection of insurance information from the patient at the site of the test" is immaterial. Dkt. No. 693 at 38. The central factual disputes in this case instead pertain to Defendants' relationships with the Private Clients and Referral Clients, including whether they double-billed for Private Clients, told the Referral Clients that they did not need to provide LabQ with insurance information for their patients, and failed to institute policies to collect insurance information from those clients. Am. Compl. ¶¶ 67–70, 92. The factual disputes in this case also turn on whether LabQ failed to train technicians on the collection of insurance information, *id.* ¶ 89; whether LabQ knowingly and systematically failed to collect information, such as social security numbers, that could be used to determine that a patient was insured, *id.* ¶¶ 97–98; whether LabQ submitted claims to HRSA when it had information in its possession that the

patient was insured, *id.* ¶¶ 106–10; whether LabQ billed HRSA when private insurance failed to pay a claim, *id.* ¶ 119–124; and whether the LabQ Corporate Defendants failed to reimburse the Uninsured Program when they were paid by both the Uninsured Program and private insurance for the same COVID-19 test, *id.* ¶¶ 126–32.  And these disputes will turn upon the knowledge of the most senior personnel at the LabQ Corporate Defendants.

Defendants stated that Family Member-1 and Family Member-2, if they remember their experiences from years ago, could testify to the GoMeyra digital process and what was on the screen for that process.  Dkt. No. 709 at 26.  But there is no dispute as to GoMeyra—the content of the digital intake process is admitted by both parties.  Dkt. No. 736 at 27.  Defendants also state that Family Member-1 and Family Member-2 could each testify to what the technicians at the mobile site told her, how the technicians responded to any statements she made, and why in certain instances insurance information is not recorded.  Tr. 17:24–18:6.  But that does not make either a likely material witness.  Tens of thousands of persons in Manhattan alone (not to mention the other boroughs and other sites) received COVID-19 tests from the LabQ Corporate Defendants during the Relevant Period.  Numerous of those patients were recorded as being uninsured when in fact they were insured.  Am. Compl. ¶ 102.  Defendants do not identify anything distinctive about the experiences of Family Member-1 and Family Member-2 at the mobile testing sites that would make them material witnesses and that would not be in the possession of the thousands of other persons whom Defendants could call as witnesses, if they desire to call any patients at all as witnesses, which appears unlikely.  Defendants have all but admitted that they plan to call no patients as witness.  In their Initial Disclosures, Defendants listed thirty-three witnesses by name and listed ten categories of additional witnesses.  Dkt. No. 737-8.  The witnesses range from employees of Defendants' third-party service providers to

employees of the New Jersey Division of Medical Assistance and Health Services.  Dkt. No. 737-8.  Defendants do not list a single patient as a witness.

Therefore, the Court concludes that neither Family Member-1 nor Family Member-2 are likely to be called as a material witness.

### 3.    Section 455(a)

That leaves the question whether I should recuse myself under Section 455(a).  "A fact's failure to give rise to recusal under § 455(b) does not automatically mean that same fact does not create an appearance of partiality under § 455(a)."  *In re Certain Underwriter*, 294 F.3d at 305.  "The goal of section 455(a) is to avoid even the appearance of partiality. If it would appear to a reasonable person that a judge has knowledge of facts that would give [her] an interest in the litigation then an appearance of partiality is created even though no actual partiality exists because the judge does not recall the facts, because the judge actually has no interest in the case or because the judge is pure in heart and incorruptible."  *Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. 847, 860 (1988) (internal quotations omitted).  Partiality under § 455(a) is evaluated on an objective basis after considering "whether a reasonable person, knowing all the facts, would conclude that the trial judge's impartiality could reasonably be questioned."  *United States v. Wedd*, 993 F.3d 104, 114 (2d Cir. 2021) (*quoting United States v. Thompson*, 76 F.3d 442, 451 (2d Cir. 1996)).

"The judge's lack of knowledge of a disqualifying circumstance . . . does not eliminate the risk that 'his impartiality might reasonably be questioned' by other persons."  *Liljeberg*, 486 U.S. at 859.  "Justice must satisfy the appearance of justice."  *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 825 (1986).  "In close cases, 'the balance tips in favor of recusal.'"  *Wedd*, 993 F.3d at 115 (internal citations omitted).  At the same time, Section 455(a) requires concern for appearances but does not "require[] concern for mirages."  *Id.* at 114.  "Where a case . . .

involves remote, contingent, indirect or speculative interests, disqualification is not required." *In re Certain Underwriter*, 294 F.3d at 305.

