

# ZELL & ASSOCIATES
## INTERNATIONAL ADVOCATES LLC
AN AFFILIATE OF FANDZ INTERNATIONAL LAW GROUP
International Attorneys & Notaries

November 12, 2025

**VIA ECF/CM**
Hon. Lewis J. Liman
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re: *United States of America v. LabQ Clinical Diagnostics, LLC, et al.*, No. 22 Civ. 10313 (LJL)

Dear Hon. Judge Liman:

    We submit this letter motion on behalf of Defendants LabQ Clinical Diagnostics LLC, Community Mobile Testing, Inc., Dart Medical Laboratory, Inc. and Moshe Landau (collectively, the "LabQ Defendants") to address the continuing impasse under the Court's August 2, 2024 Stipulation and Order (Dkt. 60, the "8/2 Order"). Despite the passage of more than fifteen months since that stipulation was entered—and the extensive proceedings this spring concerning its implementation—the Government has yet to consent to, or allow, the release of a single dollar for either business or personal expenses. The 8/2 Order's purpose and plain text have been effectively nullified.

    As things currently stand, the LabQ Defendants are functionally unable to litigate this case at all. The Government's unyielding refusal to release funds has suffocated the Defendants—deliberately so—ensuring that they have no meaningful ability to defend themselves or advance their claims on the merits thereby causing substantial prejudice to the LabQ Defendants.

    The Government's insistence that the LabQ Defendants somehow finance this litigation through loans secured by the very real-estate properties already subject to its own writs simply will not work—and has not worked. Not only does such a "solution," if it can be called that, place the Government in the untenable role of supervisor and final arbiter of what the Defendants may or may not finance, but it has proven a cumbersome and bureaucratic nightmare, riddled with delays, documentation impasses, and economic impracticalities.

*Letter Motion*
November 12, 2025
Page 2

In today's volatile real-estate market, this approach is not only unworkable but financially unsound, rendering the 8/2 framework illusory in practice.

This unprecedented state of affairs offends the most fundamental principles of due process and creates a grossly uneven playing field, where one party wields the full power of the United States while the other is deprived of the basic resources necessary to be heard.

### I.     The 8/2 Order's Intended Function

The 8/2 Order was a negotiated mechanism to preserve equilibrium between the Government's attachment rights and the Defendants' operational survival. It expressly permitted the payment of "Covered Expenses," defined as:

(1) reasonable business expenses of LabQ, Dart Medical, and Community Mobile Testing;
(2) reasonable personal expenses of Moshe Landau; and
(3) reasonable attorneys' fees of any Defendant.

Paragraph 4 authorized Defendants to use restrained accounts to pay those expenses "as they come due" without prior Government or Court approval—subject only to post-hoc review. Paragraph 3 further provided that any necessary Government consent to new liens or subordinations "shall not be unreasonably withheld." These provisions reflected the Court's understanding that the Defendants must be able to function as a going concern and maintain the properties securing any potential judgment.

However, because the LabQ Defendants no longer have any liquid funds available in their restrained accounts, the ability to "use cash" from those accounts is now illusory. What remains is the Government's so-called "real-estate solution"—the idea that Defendants should finance their litigation and operations by taking loans against properties already subject to the Government's own writs. As discussed above, that approach is both unworkable and absurd, placing the Government in the role of gatekeeper over every financial decision while imposing a bureaucratic, economically unsound, and practically impossible framework that defeats the very purpose of the 8/2 Order.

This breakdown in the Order's implementation is precisely what gave rise to the prior round of motions last spring, in which the same issues were squarely presented but remain unresolved to this day. In fact, as any reasonable observer would surmise, the situation has become exponentially worse for the LabQ Defendants: their financial condition has deteriorated, their operational capacity has been paralyzed, and their ability to meaningfully participate in this litigation has been all but extinguished.

*Letter Motion*
*November 12, 2025*
*Page 3*

### II.     The Prior Round of Motions (May–July 2025; August 2025)

The same issues were squarely presented in the parties' May 2025 motion cycle. On May 20, 2025, the LabQ Defendants moved to modify the 8/2 Order to permit payment of basic business, property, personal, and legal expenses (Dkt. 495). Rather than recognizing the gravity of the situation or the humanitarian and constitutional implications of cutting off all financial lifelines, the Government seized the opportunity to further punish the Defendants—filing a barrage of contempt applications that weaponized procedural mechanisms to deepen the very crisis the 8/2 Order was meant to prevent. The Government responded on May 23rd with a cross-motion for contempt, accusing the Defendants of violating the Order through routine inter-company payments among entities forming part of the LabQ network (Dkt. 534).

Despite months of briefing and extensive evidentiary submissions, the Government's narrative prevailed: on July 8, 2025, the Court issued an Order holding Defendants in violation of the 8/2 Order and denying modification (ECF No. 574). Since then, no relief of any kind has been approved, and the LabQ Defendants remain unable to use restrained assets even to preserve the very properties and businesses securing the Government's contemplated judgment.

