```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                                                 :
UNITED STATES OF AMERICA, et al.,                                :
                                                                 :
                        Plaintiffs,                              :
                                                                 :              22-cv-10313 (LJL)
            -v-                                                  :              22-cv-00751 (LJL)
                                                                 :
LABQ CLINICAL DIAGNOSTICS, LLC, et al.,                          :              MEMORANDUM AND
                                                                 :                    ORDER
                        Defendants.                              :
                                                                 :
-----------------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/26/2025

LEWIS J. LIMAN, United States District Judge:

By Opinion and Order of November 10, 2025, the Court denied Defendants' motion for the undersigned to recuse himself pursuant to 28 U.S.C. § 455. Dkt. No. 773; *United States v. LabQ Clinical Diagnostics, LLC*, 2025 WL 3136824 (S.D.N.Y. Nov. 10, 2025).[1] Defendants LabQ, CMT, Dart, and Landau (the "Moving Defendants") have filed a petition for a writ of mandamus with the Second Circuit challenging that decision (the "Petition"). Dkt. No. 791. The Moving Defendants have now filed a letter motion with this Court asking the Court to stay all proceedings pending the Second Circuit's determination of the Petition. Dkt. No. 792. In response to that letter motion, the Court suspended all proceedings (except for a discussion regarding referral of the matter for settlement purposes, which was held on consent of the

---

[1] Defendants are LabQ Clinical Diagnostics, LLC ("LabQ"), Community Mobile Testing, Inc. ("CMT"), Dart Medical Laboratory, Inc. ("Dart," and with LabQ and CMT, the "LabQ Corporate Defendants"), Rabbi Moshe Landau ("Landau"), MLK Blvd Upscale LLC, 175 Park Avenue LLC, The Malon Resort NJ LLC, the Thomas G. Rosano PhD LLC d/b/a National Toxicology Center, David Landau, Har Hazayis'm Realty LLC, Realty at HH LLC, NJJ Institutions, Congregation Kolel Vyashkem Avrhom Inc, Yampola 2022 Charitable Lead Annuity Trust, Carebot ABA LLC, OvaLab LLC, and Care Bio Clinical Corp.

parties).² The Court now denies the motion for a stay.

"The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken v. Holder*, 556 U.S. 418, 433–34 (2009). "The four stay factors are '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Mahdawi v. Trump*, 136 F.4th 443, 449 (2d Cir. 2025) (quoting *Nken*, 556 U.S. at 434). "A stay pending appeal is not a matter of right." *DiMartile v. Hochul*, 80 F.4th 443, 456 (2d Cir. 2023). "It is well established that the first two factors are the most critical, and that both must be satisfied." *Id.* (internal citations and quotations omitted).

The Moving Defendants have not satisfied the first factor, in that they have not made a strong showing of likelihood of success on the merits. "To satisfy the 'success on the merits' factor, the moving party must show that his chance of success on the merits is more than a 'mere possibility.'" *DiMartile*, 80 F.4th at 456 (quoting *Nken*, 556 U.S. at 434). To succeed, the Moving Defendants will have to show both that the Court erred in its recusal decision and that the Second Circuit "is likely to grant mandamus." *New York v. U.S. Dep't of Com.*, 339 F. Supp. 3d 144, 148 (S.D.N.Y. 2018). The Moving Defendants face high hurdles on both fronts. A decision denying a motion to recuse is reviewed only "for abuse of discretion." *In re Certain Underwriter*, 294 F.3d 297, 302 (2d Cir. 2002); *see Saleh v. Pastore*, 2021 WL 4978574, at *2 (2d Cir. 2021). The trial judge, who is deeply familiar with a complex record and the issues raised by it, "is in the best position to appreciate the implications of those matters alleged in a

---

² The Government responded to the request for a stay on November 20, 2025. Dkt. No. 803. Moving Defendants replied on November 25, 2025. Dkt. No. 807.