Defendants do not assert, and the Court has not identified, any "interest" it could have in this litigation, whether direct or remote. Tr. 20:10–11 ("We're not alleging that either you or your family members have an interest"). The Court is economically and reputationally indifferent to the result in this case. The fact that the Court received COVID-19 tests from Defendants in the past and that family members also received such tests does not give any of them an interest in the outcome of these proceedings.

There also is no risk of an appearance that the Court has a bias in this case. Though I do not recall the events of my visit to a LabQ site, no reasonable observer could believe that through those visits—after the Relevant Period—I would have learned facts that would have given me an interest in the case or made me less then impartial. Thousands of New Yorkers including a number of my peers, provided insurance information to the LabQ Corporate Defendants. We are not all biased or partial because of those visits. Indeed, that insurance was recorded on the occasions that I visited the mobile site would suggest at most to a reasonable observer that I was asked for insurance information; people do not ordinarily volunteer their insurance information. And that two of my family members in 2021 and 2022 received a test from LabQ also does not create an appearance that I have a bias. The family members too are no different than the thousands of other New Yorkers who may have received tests from Defendants. That they received tests does not mean that they have knowledge of or a view with respect to Defendants' billing practices. As noted, the claim in this case relates to the alleged systematic failure to collect insurance information and systematic billing of HRSA for patients that Defendants knew

were insured.  It does not turn upon whether a technician occasionally failed to request insurance

information or a patient occasionally failed to provide such information.

Defendants administered tens of thousands of tests in Manhattan alone (which contained

less than half of the 100 mobile testing sites LabQ operated throughout New York City, Am.

Compl. ¶ 20) and 4.3 million tests throughout their lines of business.  *Id.* ¶ 18; Dkt. No. 193 ¶ 26.

According to Defendants, by 2022 CMT operated over 230 mobile testing sites and, at the height

of the pandemic, performed 700 to 800 tests per site per day.  Dkt. No. 186 ¶¶ 9, 11.  Defendant

Landau himself admitted that "it is very possible" that there were instances where a technician

told a patient that insurance information is not required for testing.  Am. Compl. ¶ 96.  From that

vantage, with such an expansive volume of tests during the Relevant Period, and at a time where

many individuals were required to take COVID-19 tests regularly, whether on a handful of

occasions a person was sometimes reported as providing insurance information and sometimes

not is a matter of indifference.  It would not suggest anything about the Defendants' practices

and therefore could not give rise to any appearance of bias, lack of impartiality, or prejudgment.[9]

"A judge is as much obliged not to recuse himself when it is not called for as he is

obliged to when it is."  *In re Drexel Burnham Lambert Inc.*, 861 F.2d at 1312.  In this case, an

---

[9] The cases cited by Defendants concern closer connections between the judge and central issues in the case, as well as far greater personal or financial interests in the outcome.  *See e.g., Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120, 128 (2d. Cir. 2003) (judge was required to recuse himself where he had a financial interest in the outcome); *United States v. Hernandez*, 2025 WL 2461062, at *3–4 (S.D.N.Y. Aug. 26, 2025) (recusing herself where there was concern of financial interest in the outcome); *German v. Federal Home Loan Mortg. Corp.*, 943 F. Supp. 370, 373–74 (S.D.N.Y. 1996) (judge recused himself where defendants planned to raise city's negligence as a defense and judge was Deputy Mayor during the relevant period); *see also In re Aguida*, 241 F.3d at 202 (finding "no doubt" that judge did not abuse his discretion in denying motion for recusal where he attended conference at which a former C.E.O. of the defendant spoke).

objective view of the facts, from the perspective of a reasonable observer, requires that the Court continue to preside over this case.

## CONCLUSION

For the reasons stated above, the motion for judicial disqualification is DENIED. The motion for transfer of venue is also DENIED.

The Clerk of Court is respectfully directed to close Dkt. No. 708.

SO ORDERED.

Dated: November 10, 2025
      New York, New York

                              LEWIS J. LIMAN
                       United States District Judge