Incredibly, rather than stepping back to reassess its overreach, the Government doubled down. On August 12, 2025, it filed yet another motion for contempt (Dkts. 524–525), again invoking the 8/2 Order and alleging that the LabQ Defendants had failed to disclose certain real-estate interests. This new motion—later expanded through a series of filings in September 2025 (Dkts. 705–707, 732–733)—was not a measured effort to clarify compliance, but rather a continuation of the same punitive campaign, repackaging discovery disputes and property-listing technicalities into sweeping claims of fraud and concealment.

In short, this second contempt motion epitomized the Government's ongoing strategy: to litigate by attrition, to exhaust and extinguish resources rather than seek truth, and to turn every procedural wrinkle into another instrument of suffocation.

Together, the Government's successive contempt motions have consumed the past six months of litigation, draining the Defendants' remaining resources and diverting attention from the merits of the case to an endless cycle of accusation and defense. Each round has left the LabQ Defendants in a much weaker position—financially, operationally, and legally—while the Government's demands have only expanded. The result is a proceeding no longer about justice or compliance, but about attrition and control. What began as an effort to preserve assets has now metastasized into a mechanism for total

*Letter Motion*
*November 12, 2025*
*Page 4*

strangulation, leaving the LabQ Defendants unable to operate, to defend themselves, or to meaningfully engage with the substance of the claims against them.

### III.   The Present Situation

The present situation has become unsustainable. By its own admission, the Government's cumulative restraints now exceed $49 million (Dkt 732, pg. 20), far surpassing the Court's own probable single-damages finding of $36.6 million. The Government continues to expand writs without regard to proportionality, due process, or the practical reality that the LabQ Defendants no longer possess a single dollar of unrestrained cash. As a direct result, the Defendants have been unable to perform even the most basic functions necessary to maintain compliance, preserve evidence, and sustain their ability to litigate this case. The LabQ Defendants have disclosed their monthly bank statements to the Government in accordance with the 8/2 Order, and what they show is dire.

1. **Employee Compensation and Litigation Support:** Payroll has been frozen for both laboratory and administrative personnel—including licensed technicians, data-entry staff, and compliance officers—many of whom are essential to the defense of this case. These employees maintain and interpret the very data sets at issue, assist counsel in responding to discovery. The loss of these employees directly and substantially impairs the LabQ Defendants' ability to participate meaningfully in discovery and trial preparation.

2. **Employee Health-Insurance Coverage:** Premium payments for employee health-insurance plans have lapsed, leaving staff without medical coverage and further accelerating attrition among critical personnel.

3. **Regulatory and Licensure Costs:** Mandatory fees and filings for federal and state laboratory licensure—including renewals, proficiency-testing subscriptions, and periodic reporting—cannot be paid.

4. **Information-Technology and Data Infrastructure:** Payments for laboratory information systems (LIS), cloud-based data-retention servers, and cybersecurity vendors are overdue. Discovery is effectively frozen: the principal servers containing responsive documents are blocked cutting off access to databases required for production to the Government. The LabQ Defendants contracted with Complete Discovery Source ("CDS") to host their Relativity database, along with the database in the PerkinElmer litigation. CDS has discontinued access to the Relativity database in this action pending payment of the approximately $200,000 it is owed.

5. **Pending Litigation Deadlines and Expert Funding:** Defendants' reply papers are due in less than two weeks on the Government's Opposition to Defendants' Motion for Relief from Writs (Dkt. 748), yet their retained expert—whose analysis formed the core of Defendants' motion (*see* Dkt. 721-1)—is owed a substantial unpaid balance and cannot continue work.

6. **Depositions and Related Proceedings:** The LabQ Defendants cannot proceed to conduct depositions under the current financial arrangement. Defendants cannot pay for reporters, transcription services, videographers, or travel costs for witnesses—expenses that are indispensable to any deposition process. The LabQ Defendants are being asked to litigate discovery obligations they have no financial capacity to fulfill.

While on April 14, 2025 the Court amended the 8/2 Order to permit the LabQ Defendants to subordinate certain writs of garnishment and writs of attachment to pay for certain legal expenses (Dkt. 377), in practice that has not resulted in the needed relief. As the Government notes in its second contempt motion, the LabQ Defendants mortgaged certain unwritted properties between March and June 2025. As has been disclosed to the Government, the proceeds of those mortgages went to paying legal fees to the Epstein Becker law firm, and costs and maintenance of the writted properties. There has been no significant source of funds to the LabQ Defendants since that time, and the LabQ Defendants have not been able to sell or mortgage the properties identified in the April 14 Stipulation.

**Personal Maintenance and Minimal Subsistence**

Even minimal living expenses for Rabbi Moshe Landau, which the 8/2 Order expressly authorized as "reasonable personal expenses," have been wholly blocked. Mr. Landau has no access to funds for basic household needs, while simultaneously expecting him to manage counsel, coordinate discovery, and comply with court orders.