recusal motion." *In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1312 (2d Cir. 1988). "A judge considering recusal must balance the need for 'public confidence in the judiciary against the possibility that those questioning [her] impartiality might be seeking to avoid the adverse consequences of [her] presiding over their case.'" *Certain Underwriter*, 294 F.3d at 302 (quoting *Drexel,* 861 F.2d at 1312). And the Second Circuit will grant a petition for a writ of mandamus only "'where the petitioner has demonstrated that its right to such relief is clear and *indisputable*." *Id.* (emphasis in original) (quoting *Drexel*, 861 F.2d at 1312). "The remedy of mandamus is a drastic one, to be invoked only in extraordinary situations." *Mahdawi*, 136 F.4th at 455 (quoting *Kerr v. U.S. Dist. Ct. for N. Dist. of Cal.*, 426 U.S. 394, 402 (1976)). Where a party raises an issue regarding recusal, "most applications for mandamus are denied." 13D Wright & Miller's Federal Practice & Procedure § 3553 (3d ed. 2025); *see, e.g.*, *Chevron Corp. v. Naranjo*, 2011 WL 4375022 (2d Cir. Sept. 19, 2011).

      The Court "meticulously," *In re Basciano*, 542 F.3d 950, 957 (2d Cir. 2008), analyzed Defendants' motion for recusal, conducting oral argument and requesting a supplemental submission from Defendants. Minute Entry for Oct. 22, 2025; Dkt. No. 762. It rejected the motion for two independent reasons. First, the motion was untimely. Defendants had all of the information in their possession from the moment the case began and filed the motion only after they had been held in contempt and on the eve of the Court considering the contempt sanctions to impose. The facts strongly suggested that Defendants waited to file the motion until they could see "which way the wind appear[ed] to be blowing," *Universal City Studios, Inc. v. Reimerdesi*, 104 F. Supp. 2d. 334, 349–50 (S.D.N.Y. 2000), and filed the motion to "'hedg[e] its bets against the eventual outcome,'" *United States v. Yonkers Bd. of Educ.*, 946 F.2d 180, 183 (2d Cir. 1991) (quoting *Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.2d 334 (2d Cir. 1987)), and to

3

avoid what Defendants perceived might be "the adverse consequences of [the undersigned] presiding over their case," *Drexel*, 861 F.2d at 1312, or at least (as discussed below) to secure an extended period of time before any judge presided over the case.

Moving Defendants do not identify any "clear and indisputable" errors in this Court's reasoning or judgment. The single case that Moving Defendants cite in support of their argument that their motion was timely is *Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.2d 326 (2d Cir. 1987), in which the Second Circuit held that a motion for recusal was *untimely* even though granting the motion would not have wasted judicial resources. In this case, the Court considered all of the *Apple* factors and concluded that Defendants' motion "was made only after Defendants had participated in pretrial proceedings in a substantial way, [that] granting it would represent a waste of judicial resources, and [that] Defendants . . . demonstrated no good cause for delay." *LabQ Clinical Diagnostics*, 2025 WL 3136824, at *13. *Apple* thus fails to establish a clear and indisputable error in the Court's decision.

Second, and independently, the Court analyzed all of the Section 455 factors with care as the law requires. *See Certain Underwriter*, 294 F.3d at 305 ("[T]he grounds asserted in a recusal motion must be scrutinized with care, and judges should not recuse themselves solely because a party claims an appearance of partiality." (quoting *In re Aguinda*, 241 F.3d 194, 201 (2d Cir. 2001))). Defendants are of course entitled to seek appellate review, *see* Dkt. No. 807 at 2, but the stay factors require this Court to determine whether that review is likely to result in success. The Court concludes that it is not.

The undersigned did not and does not have "personal knowledge of any disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1); *see Yonkers Bd. of Educ.*, 946 F.2d at 184 (judge was not required to recuse where he did not acquire information

4

regarding any disputed evidentiary facts, as the facts at issue "could not be reasonably contested"). The Court received two COVID-19 tests from Defendants but those were after the time period relevant to this case. Although Defendants argue that what happened at patient intake and at the mobile testing sites is relevant to the resolution of this dispute, any relevance would be limited to the time period at issue in this case—the time prior to the end of the Uninsured Program[3] in March 2022 during which the Government alleges Defendants were involved in illegal conduct. There is no dispute regarding Defendants' conduct after the relevant time period. It is undisputed that Defendants collected insurance information from their patients (and the record establishes they did so from the undersigned). The disputed issue is whether Defendants' collection of insurance information after March 2022 was a departure from their conduct prior to March 2022. *LabQ Clinical Diagnostics*, 2025 WL 3136824, at *14. And as to that issue, the Court has no personal knowledge.