This paralysis directly contradicts the Court's original intent under the 8/2 Order—to create a functional mechanism for reasonable business, personal, and legal expenses under supervision. Instead, the Government's tactics have converted those safeguards into instruments of punishment. The Defendants have complied with every disclosure directive, producing millions of pages of documents, and continue to cooperate in discovery, while the Government still withholds approximately 3,000 OIG-related documents without production or privilege logs.

*Letter Motion*
*November 12, 2025*
*Page 6*

The imbalance is stark: one side is starved of resources and burdened by overbroad restraints, while the other continues to litigate freely with the full resources of the federal government.

The cumulative effect is that the LabQ Defendants cannot meaningfully defend themselves, cannot maintain their regulated business infrastructure, and cannot even preserve the very assets the Government purports to secure. The current framework has become a constitutional and practical impossibility—a system that ensures collapse rather than compliance.

### IV.   Request for Relief

To restore the equilibrium contemplated by the 8/2 Order and to prevent further irreparable harm, the LabQ Defendants respectfully request that the Court grant the following relief, grounded in both the FDCPA's proportionality mandate (28 U.S.C. § 3013) and the Court's inherent authority to tailor prejudgment remedies to prevent abuse:

1. **Cap the Aggregate Restraints at $36.6 Million:** The Court's own November 10, 2025 order fixed probable single-damages at $36.6 million, characterizing the Government's broader proof as "not overwhelming" and the case as "close." There is no legal or factual justification for maintaining restraints that exceed that amount. The excess $13 million in writs should therefore be lifted immediately

2. **Bar Any Expansion of Writs or Additional Restraints:** While the cap is in place, the Government should be barred from issuing or seeking any new writs or expansions thereof, to halt the ongoing cycle of coercion and preserve the status quo pending resolution.

3. **Permit Substitute Security at the Capped Amount:** Should the LabQ Defendants be able to tender cash or an irrevocable standby letter of credit, or funds to be held in trust by counsel, in the capped amount, the Court should accept such security and vacate the writs entirely. This would maintain full protection for the United States while restoring operational viability to the Defendants.

4. **Enter a 60-Day Administrative Stay:** A short administrative stay would allow (i) the parties to meet and confer within seven days; (ii) referral to a Magistrate Judge for a prompt settlement conference and/or mediation; (iii) a pause on further sanctions proceedings; and (iv) a Day-45 status conference to assess progress.

*Letter Motion*
*November 12, 2025*
*Page 7*

During this period, the Court should also direct the Government to produce or log the outstanding OIG materials within fourteen days, restoring some measure of discovery parity.

As part of the requested relief, the LabQ Defendants further ask that during the proposed stay period the Court withhold decision on all pending matters—including (1) the motion for contempt remedies in relation to the first contempt motion (Dkt. 584); (2) the second contempt motion (Dkts. 524–525); and (3) the Government's letter motion to compel responses to interrogatories and requests for document production (Dkt. 772)—so that the parties may engage in meaningful discussions and preserve the status quo pending the Court's further direction. The LabQ Defendants also request that the stay period includes the discovery deadlines.

The LabQ Defendants intend to file their Reply in support of the Writs Relief Motion (Dkt. 721) on November 24, 2025 without a declaration from their retained expert (as discussed above). A resolution of this motion will hopefully resolve—or at least substantially narrow—many of these piecemeal, attrition-driven disputes, further underscoring the wisdom of a short stay to promote judicial economy, procedural fairness, and orderly case management.

V.  Conclusion

The relief requested is not radical—it is restorative. It implements the Court's own prior findings, preserves the Government's interests in full, and prevents the irreversible destruction of a regulated clinical laboratory that continues to safeguard patient data and evidence. Without such intervention, the LabQ Defendants will simply not be able to litigate this case—ensuring not justice, but substantial prejudice and collapse.

Respectfully submitted,

Date: November 12, 2025

*/s/ Jeffrey E. Michels*
Jeffrey E. Michels, Esq.
ZELL & ASSOCIATES INTERNATIONAL
ADVOCATES, LLC
1345 6th Avenue 2nd Floor
New York, New York, 10105
Telephone: (212) 971-1349
jmichels@fandz.com

*Letter Motion*
*November 12, 2025*
*Page 8*

| | |
|---|---|
| L. Marc Zell<br>*Of Counsel*<br>ZELL & ASSOCIATES INTERNATIONAL ADVOCATES, LLC<br>800 Connecticut Ave., N.W.<br>Suite 300<br>Washington, D.C. 20006<br>Email: mzell@fandz.com | Noam Schreiber<br>*Of Counsel*<br>ZELL & ASSOCIATES INTERNATIONAL ADVOCATES, LLC<br>800 Connecticut Ave., N.W.<br>Suite 300<br>Washington, D.C. 20006<br>Email: noam.schreiber@fandz.com |

cc: Counsel of Record (by ECF)