This is also not a situation in which the judge's "spouse, or a person within the third degree of relationship to either of them . . . [i]s to the judge's knowledge likely to be a material witness in the proceeding." 28 U.S.C. § 455(b)(5)(iv). Defendants attempted to bootstrap a recusal claim under Section 455(b)(5)(iv) by identifying members of the Court's family who received COVID-19 testing from LabQ and then by arguing that those family members are material witnesses. The evidence consists of one test taken by my wife within the relevant period and five COVID-19 tests taken by my adult daughter within the relevant period. Dkt. No. 764. Defendants claim that the Court's family members registered for their tests through

---

[3] The Uninsured Program refers to the federal program administered by the Health Resources and Services Administration ("HRSA") that reimbursed providers who provided COVID-19 testing to people who did not have healthcare coverage on the relevant date of service. Dkt. No. 493 ¶¶ 2, 35–36.

5

Defendants' GoMeyra platform which, as neither party disputes, requires patients to provide insurance information.  Dkt. No. 736 at 27.  Defendants also claim that insurance information was not recorded for my wife's visit and on four of my daughter's visits.  Defendants submitted a claim to the Uninsured Program for my wife's single visit, but not for any of my daughter's visits (i.e., private insurance paid for all of my daughter's visits regardless whether insurance information was reported on GoMeyra or not).  Dkt. No. 709-1 ¶ 16.  There is no other evidence regarding the circumstances under which the information was recorded; at Defendants' request, the Court specifically has not inquired of its family members.  Transcript of Oct. 22, 2025 Oral Argument ("Tr.") at 14:23–15:4, Dkt. No. 549.

      As the Court explained, Defendants satisfied neither the "likelihood" nor the "materiality" elements of Section 455(b)(5)(iv).  It was and is not "likely" that Defendants would call as a witness any member of the Court's family to testify to their receipt of COVID-19 tests.  Indeed, Defendants did not list as a likely witness *any* person who received COVID-19 tests at a mobile testing site.  Dkt. No. 737-8.  Defendants themselves apparently do not believe that testimony from such patients is relevant.  Defendants still have not changed their Rule 25(a)(1) disclosures to list members of the Court's family, or any other patients, as persons whose testimony they intended to take.  And it is highly unlikely that (1) Defendants would call members of the Court's family as witnesses were the Court to transfer the case; or (2) that Defendants would call any family members of any other member of the judiciary.  In short, the identification of the Court's relatives as "likely" witnesses appears to have been done to avoid what Defendants feared would be a forthcoming decision that might be adverse on pending motions.

      My relatives also do not have "material" information.  Tens of thousands of persons in

6

Manhattan alone received COVID-19 tests from the LabQ Corporate Defendants and numerous of those patients were recorded as being uninsured when in fact they were insured. Am. Compl. ¶ 18, 102. Defendants acknowledge that there are possibly over a thousand similarly situated insured patients at mobile testing sites for whom insurance information was not recorded. Tr. 24:6–7; *see also* Dkt. No. 33 ¶ 21; Dkt. No. 37 ¶ 5 (Government estimating that 62% of the over 1.1 million claims paid by HRSA to Defendants were premised on false claims that individuals were uninsured). Defendants have not identified anything distinctive about my family members' experiences registering for a total of six COVID-19 tests during the relevant period.

Further, the relevant question for this case is not whether patients provided accurate information at mobile testing sites. It is undisputed that there were numerous instances in which patients with health insurance were recorded as being without such insurance. Dkt. No. 182 at 19–21 (Defendants acknowledging that patients were not always truthful in providing insurance information at mobile testing sites and describing subsequent efforts to verify information). The Government's claim is that Defendants did not check the patients' information and falsely attested that they "ha[d] checked for health care coverage eligibility and confirmed that the patient is uninsured." Dkt. No. 493 ¶ 1; Dkt. No. 40-1. The Government also claims that Defendants' efforts to check for eligibility were insufficient to satisfy the "best efforts" requirement. Dkt. No. 493 ¶¶ 84–85. In particular, the Government claims that Defendants failed to train technicians on the collection of insurance information, systematically failed to collect information that could be used to verify insurance, submitted claims to the Uninsured Program where they possessed patients' insurance information or where private insurance failed to pay a claim, and failed to reimburse the Uninsured Program where both the program and private insurance paid for the same COVID-19 test. *See LabQ Clinical Diagnostics*, 2025 WL

3136824, at *15.  The Government also alleges that in LabQ's other lines of business, apart from mobile testing sites, Defendants double billed for clients and informed institutional clients that they did not need to provide insurance information.  *Id.*  Thus, as Defendants apparently recognized in their Rule 26(a)(1) disclosures, whether on a particular occasion in 2021 or early 2022 a patient did or did not include insurance information is entirely immaterial to the systemic questions upon which liability will turn in this case.

Finally, Defendants argue that, even if the Court has no knowledge of a disputed evidentiary fact and even if its family members are not likely to be material witnesses, the Court nonetheless should have recused itself because its impartiality "might reasonably be questioned." 28 U.S.C. § 455(a).  The relevant question, however, is whether "'an objective, disinterested observer fully informed of the underlying facts, [would] entertain significant doubt that justice would be done absent recusal.'"  *United States v. Amico,* 486 F.3d 764, 775 (2d Cir. 2007) (quoting *United States v. Lovaglia*, 954 F.2d 811, 815 (2d Cir. 1992)).  It is not whether some observer informed of an abridged, partial version of the facts would doubt whether justice could be done.  Defendants' framing of the relevant question as whether an observer, "aware that the presiding judge personally engaged in the same intake process whose accuracy is at issue," could view the proceedings as impartial, Dkt. No. 791-1 at 24–25, thus is misleading.  It is so broad as to require anyone who ever took a test from LabQ to recuse herself or himself no matter how distant that contact was to the facts relevant to this case.

In this case, a fully informed reasonable observer would know: (i) that it is undisputed that the Court has no interest direct or indirect in the outcome of the case, Tr. 20:10–11; (ii) the Court did not have any interaction with Defendants during the relevant time period, its insurance information was recorded, and it has no knowledge of any disputed fact, Dkt. No. 709-1 ¶ 14;

(iii) that of the visits by the Court's family members, only six were during the relevant time period and only one resulted in a claim submitted to the Uninsured Program, *id.* ¶ 16; and (iv) that Defendants have never otherwise indicated that the testimony of any visitor to a mobile clinic would be relevant to this case, Dkt. No. 737-8.  As the Court previously stated, "[t]he central factual disputes in this case . . . pertain to . . . the knowledge of the most senior personnel at the LabQ Corporate Defendants." *LabQ Clinical Diagnostics*, 2025 WL 3136824, at *15.  No reasonable observer could conclude that the Court's after-the-fact contact with Defendants and Defendants' episodic (and infrequent) administration of COVID tests to its family members at one mobile site could make it unable to fairly judge this case.

Defendants have also failed to established irreparable harm.  *See Oakley v. MSG Networks, Inc.*, 2023 WL 4373261, at *2 (S.D.N.Y. June 26, 2023) (Sullivan, J) (finding no irreparable harm from judge continuing to preside over the case, despite petition for a writ of mandamus on grounds of bias, and noting that Second Circuit remand contemplated that proceedings would continue).  They argue that should the Second Circuit ultimately disagree with this Court and grant a writ of mandamus, there will have been "wasted resources, duplicative proceedings, and potentially void orders." Dkt. No. 792 at 2; *see also* Dkt. No. 807 at 3.  But those are the ordinary consequences when any pretrial order of a court is overturned.  They cannot alone establish irreparable harm.  The consequences identified by Moving Defendants are reparable without a stay.  "[O]rdinarily[,] an order denying a motion to recuse is not appealable as a final judgment under section 1291 and does not fall within the narrow collateral-order exception to the finality requirement." *Yonkers Bd. of Educ.*, 946 F.2d at 183 (internal quotations and citations omitted); *see also Scheidelman v. Henderson*, 401 F. App'x 609, 610 (2d Cir. 2010) (summary order).  "Disqualification questions are fully reviewable on

9

appeal from final judgment." *In re Corrugated Container Antitrust Litig.,* 614 F.2d 958, 960–61 (5th Cir. 1980); *see United States v. Hicks*, 2025 WL 1013556, at *1 (2d Cir. Apr. 2, 2025) (dismissing appeal as premature and stating that defendant can challenge the denial of his recusal motion "[o]n appeal from a final appealable ruling"). Thus, the general harms Defendants identify can be addressed on appeal. They cannot provide the irreparable harm necessary to justify a stay here. If it turns out that the Court has erred in its recusal analysis and if in the interim the Court has issued orders that should not have been issued, a new judge can always vacate them. Moving Defendants have not identified any facts that would distinguish this case from any other in which a party has made a motion for recusal and the district court has denied it.[4]

"[W]here 'the government is a party to the suit, the final two factors merge.'" *Mahdawi*, 136 F.4th at 449 (quoting *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020)). Those factors weigh most heavily against a stay. As the Government emphasizes, they would suffer irreparable harm from the issuance of a stay. Defendants are subject to writs of garnishment and attachment which the Court entered on August 2, 2024. Dkt. Nos. 60–95. The Court also granted additional writs of attachment on December 13, 2024. Dkt. Nos. 241–298. Those writs of attachment restrain eight bank accounts and eighty-nine properties and can only be subordinated to pay for reasonable business expenses of the LabQ Corporate Defendants,

---

[4] The cases cited by the Moving Defendants are inapposite. *In re Al-Nashiri*, 921 F.3d 224, 238 (D.C. Cir. 2019), *Strange v. Islamic Republic of Iran*, 46 F. Supp. 3d 78, 85 (D.D.C. 2014), and *In re School Asbestos Litig.*, 977 F.2d 764, 769 (3d Cir. 1992), do not discuss the irreparable harm requirement. In *In re International Business Machines Corp.*, 618 F.2d 923 (2d Cir. 1980), the Second Circuit recognized that "a claim of personal bias and prejudice strikes at the integrity of the judicial process," *id.* at 926–7, but denied the moving party's request for a stay pending its determination of the petition for a writ of mandamus and ultimately denied the petition, *id.* at 925–26.

reasonable personal expenses of Moshe Landau, and reasonable legal fees.  Dkt. No. 60 (the "August 2024 Order").  The Court sustained the writs of attachment against Defendants' motion to quash the writs by Opinion and Order of March 13, 2025.  Dkt. No. 357; *United States v. LabQ Clinical Diagnostics, LLC*, 771 F. Supp. 3d 401 (S.D.N.Y. 2025).  The Court found that that the Government had established the probable validity of its claims that Defendants violated the False Claims Act.  It also found that the Government established the "probable validity of the amount of defendants' debt of $36.6 million," which amounted to $109.8 million in treble damages.  771 F. Supp. 3d at 465.  Finally, the Court found that there was reasonable cause to believe that Defendants had taken, and were about to take, actions that would have the effect of hindering, delaying, or defrauding the United States in its effort to recover a debt.  Specifically, the Court found that though Defendants received $131.6 million from the Uninsured Program, Defendants had less than $10 million in their bank accounts when the Government filed its original application, and the remaining funds were "largely depleted" by November 2024.  *Id.* at 462.  The Court concluded that "[b]y transferring funds to LLCs and thereafter into real property, defendants have rendered the chain of ownership more obscure," impeding the Government from recovering should it prevail on its claims.  *Id.* at 464.

Defendants violated the August 2, 2024 Order.  On May 23, 2025, the Government filed its first motion for contempt.  Dkt. No. 534.  On July 7, 2025, the Court granted that motion and found the Moving Defendants in contempt.  Dkt. No. 574.  It found clear and convincing evidence that Defendants made transfers of $475,000 from accounts subject to the writs to separate legal entities not subject to the writs for no consideration, in violation of the Court's August 2024 Order.  Dkt. No. 574; Dkt. No. 589 at 36:6–11, 39:9.  The Court reserved decision on the question of sanctions.

On August 12, 2025, the Government filed a second motion for contempt alleging that Defendants further violated the Court's August 2024 Order, which required disclosure of "each and every real property in which each Defendant has an interest, irrespective of the name on the deed of the property." August 2024 Order ¶ 9. That motion presents evidence that Moving Defendants failed to disclose ownership of twenty-five properties purchased through LLCs, as well as property in Israel and the Malon Resort hotel in New Jersey. Dkt. No. 677 at 7–10. In their response to the Government's motion, Defendants did not dispute the Government's principal claim. They admitted to failing to disclose ownership of eighteen properties in violation of the August 2024 Order and further admitted to mortgaging nine of those properties without informing the Government. Dkt. No. 705 at 9–11. The second motion for contempt and the Government's motion to impose sanctions for the first order of contempt remain pending before the Court. Dkt. No. 673 at 1.

In addition, also pending before the Court is the Government's application for a prejudgment writ of attachment on the Malon Resort. The Government alleges that Landau is the true owner of the resort and that Defendants are attempting to alienate the resort for $15 million. Dkt. No. 753; Dkt. No. 756 at 7–8, 16–17. The Government notes that its application is urgent. There is a contract of sale for the Malon Resort,[5] Dkt. No. 756 at 16–17, and another creditor recently prevailed in a breach of contract action against LabQ, which creates a risk that a different creditor may be able to secure judgment against the resort before the Government can obtain a writ on the property, Dkt. No. 803 at 3 n.5.

A stay of this action would effectively halt these proceedings mid-course and allow

---

[5] The contract for sale provides for closing of the transaction thirty days after April 15, 2025. The Government's understanding is that the transaction has not yet closed. Dkt. No. 756 at 16–17.

12

Defendants to continue to flout their obligations under the August 2024 Order. Moving Defendants argue that because "active litigation did not prevent the conduct about which the Government now complaints," the Government "cannot plausibly argue" that continuing litigation is necessary to prevent similar conduct. Dkt. No. 807 at 4. But that is almost precisely the point. Active litigation did not permit the Court to address the Defendants' violations of the Court's orders because the Court stayed all action on the contempt motions and the requests for writs pending a decision on the motion for transfer of venue and recusal. *See LabQ Clinical Diagnostics*, 2025 WL 3136824, at *5 (noting that the Court "ceased making any substantive decisions prior to the resolution of Defendants' motion for recusal"). Moving Defendants have asserted that they cannot operate under the writs, that "[b]eing under constant financial attack makes it impossible to function or litigate fairly." Dkt. No. 800-2 ¶ 11; *see also* Dkt. No. 774 at 2 (Moving Defendants' assertion that as a result of the writs, "their financial condition has deteriorated, their operational capacity has been paralyzed, and their ability to meaningfully participate in this litigation has been all but extinguished"). Were the Court to further stay this action, Moving Defendants would no longer need to operate under the writs as a practical matter. They would have freedom to continue to violate the Court's orders with relative impunity. Indeed, Defendants are transparent in what they want—to avoid a ruling on the pending motions for contempt and contempt remedies. Dkt. No. 807 at 3.

      The August 2024 Order was intended to protect important Government interests. The Government established the probable validity of its claim and that Defendants probably owed the Government $36.6 million, amounting to $109.8 million in treble damages. 771 F. Supp. 3d at

13

465.[6]  The August 2024 Order was intended to prevent further dissipation of assets and restrain Defendants' properties to satisfy that likely obligation.  *Id.* at 464 ("The effect of [Defendants'] transfers will be to make the Government's recovery efforts more difficult if a restraint is not put in place.").  To be sure, a stay would not permanently relieve Defendants of the consequences of their violation of the Court order.  The Government would be able to monitor Defendants' compliance with the order while a stay is in place.  After the stay is lifted, the Government still would be able to bring a contempt motion for any violations that occurred while a stay was in place.  But a stay would permit Moving Defendants to do precisely what the Fair Debt Collection Procedures Act and the August 2024 Order were designed to prevent; it would allow them to continue to hide the assets necessary to satisfy what the Court concluded was a probable judgment pretrial, relegating the Government to the difficult task of tracing assets and bringing judgment enforcement actions post-trial.  Thus, delay—with the opportunity it would give Defendants to continue to dissipate assets—alone would irreparably harm the Government.

For the foregoing reasons, the motion to stay is DENIED.  The Court will grant an administrative stay of seven days (until December 3, 2025) and refrain from any judicial action to allow Defendants if they wish to seek review of this Order.

The Clerk of Court is respectfully directed to close Dkt. No. 792.

SO ORDERED.

Dated: November 26, 2025
       New York, New York

LEWIS J. LIMAN
United States District Judge

---

[6] A motion to vacate the August 2024 Order currently is *sub judice*.  The Court by no means prejudges the outcome of that motion or of the Government's corresponding motion for contempt sanctions.